# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | | |
|---|---|---|
| DR. ANN McALLISTER OLIVARIUS, | § | |
| | § | |
| **Plaintiff,** | § | CIVIL ACTION NO. _____ |
| | § | |
| vs. | § | |
| | § | |
| DR. DANIEL FRIEDMAN, | § | |
| DR. JOANNE S. INGWALL, | § | |
| WILLIAM J. DONELAN, | § | |
| DR. RICHARD L. PAGE, | § | |
| KAREN SAVRANSKY, | § | |
| DANA QUINN BOYD, FREISHTAT, | § | |
| BURKE, MULLEN & DUBNOW, LLC, | § | |
| DAVID FREISHTAT, STACIE | § | |
| DUBNOW, | | |
| | § | |
| **Defendants.** | § | |

## ORIGINAL COMPLAINT OF PLAINTIFF
## DR. ANN McALLISTER OLIVARIUS

Dr. Ann McAllister Olivarius, the Plaintiff in the above-captioned proceeding (the "Plaintiff" or "Dr. Olivarius"), hereby files this, her "Original Complaint," and alleges as follows:

## I. SUMMARY OF ACTION.

1.      This action seeks redress for a systematic fraud on one arbitration, two courts and a Plaintiff asking for civil justice in those proceedings.  That justice was denied because Defendants concealed numerous material and exculpatory documents from Plaintiff Olivarius in several proceedings, conducted over many years.

2.      Those documents had been requested repeatedly.  They had been requested informally and formally, by document request and subpoena.  The arbitrator in question had unequivocally ordered their production to the Plaintiff.  Yet these Defendants willfully concealed

**ORIGINAL COMPLAINT – Page 1**

those documents, misrepresented the documents, and misrepresented their efforts to produce them to an arbitrator and the Courts, even when ordered to do so.

3.      Justice was denied the; it should not be denied now.

4.      On June 21, 1996, Plaintiff Ann McAllister Olivarius was advised that she had been terminated from her position as President, Chief Executive Officer, General Counsel, and Executive Director of the Fellows Program of The Stanley J. Sarnoff Endowment for Cardiovascular Science, Inc. (the "Endowment" or the "Sarnoff Endowment"), a charitable foundation for the promotion of cardiovascular research.  That termination was precipitous, done without notice, hearing, or stated reasons, and was wrongful in every respect.

5.      This proceeding seeks to hold the individually named Defendants accountable for their persistent, unrelenting and nationwide scheme to corrupt the arbitral and judicial processes relating to Dr. Olivarius' challenge to her termination, and simultaneously defraud those institutions and Dr. Olivarius.[1]  Defendants conducted that unconscionable scheme in the years after Dr. Olivarius' termination, across numerous state lines, through the nation's mails and wires, and with the assistance of officers of the court.

6.      The substantial scope of that long-concealed and still-continuing assault on the integrity of arbitral and judicial processes, and of its prejudice to Dr. Olivarius' rights, business and property, are the subjects of this proceeding.

7.      The damages and injunctive relief Dr. Olivarius seeks in these proceedings will compensate her for the enormous damage done to her career and business.  Fortunately, and far

---

[1]      This action does not address Dr. Olivarius' wrongful termination.  That termination is being addressed in ongoing arbitration proceedings, conducted pursuant to an arbitration agreement between Dr. Olivarius and the Endowment (only).  None of the individual Defendants named herein were or could have been parties to those proceedings.

**ORIGINAL COMPLAINT – Page 2**

from incidentally, they will also vindicate the critical principle that no party should profit from its willful corruption of the integrity of arbitral and judicial processes.

8.      Unfortunately, no award in these proceedings can cure the damages Defendants have done to the Sarnoff Endowment in the period since they seized control of that enterprise. Dr. Olivarius was an inevitable casualty of the Defendants' self-interested campaign for control of the Endowment, but the Endowment has been its greatest casualty.[2]

## II.  PARTIES.

### A.      PLAINTIFF DR. ANN McALLISTER OLIVARIUS

9.      The Plaintiff, Dr. Ann McAllister Olivarius, resides in London, England.  She was the Sarnoff Endowment's President, Chief Executive Officer, General Counsel and Executive Director for the Fellows Programs from 1992 through June 20, 1996.  Since 1996, to the extent possible, she has practiced law through her own law firm, McAllister Olivarius, which has offices in London, England and has had offices in various locations throughout the United States.

10.      Before joining the Endowment, Dr. Olivarius had been an associate and the head of the corporate practice group in the Washington, D.C. office of Shearman & Sterling, a large New York-based law firm.  During her time at Shearman & Sterling, she also came to act as General Counsel to the Endowment.  Dr. Olivarius holds bachelors, law and MBA degrees from Yale University, and a doctorate in Economics and Management from Oxford University in Oxford, England.  She is a former Rhodes Scholar.

11.      Plaintiff Dr. Olivarius asserts claims against each of the Defendants listed below. She has never filed any litigation, or demanded or prosecuted any arbitration against any of those

---

[2]      Due to her termination, Dr. Olivarius no longer has the authority or standing to vindicate the Endowment's rights.  The Endowment will have to do this itself, after the Defendants' adverse domination of the Endowment has come to an end.

Defendants.  She is not now and never has been a party to any agreement to arbitrate any disputes that she has with those Defendants.

**B.     DEFENDANTS.**

12.     Defendant Dr. Daniel Friedman ("Friedman") is a resident of New Mexico. During all relevant times, he was a member of the Sarnoff Endowment's Board of Directors.  For most of that period, Friedman served as Chairman of the Board.  Pursuant to Federal Rules of Civil Procedure 4, Friedman may be served at his business address at Presbyterian Heart Group, 201 Cedar St. SE, Ste. 7600, Albuquerque, NM 87106.

13.     Defendant Dr. Joanne S. Ingwall ("Ingwall") is a resident of Massachusetts. From the 1980's through November of 1997, she was a member of the Sarnoff Endowment's Board of Directors.  Pursuant to Federal Rules of Civil Procedure 4, Ingwall may be served at her home address of 115 Dartmouth St., West Newton, MA 02465-2835, or at her business address at Brigham & Women's Hospital, 221 Longwood Ave., Rm. 247, Boston, MA 02115.

14.     Defendant William J. Donelan ("Donelan") is a resident of North Carolina and an officer of Duke University.  From the early 1990's through the end of 1997, he was also a member of the Sarnoff Endowment's Board of Directors.  Pursuant to Federal Rules of Civil Procedure 4, Donelan may be served at his home address of 4215 Amesbury Lane, Durham, NC 27707-5711, or at his business address at Duke University Medical Center, Box 3701, Durham, NC 27710.

15.     Defendant Dr. Richard L. Page ("Page") is a resident of Washington state. During relevant times, Page was a member of the Sarnoff Endowment's Board of Directors. Pursuant to Federal Rules of Civil Procedure 4, Page may be served at his business address at the

University of Washington Medical Center, 1959 NE Pacific St., Campus Box 356422, Seattle, WA 98195.

16.     Defendant Karen Savransky ("Savransky") is a resident of Virginia.  Prior to Dr. Olivarius' termination, she was a part-time lawyer for the Endowment.  Since Dr. Olivarius' termination, she has become Director of Legal Affairs of the Endowment, as well as its Office Manager.  Pursuant to Federal Rules of Civil Procedure 4, Savransky may be served at her home address of 11424 Heritage Oak Ct., Reston, VA 20194-1977 or at her business address at The Stanley J. Sarnoff Endowment for Cardiovascular Science, 731 G-2 Walker Rd., Great Falls, VA 22066.

17.     Defendant Dana Quinn Boyd ("Boyd") is a resident of Virginia.  Prior to Dr. Olivarius' termination, she was an administrative assistant.  Since Dr. Olivarius' termination, she has become the Executive Director of the Endowment, with responsibility for the general management and financial operations of the Endowment.  Pursuant to Federal Rules of Civil Procedure 4, Boyd may be served at her home address of 9812 Thunderhill Ct, Great Falls, VA 22066-2613, or at her business address at The Stanley J. Sarnoff Endowment for Cardiovascular Science, 731 G-2 Walker Rd., Great Falls, VA 22066.

18.     Defendant Freishtat, Burke, Mullen & Dubnow, LLC ("FBMD"), is a Baltimore, Maryland law firm that conducts business in Maryland, the District of Columbia, and surrounding states.  During the relevant periods, FBMD and its attorneys David Freishtat and Stacie Dubnow, acted as Maryland Litigation counsel to the Endowment (on matters that will be more fully described below), and otherwise became involved in Endowment affairs.  Pursuant to Federal Rules of Civil Procedure 4, FBMD may be served at their address at Freishtat, Burke,

Mullen, & Dubnow, LLC, One Calvert Plaza, 201 E. Baltimore St., Ste. 1500, Baltimore, MD 21202.

19.     Defendant David Freishtat ("Freishtat") is a resident of Maryland and a name partner in FBMD.  Pursuant to Federal Rules of Civil Procedure 4, Freishtat may be served at his business address at Freishtat, Burke, Mullen, & Dubnow, LLC, One Calvert Plaza, 201 E. Baltimore St., Ste. 1500, Baltimore, MD 21202.

20.     Defendant Stacie Dubnow ("Dubnow") is a resident of Maryland and a name partner in FBMD.  She is also the daughter of Defendant David Freishtat.  Pursuant to Federal Rules of Civil Procedure 4, Dubnow may be served at her business address at Freishtat, Burke, Mullen, & Dubnow, LLC, One Calvert Plaza, 201 E. Baltimore St., Ste. 1500, Baltimore, MD 21202.

## C.     THE SARNOFF ENDOWMENT.

21.     The Stanley J. Sarnoff Endowment for Cardiovascular Science, Inc. (the "Endowment") operates as a 501(c)(3) public charity under the Internal Revenue Code.  As such, it seeks to pursue a variety of philanthropic activities, including implementing research fellowships in cardiovascular science, selecting and funding of medical students and physicians-in-training, and overseeing their progress in their research. The Endowment also engages actively in promoting research, publications, lectures and other forms of education and professional networking, and in encouraging the development of new techniques and equipment to advance cardiovascular research.  Its work is nationally and internationally recognized.

22.     As provided in its corporate charter, the Endowment "is organized, should be operated for the exclusive benefit of, and shall be controlled by," publicly supported organizations [PSOs] that are "actively engaged in developing, encouraging and maintaining a

**ORIGINAL COMPLAINT – Page 6**

cardiovascular science program."  Some of the Endowment's controlling PSOs included, during the time period relevant here, The Johns Hopkins University, The University of Texas Southwestern Medical Center, Columbia University, and Duke University Medical Center.

23.      Many other of the nation's leading medical institutions participate as sponsors of the applicants for the Endowment's Fellowships and Scholar awards, and act as host institutions, where the Endowment's Fellows and Scholars spend their research years.  All medical schools located within the United States are eligible to sponsor applicants and to host Fellows and Scholars for their research experience.  Additionally, many of these U.S. medical schools participate in the nominations of candidates to serve on the Endowment's Scientific Board. Certain foreign medical students and physicians-in-training have also participated in the Sarnoff Endowment programs.

24.      The PSO-nominated Board Members throughout the relevant period reflect the national reach of the Endowment and its PSO affiliates.  Since 1996, the Board's members have included residents of Massachusetts, North Carolina, Texas, New Mexico, Missouri and Washington State.  Throughout that same period, the Board's members generally conducted all Board meetings by national teleconferences, save for certain meetings held in conjunction with the American Heart Association's annual meetings and at miscellaneous other mutually convenient sites.  Those meetings were held in numerous cities around the country and, save for the Board's annual meetings, not in the Washington, D.C. area.

### III.  <u>JURISDICTION AND VENUE</u>.

25.      This Court has jurisdiction over this action pursuant to 18 U.S.C. § 1964 and 28 U.S.C. § 1331 in that this action is premised on violations of 28 U.S.C. § 1962, and arises under the laws of the United States.

26.     All of the Defendants are subject to personal jurisdiction in this action and in this District.

27.     Venue is proper in this District, pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391, because each of the Defendants resides in, is found in, has an agent in, or transacts business in this District, and because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this District.

## IV.  FACTUAL BACKGROUND.

### A.     A VERY PUBLIC DISMISSAL

28.     On June 21, 1996, Dr. Ann Olivarius, President, CEO, General Counsel and Executive Director of The Fellows Program of The Stanley J. Sarnoff Endowment for Cardiovascular Science, Inc. (the "Endowment"), appeared in a New York court on Endowment business.   A row of some eight lawyers from the prestigious Wall Street firm of Wachtell, Lipton, Rosen & Katz ("the Wachtell firm") faced her confidently across the courtroom.   They knew something she did not, which perhaps explains why they were smiling.   They knew that Dr. Olivarius, the principal adverse witness in a long running lawsuit involving almost $100M had been terminated "for cause."

29.     Shortly after the hearing, Dr. Olivarius was informed of her termination via telephone message.   It appeared that she was among the last to learn of it.   The press had already been informed.   A notice had been put on the door of her office in Great Falls, Virginia.   Her company credit card had been cancelled, forcing her to borrow money to get home.

30.     In the days to come, Dr. Olivarius would be denied permission to re-enter her office.   She would discover that all her papers had been confiscated, as well as the only copy of her Rolodex, that access to her computer had been blocked, and that her computer (and the

**ORIGINAL COMPLAINT – Page 8**

information stored therein) had been removed from her office in Virginia to Defendant Freishtat's offices in Maryland.  During that same period, her neighbors and colleagues would be told that she was a thief[3] and an unstable alcoholic.  Some would be informed that her husband, at that time Deputy White House Correspondent of TIME Magazine in Washington, was a criminal too.[4]

31.     Having been dismissed "for cause," Dr. Olivarius did not receive the liquidated damages and other severance benefits provided under her employment contract, and her reputation was seriously damaged.  She was given no notice of her termination and was subsequently - and repeatedly - denied the chance to respond to the allegations against her, or even to know what they were.  In fact, she was denied due process of any sort.  She was left to defend herself in an information vacuum, while those who had engineered her termination were able to access the Endowment's files at will.

32.     It would be some time before Dr. Olivarius' personal effects were returned to her. When they were, they were accompanied by a near-empty bottle of Scotch, which had been kept at the Endowment's offices for the purposes of offering refreshment to visiting Sarnoff Fellows and members of the Scientific and Main Boards.  The bottle was nearly three years old, but the message it conveyed was clear: Dr. Olivarius' termination was designed to be as degrading and humiliating as possible.

---

[3]     Letter from Olivarius to Flanigan family, 1/15/97, rebutting allegations of theft and misconduct advanced by Dubnow to Becky Flanigan, an Endowment intern and neighbour, and her father, a lawyer who became Deputy White House Counsel.  Becky had admired Olivarius, writing her after one internship, "It is always a pleasure for me to come back to such a well organized and expertly managed establishment."  Letter from Becky Flanigan, Jan. 12, 1995, McA-O 207.  After Dubnow spoke to Becky, her father forbad her to speak to Olivarius—evidence of the damage to Olivarius' professional reputation caused by the conspirators.

[4]     Freishtat to Bainton, June 26, 1996, H/I 1061, McA-O 103.

**B.     THE STANLEY J. SARNOFF ENDOWMENT FOR CARDIOVASCULAR SCIENCE, INC.**

33.     Dr. Stanley Sarnoff ("Sarnoff") was a distinguished cardiologist, academic and inventor.  He was the founder of Survival Technology, Inc. ("STI"), a small manufacturer of medical devices, who at his death in 1990 bequeathed most of his estate, approximately $29.5 million in STI stock, to fund an Endowment supporting research into heart disease.

34.     By the time of Dr. Olivarius' appointment as President, CEO and General Counsel (the events leading up to which we will discuss below), only a few of the Sarnoff-appointed Board Members remained.  Those initial Board Members were a special breed, whose dedication to the Endowment and its purposes was unquestionable.  These Board Members, who would be instrumental in the hiring of Dr. Olivarius, personified Sarnoff's vision of an Endowment dedicated to the highest standards of cardiovascular research.

35.     This group included Dr. Joanne Ingwall ("Ingwall"), of Harvard Medical School, who was then the Endowment's Chairman; Dr. Arnold Katz ("Katz"), the renowned and brilliant Cardiology Division chief at the University of Connecticut Medical School; and Dr. Myron Weisfeldt ("Weisfeldt"), a cardiology star and past President of the American Heart Association who was then at Johns Hopkins and who was extremely effective and highly regarded for his penetrating mind and courageous leadership in heart science.

36.     These distinguished cardiologists had a vision of the Sarnoff Endowment as a "national treasure," attracting fellows of the highest quality and funding cutting-edge research into cardiovascular disease – which affects more than 61 million Americans and causes 950,000 deaths a year in the United States alone.

1.   **A National Treasure Under Attack.**

37.     Before he died, Sarnoff named as his executor his friend and lawyer Robert Herzstein ("Herzstein"), a partner in the New York firm of Shearman & Sterling ("S&S"), who was then a member of the Sarnoff Endowment's Board of Directors.

38.     S&S is a major law firm, founded more than 130 years ago, with more than 1,000 lawyers operating in many world financial capitals and a record of representing financial institutions, governments and corporations.  It has been ranked among the top five such firms in the world in recent years.  Its reputation and good name are of the utmost importance to its clients.

39.     The handling of the Sarnoff estate should have been straightforward, given that most of the bequest was designated for the Endowment and could have been turned over relatively quickly.  Indeed, under the terms of Sarnoff's will, Herzstein was obliged to transmit STI shares from the estate to the Endowment in a timely manner.

40.     Instead, Herzstein used his position as executor of the estate to install himself as Chairman of the Board of STI (for which he was also the lawyer), and Chairman of the Endowment (which he also served as a lawyer).  This gave him multiple-tier possessory rights in his friend's legacy—as well as several very material conflicts of interest in violation of legal ethics and disciplinary rules.

41.     Herzstein would not wait long to use his wide-ranging powers.  Within a year, STI's stock rose from $8 per share at the time of Dr. Sarnoff's death to $24 per share.  This surge in value was a result of increased orders for the company's auto-injector, a vital and much-distributed product during the first Gulf War.  The Endowment's Board voted to direct Herzstein

to sell the shares so that the Endowment could cash in on its windfall and diversify its holdings beyond a single company.

42.     There is some evidence that Herzstein had dynastic ambitions for the Endowment. He intended to convert the Endowment into a private institution and appoint his daughter to run it. Selling the shares would have reduced his sway over the company and the Endowment and cut off the stream of Sarnoff-related legal fees.

43.     Accordingly, Herzstein refused to sell the stocks, as instructed, and continued to charge the Endowment maximum fees for handling the estate. The shares subsequently sank in value to $6, so that Herzstein's refusal to follow the terms of the will or to obey the directive of the Endowment's Board cost the institution an estimated $36 million.

44.     By 1993, Herzstein had withheld Sarnoff's legacy from the Endowment for over two years. Consequently, the Endowment had no alternative but to sue Herzstein and S&S in a Maryland court (the "Maryland Litigation"), where the Endowment was incorporated, to recover its losses and to reduce to possession of the corpus of the estate.

45.     By reason of the Maryland Litigation, S&S stood to lose some $100 million in penalties and repayment costs as well as some portion of its sizeable worldwide stature. With such a threat hanging over it, it hired one of the US's toughest and best known law firms to represent it: the Wachtell firm, whose partner Bernard Nussbaum—soon to become White House counsel in the Clinton administration—took charge of the case. He was assisted by his colleague, Marty Lipton, perhaps the most famous corporate lawyer in America.

46.     Lipton, who handled the negotiations, privately admitted that his client had made very serious mistakes—but that did not stop Wachtell from embarking on an aggressive campaign of litigation.

**ORIGINAL COMPLAINT – Page 12**

## 2. **Key Players on the Board of the Sarnoff Endowment.**[5]

### a. The Chairman of the Board.

47.    Herzstein understood that he would probably not be able to maintain direct control of the Endowment indefinitely.   He therefore created the position of "Permanent Successor" (an office unknown to Maryland corporate law, inserted by Herzstein into the Endowment's by-laws) which would ensure his longevity and the tenure of his hand-picked candidate.

48.    Dr. Daniel Friedman ("Friedman") became the Chairman of the Endowment's Board early in the litigation.   A former Sarnoff Scholar, he was nevertheless considerably younger than the rest of the Board of Directors and the Scientific Board and, unlike most of them, was not a top-ranking academic cardiologist.

49.    Herzstein picked Friedman specifically because he knew him to be pliable, and subsequent events confirmed the wisdom of his choice.   His intentions did not escape notice, however.

50.    When Herzstein first put Friedman forward, Board Member Katz wrote Dr. Olivarius, recording his anxiety at the appointment.   "By replacing Rick [Page] with Dan [Friedman],' Katz wrote, 'he [Katz] could be viewed as replacing one junior person who might not understand the full import of the Board's actions with another even more inexperienced person in an effort to weaken the Board.  In fact, I think this is exactly what he had in mind."[6] Herzstein had used the same criteria to appoint Richard L. Page ("Page") to the post earlier.

---

[5]       Exhibit "A" is a collection of demonstrative aids that should assist the Court in understanding the claims at issue here.   Exhibit "A-1" is an organizational chart of the key players involved as of June 15, 1996. Exhibit "A-2" is an organizational chart of the Endowment after the scheme, detailed below, came to fruition.

[6]       03/02/93, McA-O 226.

**ORIGINAL COMPLAINT – Page 13**

51.     Ellen Rice, the Endowment's administrative assistant who departed for Harvard Law School in 1993, recalled "Dan Friedman almost crying to me when he was designated permanent successor that he wished he could just play with his 'Barney' doll.  He didn't want to have to deal with these adult, complex issues."[7]

52.     Friedman appreciated the status and perks of being Chairman, however, and over time his enjoyment of these benefits would come to take precedence over his distaste for "adult, complex issues."  He enjoyed staying in suites at medical meetings paid for by the Endowment.  He also liked the top-line computer he asked the Endowment to purchase for him, though he did virtually no Endowment work on it.

53.     In vital respects, though, Friedman was a poor chairman – just as Herzstein had intended he should be.  He was easily flattered and unwilling to give the job the attention it really required.[8]

54.     Friedman also lacked a sense of loyalty to the institution he had been appointed to serve.  As Herzstein had envisioned, Friedman communicated frequently with him and his deputies during the litigation and divulged Endowment negotiating positions to them.  Other Board Members and the Endowment's lawyers repeatedly reprimanded Friedman for this conduct, but were unsuccessful in ending or limiting it.

        **b.      The Treasurer of the Endowment.**

55.     William Donelan, the chief financial officer of Duke University Medical School, was the Endowment's Treasurer.  He served on the Endowment's Board as part of his

---

[7]     08/30/93, McA-O 232.  One suggestion he made to Olivarius when discussing how Freishtat should be paid in 1995 was for the Endowment to sign an agreement for a contingency fee, then simply refuse to pay it once the case was over.

[8]     03/13/96, McA-O 249.  Friedman Arbitration testimony, Day 3 (April 22, 1998), p. 178: "Unfortunately, part of the job I have are hundreds of pages of faxes a week from people."

**ORIGINAL COMPLAINT – Page 14**

employment contract and disliked the burdens of serving what he described as a "piddly" Endowment immersed in a complex litigation.

56.     Nevertheless, Donelan had good reasons for remaining in place.  His presence on the Board allowed him to ensure that a good deal of the Endowment's charitable resources would continue to flow towards Duke.

57.     He also had grander plans.

58.     In the difficult years of the Maryland Litigation, there were many discussions of dividing up the Endowment's corpus between other institutions.  In 1992, when Donelan was first appointed to the Board, he formed an alliance with fellow Board Member Bill Neaves ("Neaves"), of the University of Texas Southwestern.  It was Donelan and Neaves' plan to take control of the Endowment and split its assets between their two universities in 1992.  In pursuit of that goal, Donelan briefly succeeded in becoming Chairman of the Board during 1995.  He was not popular and was removed quickly.

59.     The coup attempt failed, however, and when it did Neaves instantly resigned from the Board.  Donelan remained to oversee the many tens of thousands of dollars per year that went to Duke students from the Endowment, though his sometime relationship with other Board Members remained frosty.

**Earlier Treasurer Richard L. Page.**

60.     Richard Page rejoined the Board in September 1996.  He was then Friedman's best friend and had originally been placed on the Board by Herzstein in 1992 because he was young and Herzstein thought that he, along with Friedman, could be manipulated.

61.     Page was too young and professionally unaccomplished to be otherwise considered for service on a prestigious board.  As Weisfeldt wrote, "Several of us on the Board

**ORIGINAL COMPLAINT – Page 15**

are very concerned about Rick Page being put into a very difficult situation for a young faculty member.  I personally think that the whole thing for Rick is a disaster…  He does not belong on the front lines."[9]

62.     Being a Director was valuable to Page, providing professional stature, contacts and the potential of access to Endowment funds for his employer. He owed his original membership to his weakness and pliability in Herzstein's eyes; he owed his return in 1996 to his friendship with Friedman.   Membership was important for his professional prospects and remains so.

**3.     A Corporate Defector.**

63.     Dr. Ann Olivarius, since 1992 the Endowment's President, CEO, General Counsel and Executive Director of the Fellows Program, had also worked for Shearman & Sterling.  She had run S&S's corporate law department in its Washington office and become the Endowment's General Counsel there.

64.     In August of 1992, Herzstein directed Dr. Olivarius to prepare false documents to help him justify his unwarranted hold on the Endowment's money.  She refused.  She was promised a partnership, then worth $650,000 per year, to buy her silence and continued co-operation.  She refused again, though this time she went even further.

65.     Taking a 60% salary cut from what she could have made at S&S, Dr. Olivarius left S&S and went to work at the Endowment itself, convinced that without dedicated protection and reform it would fall prey to the corporate wolves.  It was not an easy decision, but it was an important one.[10]  In the talks that led to Dr. Olivarius' employment, Ingwall charged her not only

---

[9]     Mike Weisfeldt to Joseph Greenfield, Chairman of Duke University Department of Medicine, 4 Feb. 1992.

[10]    The Board knew Dr. Olivarius had left an excellent career at Shearman & Sterling to join.  Ingwall's draft of the Answer to the First Amended Complaint, June, 3, 1996, has the following excerpt.  "Moreover, at

**ORIGINAL COMPLAINT – Page 16**

with managing the litigation against S&S, but with transforming the Endowment from an informal "boys' club" of Herzstein's placements into the "national treasure" which Weisfeldt, Katz and Ingwall envisaged.

### a.    The Modernization of the Endowment.

66.    Bringing about reform at the Sarnoff Endowment was difficult because the Endowment did not control its own funds. Herzstein retained them, under court supervision, while the Maryland Litigation continued.

67.    Nevertheless, with the support of the most scientifically gifted and ambitious directors, Dr. Olivarius brought vision, energy and high standards to the task of upgrading the Endowment.

68.    The Endowment's principal program of funding medical students and junior doctors in periods of research was expanded at her instigation.    Scientific programs were improved and new "star" members were recruited for the Scientific Board, including Dr. Art Feldman of The University of Pittsburgh, Dr. Ira Tabas of Columbia, Dr. Ivor Benjamin of University of Texas-Southwestern (now at the University of Utah), and Dr. Kricket Seidman of Harvard.

69.    Annual elections were introduced for the Scientific and Main Boards, and Dr. Olivarius upgraded the Annual General Meeting so participants could receive Continuing Medical Education credits.

70.    A new Fellows' and Scholars' *Handbook* was devised.

---

that time, Dr. Olivarius did not intend to leave her work [at S&S].  Dr, Olivarius loved her work at S&S and was not sure that running the Endowment was the right 'career move' for her."  Ingwall has written in the margin, "Correct."

71.      An annual report about the Endowment's good works was written for the first time and widely distributed, using Dr. Olivarius' extensive Rolodex, to anyone who might be a potential donor or affiliate.[11]

72.      Internally, the Board started receiving detailed budget, litigation, and other reports.  A state of the art fiscal policy, conflict of interest policy and employee manual were developed.  Procedures for accounts payable and expense account double authorizations were established and applied to all Endowment expenses, and a pension plan devised.  Rice served as coordinator of the Fellows program, followed by Amy Peiken (now Amy Peiken Palmer).

73.      These efforts to modernize and improve the Endowment were at Dr. Olivarius' instigation, with the strong support of Weisfeldt, Katz and Ingwall.

74.      Dr. Olivarius also built an excellent and smooth-working team of outside contractors, including bookkeeper Michael Saylor, accountants Joseph Romagnoli and Charles Cocke, pension advisor Dorothy Hodgkin from the leading firm Tucker Anthony, and asset manager Robert Morse, founder of the Wall Street Fund, who significantly outperformed the market.

75.      Rosa Green, from Yale and Morgan Stanley, helped advise on the valuation of STI.  Dr. Elizabeth Ballantine, a Washington attorney and member of the board of Cowles

---

[11]      Although after firing her the Conspirators painted Olivarius' tenure at the Endowment as bleak, others recognized her accomplishments achieved in difficult circumstances.  Ira Tabas, Professor of Medicine at Columbia, wrote in a reference for Olivarius in 1998: "Ann and I worked together at several meetings of the Board each year, and we communicated frequently by telephone and fax in between the meetings.  In each of these settings, I found Ann to have excellent judgment, and her opinions on a wide variety of issues related to the Endowment were intelligently conceived and eloquently communicated.  I was particularly impressed by Ann's thoughts on improving the scientific excellence of the Endowment.  Ann was a tireless worker, and she held the highest standards of excellence for both the organization and the content of the meetings.  Based upon my experiences with Ann during this period, I feel she would be a valuable asset in positions of leadership in both higher education and in business." Letter from Ira Tabas, M.D., Ph.D, February 20, 1998.

**ORIGINAL COMPLAINT – Page 18**

Communications, McClatchy Newspapers and Grinnell College, advised on ways of strengthening the Board, the Endowment and its stance in the Maryland Litigation.

76.     Dr. Jean Kummerow, a nationally recognized consultant in organizational behavior, taught leadership skills to Scholars, Fellows and Board Members.

77.     Because of the Endowment's charitable purpose and then-problematic finances, Dr. Olivarius was able to convince all of these otherwise high-priced specialist advisors to bill at concessionary rates or not at all: a first-rate team at bargain basement prices.

78.     It was self-evident that Wachtell and S&S would look for any chink in the Endowment's armor.  Dr. Olivarius and the team she assembled were careful to put high-quality financial management systems in place and to do everything by the book.

**b.      Dr. Olivarius' Focus on Protecting the Endowment.**

79.     Having left a lucrative and prestigious position at S&S in order to protect the Endowment and lead its quest to regain control of its assets, Dr. Olivarius built up an effective staff of in-house paralegals to digest many thousands of documents relevant to the case.  More than $100m was potentially at stake, and the Endowment was pitted against one of the world's richest law firms.

80.     Over time, Dr. Olivarius assembled an impressive collection of outside counsel to represent the Endowment in the Maryland Litigation.  Marsha Cohan, a graduate of Harvard Law School and veteran of Skadden Arps, devised the extensive litigation data retrieval system and advised on a variety of corporate matters relating to the possible sale of STI.

81.     Robert Shulman of the insurance specialist firm Howrey & Simon helped protect the Endowment's assets, directors and officers.

82.     Another key addition was Brendan Sullivan, senior partner of Williams & Connolly and a nationally recognized legal heavyweight, whom Dr. Olivarius put in place to provide the kind of heft needed to take on S&S and Wachtell.  He acted as settlement counsel.[12]

83.     Sullivan's talented corporate partner Michael Sundermeyer provided advice on the sale of STI to several prospective purchasers, and on legal ethics.

> **c.     Dr. Olivarius is Pivotal to the Endowment's Case in the Maryland Litigation.**

84.     Dr. Olivarius was an extremely dangerous adversary to Herzstein.  As his former colleague, with day-to-day responsibility for the Endowment's affairs at S&S, she knew precisely how Herzstein had tried to promote his own interests at the Endowment's expense.

85.     Dr. Olivarius knew where and how S&S had acted wrongly.  She understood the truth that lay behind a vast number of documents in the case, and she had intimate knowledge of S&S's politics and personalities.  She was the essential witness to S&S's bad acts and the fulcrum of the Endowment's case.

86.     The campaign by the new crop of energetic cardiologists on the Board to raise standards and professionalize the Endowment was not universally popular, for reasons that will become clear.

87.     The Maryland Litigation was divisive too.  The strain of being constantly attacked by Wachtell, including its repeated threats that Board Members would be sued personally for millions, made Board Members restless and worried.

88.     Herzstein retained his contacts on the Board, Science Board and elsewhere in the Endowment community.   He maintained ongoing communications with Board Chairman

---

[12]     Because an associate at Williams & Connolly had once worked on an Endowment matter while at Shearman & Sterling under Olivarius' direction, Williams & Connolly had a conflict and could not act as litigation counsel.

**ORIGINAL COMPLAINT – Page 20**

Friedman, and regularly used him to foment discontent with the new regime of Weisfeldt, Katz, Ingwall and Dr. Olivarius.   Herzstein's control of the Endowment's purse-strings further complicated matters.

89.     S&S asserted in settlement talks that it would hand over the Endowment's assets in return for a full release, which had to include a release for its own misconduct. [13] The litigation continued, however, when the Board decided that a public charity should not be expected to lose millions of dollars because of deliberate acts of self-enrichment by a powerful law firm.

90.     In 1992, S&S had offered $42.4 million — the value of the STI shares and liquid assets at that stage. The Board had rejected this offer.  It was clear by 1996, with Dr. Olivarius in place, that the Endowment was poised to make a convincing case for the return of its original corpus and for substantial compensatory damages.

91.     If the Endowment made that case, S&S stood to lose $100m.

### d.     An Ingenious Plan.

92.     Wachtell's strategy in defending S&S was as simple as it was audacious.   The firm knew that the Endowment's greatest asset was Dr. Olivarius herself.   She was its stoutest defender and the star witness in its case.   Moreover, she had inside knowledge of the machinations at S&S that had led to the withholding of Sarnoff's legacy.

93.     The prospect of facing Dr. Olivarius in open court was unthinkable.   She needed to be removed from the process, and that required some kind of alliance with influential figures at the Endowment itself.

---

[13]     06/04/97, McA-O 183.

**ORIGINAL COMPLAINT – Page 21**

94.     Fortunately for Wachtell, the seeds of that alliance had already been planted on the Endowment's Board.  A delicate game of behind-the-scenes diplomacy began, one which relied both on Herzstein's close personal relationships with Endowment Board Members and on Wachtell's ability to intimidate those who took their fiduciary duties to the charity too seriously.

### e.     The Hiring of David Freishtat.

95.     In 1995, Dr. Olivarius hired David Freishtat ("Freishtat") to act as Maryland counsel to argue the Endowment's case in the Maryland Circuit Court.

96.     Brendan Sullivan recommended Freishtat for that position.  Though he thought Freishtat was an impressive courtroom performer, he also told Dr. Olivarius that his written work would not be up to Wachtell's or her standards, and that she would need to supervise it and his strategic thinking closely.[14]  It was Dr. Olivarius' job to manage the case and get it to trial, Freishtat's to argue it under her guidance.

97.     While settlement talks continued via Sullivan during 1995, Freishtat and his daughter (and legal associate) Stacie Dubnow ("Dubnow") spent the year preparing an exhaustive opinion letter analyzing the strengths and weaknesses of the Endowment's case.[15]

98.     Freishtat, as will become clear, possessed an unerring instinct for pursuing his own interests.  It was obvious to him at once that substantial fees might be garnered from his handling of the Maryland Litigation.  It was also evident that sharing the work with another

---

[14]     Olivarius wrote:   "The quality of his work is not at a level that I would expect from him, even though Brendan Sullivan warned us that Freishtat's paper work would be inadequate." 06/06/96, McA-O 488, H/I 1121.   She testified at the Arbitration: 04/05/98, McA-O 954, "I was absolutely clear from what I could see so far and the references that Freishtat was the one to argue that case in Baltimore. But I was also very clear from all the references and from what I had seen of his work that the work was sloppy and that he would need backup."

[15]     02/01/96, McA-O  289.

**ORIGINAL COMPLAINT – Page 22**

lawyer would force him to share his financial reward, too.  He therefore preferred to keep the Endowment work, as it were, "in the family."

99.     It was a position which put him on an inevitable collision course with Dr. Olivarius, for whom the Endowment – and the recovery and protection of its assets – was the priority.

### f.     The Temperature Rises.

100.    As part of its strategy to exhaust the Endowment and intimidate any Board Members who refused to accept the illegal defrauding of the institution by a powerful law firm, in 1996 S&S sued Dr. Olivarius and Endowment Director Ingwall, then a Professor at Harvard Medical School, personally in the New York state courts (the "New York Litigation").

101.    These suits sought $3 million in damages from each of them personally, and, by filing them, Herzstein let it be known that other Board Members might face similar treatment if they pursued the Maryland Litigation with too much fervor.

102.    Freishtat immediately recognized the New York Litigation for what it was: a "blatant and unprincipaled [sic] attempt to intimidate Joanne [Ingwall] and Ann [Dr. Olivarius][16]".  For the time being, however, he chose to underplay its significance.

103.    Ingwall at once understood the danger she was in.  As she wrote Freishtat, "The NY suit is not a small annoyance as you say but would successfully divide us all.  The suit was brought against both Ann and me because of the other suits."

104.    It was clear that Dr. Olivarius and Ingwall needed counsel to defend themselves. After interviewing several firms, they hired J. Joseph Bainton ("Bainton"), then of Ross &

---

[16]     Letter from Freishtat to Endowment Board of Directors and Scientific Board, June 5, 1996, McA-O 80. This letter also says the accusations are "scurrilous, false and outrageous" and that "Joanne and Ann are entitled to a defense under the Endowment's By-Laws."

**ORIGINAL COMPLAINT – Page 23**

Hardies, to represent both them and the Endowment.[17]   Bainton had represented another client who had sued S&S and won.   Dr. Olivarius and Ingwall also hired Dan Cohn ("Cohn"), a "lawyer's lawyer" at Cohn & Kelakos in Boston with whom Bainton had previously collaborated.  He would work with Ingwall directly in Massachusetts, where she lived, as well as on the main case.

105.   Bainton had an inventive mind and excellent presence.  He was willing to take the case even though he had plenty of other clients, and Herzstein's continuing hold on the Endowment's finances meant that there was no guarantee that he would get paid anytime soon — if at all.

106.   Understanding the challenge of the Maryland Litigation, Dr. Olivarius recognized the need for input from a lawyer who had prevailed against S&S in the past.  She wished Bainton to provide big-firm support to Freishtat and Dubnow in Maryland while also defending Dr. Olivarius and Ingwall in New York.[18]

### g.       Freishtat's Pursuit Of Personal Enrichment.

107.   Despite the obvious need for a coordinated strategy, Freishtat only saw Bainton and Cohn as threats.  He had no intention of giving up complete control of the potentially vast revenue stream presented by the Maryland Litigation.  Having come to know Dr. Olivarius, he may also have feared that the hiring of Bainton was her first step towards replacing him. Certainly he confessed as much to Bainton himself, in the most disparaging terms.[19]

---

[17]      06/06/96, McA-O 565, H/I 1012.

[18]      05/29/96, McA-O  1156, H/I 3029 Bainton to Dr. Olivarius:  "In addition, we understand that from time to time the Endowment may ask the benefit of our views regarding aspects of the Maryland Action, which we shall give to the extent that our representation of the parties to the New York Action does not ethically preclude our rendering such advice."

[19]      Freishtat letter to Bainton, June 24, 1996: "Your ingratiating letter to the Board of Directors, before the June 21 blowout, substantiates what I have suspected, i.e., Ann wanted you to assume control of the

108.     Freishtat had also been pressing for a 33-40% contingency fee.  He had a history of irregular financial dealings with clients[20] and Dr. Olivarius had already caught him in the act of double-billing $15,328 in professional fees.  Anxious to protect the Endowment's eventual payout from inflated legal charges, she told Freishtat that she would consider paying a contingency only if he took a percentage on any value he was able to add to S&S's 1992 settlement offer of $42.4 million.  Freishtat had no interest in the proposal.[21]

109.     Though she could not have known this at the time, Dr. Olivarius was providing Freishtat with all the motive he needed to destroy the Endowment's case.  With his fees not contingent on his success, all that mattered was the number of hours that he and Dubnow would be able to bill for.  From now on, it would be the quantity, not the quality, of his work that mattered.

110.     A further inducement to poor performance was about to be offered by Wachtell.

---

Maryland Litigation and that you were willing to do so in spite of the flagrant conflict of interest that exists between Ann and the Endowment."  06/24/96, McA-O 443, Freishtat arbitration testimony, Day 12, p. 82: "A time came when I was convinced that, not only did Ann want you take control of the Maryland Litigation, but you were maneuvering and positioning yourself to do so."

[20]     Olivarius called Freishtat's references before hiring him.  Her letter to the Board describing these calls recorded excellent reviews of him as a litigator, but "each of his clients with whom I spoke remarked on how expensive he is."  Letter to Board, July 11, 1995.  Orally she reported a more complex evaluation from Freishtat's former client Charles Ellerin, who described Freishtat as greedy.  "I have a problem with David and his bills.  Just between us – how can he put in the amount of time he bills me for and still sleep and occasionally eat.  He says he takes no lunch and no holidays.  I don't get it….No better lawyer; not a friend; greedy; unscrupulous; tremendous demeanor in courts…he comes on strong.  Insisted I pay him a bonus after the fact, when the case was over.  We had not agreed to this and in fact, had agreed to a fee structure which he wanted to ignore."  When Olivarius reported his comments to the Board, they said they should not be disqualifying and to watch Freishtat carefully.  07/11/95, McA-O 950.

Freishtat once charged a client an 80% contingency fee, and sued to collect it.  *Summers v. Freishtat*, 335 A.2d 89 (Md. App., 1975).  Freishtat claimed a brokerage fee of $14,000 after having been paid $4,000, sued and lost, and then appealed and lost.  *Freishtat v. Callow*, 261 A.2d 458 (Md. App. 1970).  Another one of his references said: "David lives by a philosophy: hit hard."  Letter from Olivarius to Marsha Cohan, July 10, 1995.

[21]     No contingency fee also meant Freishtat's personal gain from the Maryland case depended not on what the Endowment received, but on the hours his firm could bill.

**ORIGINAL COMPLAINT – Page 25**

h.     **A Conspiracy Begins.**

111.     On April 10, 1996, Freishtat met privately with Wachtell lawyers Nussbaum and Forrest.  Remarkably, they insisted that General Counsel Dr. Olivarius not attend, and casually suggested that Freishtat's prospects for bringing home a good settlement would rise if Dr. Olivarius were not at the helm of the Endowment.

112.     This was an odd claim to make, given Dr. Olivarius' professional record and her centrality – as both overseer and star witness – to the Endowment's case.  Freishtat himself acknowledged Dr. Olivarius' undoubted abilities and commitment to the Endowment, in a letter that flatly contradicted his later sworn testimony at the arbitration hearing that followed her summary dismissal.

113.     As he wrote in February, 1996, just four months before Dr. Olivarius' termination "for cause": "Ann is highly organized and efficient, and is an extremely intelligent, able attorney. She is articulate, extremely hard working, and is, without question, devoted to the Endowment's welfare and best interests.  She appears to us to have the strength of character and kind of indomitable will needed to persist in what may be a long, nasty … struggle for the Endowment."[22]

114.     In hindsight, it was precisely because of these qualities that Freishtat would work for Dr. Olivarius' removal.  He would, however, need allies to bring about that result.

115.     In October, 1995, Karen Savransky ("Savransky") was hired to do part-time legal work for the Endowment, after a hiatus in her legal career.  She handled basic matters like corporate formalities, drafted letters for Dr. Olivarius' signature and did modest trial support, fitting the work into her primary role as wife and mother.

---

[22]     Letter from Freishtat to the Board, Feb 29, 1996, McA-O 289.

116.    Savransky was not a member of the Virginia bar.  Given her inexperience in complex litigation and scant knowledge of the Endowment's history and highly complex legal position, she did not write to or deal with anyone without Dr. Olivarius' supervision. Her junior status did not, however, constrain her ambition.

117.    Dana Boyd ("Boyd") was the Endowment's Associate Director for Scientific Programs, a grand title that added stature to an essentially low-level job: the handling of the administrative needs of the Fellows.

118.    Neither Boyd nor Savransky had much prospect of promotion.  Their skill sets were limited and their salaries – initially $15/hr and $19.23/hr, respectively – were generous, given the limited scope of their responsibilities.  They did, however, have access to the internal workings of the Endowment, and Freishtat saw the value of a closer collaboration with them.

119.    A mutually advantageous relationship was about to begin.

### i.    A Special Relationship.

120.    At the Endowment's Annual Meeting in early May 1996, Savransky and Boyd arranged a private meeting with Freishtat and Dubnow.  They understood Freishtat's anxiety at the prospect of being replaced by Bainton, and saw with him that the removal of Dr. Olivarius could only lead to personal advancement and financial enrichment.[23]

121.    In light of those objectives, Boyd and Savransky began raiding Dr. Olivarius' papers and making secret late-night phone calls to Freishtat and Dubnow.  Savransky admitted later that she "routinely had confidential communications with outside counsel."[24]

---

[23]    "David advised krs [Savransky] and dana that he spoke with friedman and donelan and advised them of altered agenda. He told ks and dana how friedman and donelan felt about the need to control matters until we get ann's affidavit."  06/07/96, McA-O 83, telephone notes by Savransky.

[24]    Arbitration transcript, Day 1, pp. 245-6, 251, 267, 273.

**ORIGINAL COMPLAINT – Page 27**

122.     In one such call, after illicitly going through Dr. Olivarius' papers (to which they had no legitimate access), they told Freishtat and Dubnow that Dr. Olivarius kept a "hit list" detailing his firm's mistakes.  "[C]opy ann's piece of paper about why freish[tat] firm is not as good as bainton's firm," Savransky wrote after talking to Freishtat.  "When did ann have marsha [Cohan] write up the hitlist[?]"  "[AO] said bainton could handle entire case if he had to."[25]

123.     In other calls to Freishtat, Savransky and Dubnow reported that Dr. Olivarius was preparing a presentation to the Board to get his firm dismissed.  According to Savransky's notes, "Karen [Savransky] said that Dana [Boyd] overheard Ann speaking with [outside counsel] Marsha Cohan and telling Marsha to prepare an argument for Ann to present to the Endowment's Board of Directors on Monday in which she will suggest that the Endowment get rid of Freishtat."[26]

124.     This was untrue.  Despite Boyd's eavesdropping, Dr. Olivarius never told Cohan to prepare any such argument, and did not wish to fire Freishtat. Savransky and Boyd's misrepresentation was highly effective, however:  it convinced Freishtat that Dr. Olivarius was about to strike.

### j.     The Conspiracy Widens.

125.     In Freishtat's mind, at least, the need for action became more pressing.  Freishtat could not, however, move against Dr. Olivarius without the support of the Endowment's Board. Fortunately for him, his interest in removing his boss was shared by S&S and by S&S partner Herzstein, who had appointed the Board's Chairman, Friedman.  Freishtat was never on close terms with Friedman, but now they had a common agenda.

---

[25]     McA-O 83, 6/7/96.

[26]     Notes by Savransky of her own phone conversations with Freishtat, 6/14/96, McA-O 89.

126.    Fortunately for Freishtat, Friedman also considered Dr. Olivarius a threat to his position, though for very different reasons.

### k.    Friedman's Motives.

127.    Dr. Olivarius had received complaints from Sarnoff Scholars and Fellows about Friedman's inappropriate behavior towards female scholars at medical meetings.  She had warned him personally about them, worried that Wachtell would use any weakness in the Board's management to their advantage in the Maryland Litigation, and had cautioned him privately about these and other personal indiscretions that had surfaced at earlier meetings.

128.    Just as crucially, Friedman knew that Dr. Olivarius had received a legal opinion from the major Washington law firm of Wilmer, Cutler & Pickering (now Wilmer, Cutler, Pickering, Hale & Dorr, LLP), which found his "permanent successor" status illegal under Maryland corporate law.  Dr. Olivarius had been concerned (rightly, as it turned out) that Friedman's illegal position would create yet another vulnerability in the Maryland Litigation.

129.    Like Freishtat, Friedman believed that Dr. Olivarius planned to oust him from his position.

### l.    Donelan's Motives.

130.    The Endowment's Treasurer, Donelan, was also worried.  He knew that Friedman was unlikely to be sued by Herzstein, who was close to him, and had appointed him to the Board.  He was, however, quite concerned that he could be on Herzstein's target list.

131.    Weisfeldt had resigned from the Board in March, 1996, much to Freishtat's satisfaction, in order to avoid getting sued.  In fact, Freishtat had boasted to Dr. Olivarius that he had used his influence with Elizabeth Head, General Counsel to Columbia University, to get Weisfeldt removed.

**ORIGINAL COMPLAINT – Page 29**

132.    Weisfeldt's resignation had automatically necessitated Page's, under the Endowment's bylaws.  With Ingwall and Dr. Olivarius already the subject of major law suits, the departure of Weisfeldt and Page left Donelan alone and exposed.  He was now the only Member of the Board who was not either on cozy terms with S&S or being sued by them.

133.    When Freishtat informed Friedman and Donelan, in a letter dated June 10, 1996, that, should Dr. Olivarius go, "another suitable representative will be in the wings,"[27] his information was received with relief.  So was Freishtat's suggestion that, with Dr. Olivarius gone, Wachtell would cease to fight the Maryland Litigation with the ferocity it had hitherto displayed.[28]

## l.    The Emergence of a Common Plan.

134.    At his private meeting with Wachtell in April, 1996, Nussbaum and Forrest had suggested to Freishtat that he might find it easier to broker a settlement in the Maryland Litigation with Dr. Olivarius out of the picture.

135.    The not-so-subtle implication was that, should Dr. Olivarius be allowed to continue the excellent work she was doing (work that might result in S&S being forced to pay out up to $100 million) Wachtell would continue its relentless and intimidating pursuit of individual Board Members.

136.    A tempting scenario began to form in the minds of the drama's central players.

137.    With Dr. Olivarius gone, Friedman could continue to retain his position as Chairman of the Board.  For his part, Donelan could sleep easy at night, knowing that he would not wake up to find that a $3 million law suit had been filed against him.  And Freishtat and

---

[27]      Freishtat to Friedman and Donelan, 06/10/96, McA-O 304.

[28]      Arbitration transcript, Day 3, p. 15.  When it came time to decide to fire Olivarius, Donelan said "our counsel played a very major role in my decision of how I voted."  Day 3, p. 91.

Dubnow would be able to drum up exorbitant legal fees, free from the scrupulous oversight of a first class lawyer committed to protecting the Endowment's future and Dr. Sarnoff's legacy.

138.     Savransky and Boyd, for their parts, saw the possibility of swift career advancement, and in this they were correct.  After they played their roles in ousting Dr. Olivarius from the Endowment, Boyd became Executive Director and her salary has essentially went from $19/hr in 1995 to $85.50/hr only a few years later.  Savransky received a promotion to Director of Legal Affairs.[29]

139.     The only obstacle to the plan was the integrity of Ingwall, the sole remaining Board Member with a record of primary loyalty to the Endowment.   Ingwall had been instrumental in the hiring of Dr. Olivarius, and had been a staunch ally in her campaign to develop the charity into a world class institution.

140.     It would take an artful combination of guile and ruthlessness to turn this highly principled academic, the first female full Professor at Harvard Medical School, into a criminal.

141.     Ultimately, however, she would be the Conspirators' downfall.

> **m.     Tentative Steps.**

142.     Before the Conspirators could act, Freishtat needed information that might discredit Dr. Olivarius and provide the grounds for her termination "for cause."  As will become clear later, a simple termination of Dr. Olivarius would not have answered the Conspirators' purpose.  In order to commit the fraud on the court which the eventual settlement with S&S would require, Dr. Olivarius' professional reputation had to be thoroughly trashed.

---

[29]     See Exhibit "A"-3" (Boyd Salary Rise).

**ORIGINAL COMPLAINT – Page 31**

143.   Freishtat had already taken the step of securing Savransky, his accomplice, the status of Endowment employee rather than part-time contractor.  He could now comfortably rely on her and Boyd to keep him informed about Dr. Olivarius' intentions.

144.   Freishtat had called Donelan to get his agreement to the promotion, and Donelan (by now an active Conspirator as well) had called Dr. Olivarius to give his backing.

145.   Dr. Olivarius had agreed, on one proviso: that Savransky become a member of the Virginia bar.  This Savransky agreed to do.  She billed the Endowment for the time to prepare her application.  When Dr. Olivarius asked her about its progress, she said she would submit it "any day."  Later she said she had submitted the application and was waiting to hear about admission.

146.   In fact, Savransky would not become a member of the Virginia bar until August 13, 2004, more than eight years after allegedly applying.

**n.    Commercial Bribery.**

147.   In return for promises of promotion and a dramatically higher salary, Boyd actively helped Freishtat and Dubnow formulate and execute a plan to get rid of Dr. Olivarius.[30] By this writing, e.g., Boyd's salary has gone from $19/hr to at least $85/hr, with no one to oversee her work.

148.   Boyd now violated her basic duties of honesty and loyalty to her employers. They eavesdropped on Dr. Olivarius' telephone conversations, copied papers from her office to

---

[30]    "David advised krs [Savransky] and dana that he spoke with friedman and donelan and advised them of altered agenda. He told ks and dana how friedman and donelan felt about the need to control matters until we get ann's affidavit."  06/07/96, McA-O 83, telephone notes by Savransky.

send to Freishtat,[31] and stole papers from her desk, including draft engagement letters sent by Bainton and Cohn, which were of commercial advantage to Freishtat.

149.    This was a major violation of legal ethics, both for Savransky to give and Freishtat and Dubnow to receive.

150.    Savransky and Boyd also removed letters that Dr. Olivarius had placed into a U.S. postal service mail drop, including fundraising letters and a bar reference for a potential witness from S&S in the Maryland Litigation, and diverted them to Freishtat.

151.    This was mail tampering, a felony.

152.    Boyd and Savransky now went even further.  Sensing that Dr. Olivarius' removal would offer them great opportunities for personal advancement, a once-in-a-lifetime opportunity, – they threw their lot in decisively with the Conspirators.

153.    They defamed Dr. Olivarius, calling her unstable, inattentive to her duties, and a problem drinker.  Freishtat and Dubnow repeated these slurs to the Board[32] - who, as we have seen, had their own reasons for entertaining such allegations.

o.      **The Conspirators attempt to set up Dr. Olivarius.**

154.    Faced with intimidating nuisance suits from Wachtell against both herself and Ingwall, Dr. Olivarius discussed the possibility of filing counterclaims against S&S in early June, 1996, shortly before her termination "for cause."

---

[31]    Savransky wrote notes of her conversations with Freishtat and Dubnow from May 31 through July 12, McA-O 83 (Respondent's Exh. 80):  "copy ann's piece of paper about why freish firm is not as good as bainton's firm."  "Dana is compiling all of the financial information and she will fax a copy of the list."

[32]    Dubnow to Directors: "Central Office confirms that Ann also drank on the job." "According to Central Office staff she sometimes would begin drinking in the morning to calm her nerves."  07/02/96, H/I 1115, McA-O 106.   In the service of the conspiracy, Savransky and Boyd twisted and magnified innocent events to further their own ambitions.  The origins of the "drinks in the morning to steady her nerves" contention was a single episode when Olivarius, who had missed dinner, stayed at the Endowment all night working on a legal brief, and poured herself one drink of Scotch of which she consumed a few sips over a long night.  This letter from Dubnow, found in the Harvard Ingwall files, was one more the Endowment illegally hid from the arbitrator.

155.    These counterclaims had the potential to put S&S on the defensive, a strategic gain for the Endowment and a step approved by Bainton.  Neither Boston attorney Cohn, who was at the June 7, 1996 meeting at which Bainton was introduced to the Board, nor Dr. Olivarius had yet had a chance to conduct the research necessary to make a final decision.

156.    For understandable reasons, Freishtat abhorred the idea of filing counterclaims of any sort.[33]  A counterclaim suit would involve the hiring of further counsel, and the consequent dilution of Freishtat's control over the future of the Endowment.  Worse still, a successful suit might force S&S to capitulate, thus depriving Freishtat of vast potential revenues.

157.    Dr. Olivarius directed Freishtat to prepare a legal memorandum on the advantages and disadvantages of pressing a counterclaim suit, but he refused to produce one.  This was an astonishing step for an outside litigation counsel to take, but, by now, Freishtat was increasingly sure of his position.  Like the Wachtell lawyers whom Dr. Olivarius would face in a New York courtroom on the morning of her dismissal "for cause," he knew that her days at the Endowment were numbered.

158.    Instead of obeying his client's instructions, Freishtat told the Board that the counterclaims Dr. Olivarius was considering would constitute "private inurement" to her – a personal gain not permitted to someone running an Endowment – and that this would jeopardize the Endowment's litigation posture in Maryland.[34]

159.    Any legal research would have overturned this argument, but Freishtat did not conduct any for this simple reason:  in a letter written on June 6, 1996, more than two weeks

---

[33]    06/10/96, McA-O 84.

[34]    Memorandum from Bainton to Board, June 21, 1996, McA-O  467; from Blaustein to Board, June 21, 1996, McA-O 446; Dr. Olivarius's promise to assign any counterclaim winnings to Endowment in any event, Dr. Olivarius to Board, June 6, 1996, H/I 1121, McA-O 488.

**ORIGINAL COMPLAINT – Page 34**

before Freishtat made this presentation to the Board, Dr. Olivarius had written to Board Members confirming that she would not bring counterclaims without "the knowledge and written endorsement of a unanimous Board of Directors".[35]

160.   Dr. Olivarius also confirmed that, to avoid any potential conflict of interest, she would assign to the Endowment all monies she might win in any counterclaim action.

161.   When the time came for Dr. Olivarius to rebut the Conspirators' charges of conflict of interest in the arbitration hearing that followed her termination "for cause," this letter would have vanished.  So would all of Freishtat's recollections of the many conversations in which Dr. Olivarius had repeated this offer to him, orally.

162.   It would be almost five years before Dr. Olivarius saw the crucial letter again.

163.   It is important to remember that, while Dr. Olivarius offered to put any pursuit of counterclaims before the Board for approval, and to hand over to the Endowment any monies gained from a successful counterclaim action, Ingwall made no such offers – though she was in an identical situation.

164.   The fact that the Conspirators later pursued Dr. Olivarius (who offered to consult with the Board) on conflict of interest charges, while ignoring Ingwall (who did not), points to an inescapable fact: that the Conspirators were more concerned with terminating Dr. Olivarius "for cause" than with any possible conflicts of interest.

**p.     The June 7 Meeting.**

165.   Ingwall, the Endowment's Director and Chair of its Litigation Committee,[36] had found Freishtat difficult and bombastic when he accompanied her and Dr. Olivarius to interview New York counsel when the cases against them were first brought by Wachtell.

---

[35]     Dr. Olivarius' June 16, 1996 letter to Board.  McA 488 H/I/121.

**ORIGINAL COMPLAINT – Page 35**

166.    Ingwall feared that Freishtat would dominate the June 7 Board Meeting at which the possibility of filing counterclaims was to be discussed, and feared that Bainton would not be able to explore counterclaims fully with the Board if Freishtat were there.

167.    Accordingly, Ingwall directed Dr. Olivarius to design the meeting so that Bainton would have some time to talk to the Board without Freishtat present.  Freishtat, a contractor, had no automatic right of attendance at Board Meetings.

168.    Dr. Olivarius did as Ingwall asked.  She was additionally concerned that until Freishtat signed a joint defense agreement with Bainton (which he had so far refused to do), talking about the New York suit in front of him might void attorney-client privileges that she and Ingwall held vis-à-vis the New York Litigation

169.    Dr. Olivarius sent Freishtat an abbreviated agenda reflecting the limited role Ingwall wanted him to play.[37]   Boyd, who was not privy to Dr. Olivarius' conversation with Ingwall, typed that abbreviated agenda and secretly called Dubnow on the evening of June 6 to tell her that the one being sent to Freishtat was "doctored."[38]

170.    The Conspirators hoped, quite wrongly, that this discrepancy might give them an opening to fire Dr. Olivarius "for cause."   At the arbitration that followed Dr. Olivarius' termination, the Conspirators testified that Freishtat, Donelan and Friedman (though not Ingwall, who had yet to be coerced by the others into joining their conspiracy), forearmed by Boyd's and

---

[36]    Minutes of Board meeting, November 14, 1995, McA-O 284.

[37]    The Conspirators provide corroboration that Ingwall, not Olivarius as they claimed at the arbitration, was responsible for the impulse to allow Bainton to speak to the Board on his own without Frieshtat.  Jeff Rosenfeldt, an associate working in Freishtat's firm, put this in his telephone notes of his secret calls with Savransky and Boyd: "Karen and Dana.  9:50am Ann instructed Karen and Dana not to give conference call number.  Said that Joanne wanted to talk to the Board in private and does not want David participating."  McA-O 83.

[38]    "Dana got on the telephone and advised me that Ann had asked her to doctor the Agenda that was sent to our office…" Notes of Dubnow to file,  06/07/96, McA-O 341.

Savransky's secret phone calls, had secretly agreed in advance to remain noncommittal at the June 7 meeting.[39]

171.     They wished to entrap Dr. Olivarius, by inducing her to pursue counterclaims more vigorously than the Board's noncommittal stance allowed.

172.     This was termed "the charade" <u>by the Conspirators themselves</u>.

### q.     The Coercion of Ingwall.

173.     It was imperative for the Conspirators to secure the co-operation of Ingwall, the Board's Secretary and chairman of its Litigation Committee, in their scheme to oust Dr. Olivarius.

174.     They did not, of course, apprise her of their own motives for ridding the Endowment of its general counsel and chief witness in the Maryland Litigation.  They appealed, instead, to Ingwall's sense of fair play, and produced a range of fraudulent charges against Dr. Olivarius, hoping to shock Ingwall into betraying her friend and ally.

175.     The charges were presented at the last possible moment, on the eve of the June 20 Board Meeting at which her vote for Dr. Olivarius' termination would be required.  They were extensive and superficially damning, ranging from inappropriate consumption of alcohol in the workplace and mental instability to expense account fraud and the deliberate misappropriation of the Endowment's assets.

176.     Ingwall, who knew Dr. Olivarius well, was deeply suspicious of the charges made against her.  "We need to hear other opinions," she wrote on Freishtat's letter advising the Board

---

[39]        06/26/96, McA-O 601, letter from Ingwall to Freishtat and Dubnow.

to terminate Dr. Olivarius. "Asche [Ingwall's lawyer] says it's inappropriate for David to insist."[40]

177.    Ironically, however, it was Ingwall's ethical standards that allowed the Conspirators to draw her into their illegal acts.  When confronted with the expense fraud charges against Dr. Olivarius, she was deeply shocked.

178.    "Unacceptable [is] too weak [to describe how I feel about the supposed expense account violations]," she wrote on her copy of Freishtat's June 19 letter with its draft resolutions to terminate Dr. Olivarius.[41]

179.    Ingwall, however, wanted proof – and that was something that the Conspirators were neither willing nor able to provide.  "This requires careful documentation and report (oral) by a neutral party to the Board ASAP," she wrote.

180.    To get her vote, the Conspirators promised to provide the careful documentation and neutral report for which she had asked, but they never delivered either.[42]  Given Ingwall's previous experience as Treasurer, during which she had carefully monitored Dr. Olivarius' expenses and grown familiar with the exacting systems that Dr. Olivarius had put in place for expense approval, it would have been dangerous to show her anything.  She would have understood at once that she was being deceived, and the entire conspiracy would have been threatened.[43]

---

[40]    Ingwall notes on Freishtat June 18 letter, H/I 1070.

[41]    H/I 1073, Ingwall letter to Freishtat, June 19, 1996.

[42]    H/I 1073, Ingwall letter to Freishtat, June 19, 1996.

[43]    As was to become typical of Ingwall, she tried to have it both ways with Olivarius, leaving a message with a babysitter on June 24: "1.  As[c]h[e] advised against talking to anyone  2.  I called Sundermeyer today who is trying to reach Brendan [Sullivan]  3.  I voted no such thing [i.e. for termination].  You should know that….Love Joanne"  Ingwall sent Olivarius a gift in August 1996 with a note reading: "I hope the lawyers will soon allow us to sit down for a cup of coffee together and talk.  I will call the office Monday.  As ever,

181.    As it was, Ingwall refused to sign the resolution to terminate Dr. Olivarius that was presented to her at that meeting.

182.    After the June 20 meeting at which the Board voted to terminate Dr. Olivarius, Ingwall secured Freishtat's and Dubnow's commitment to write a termination resolution based on substantiated fact for her to sign.

183.    Unable to produce one, and having come too far to retreat, they instead sent the original resolution to Dr. Olivarius via Bainton, missing Ingwall's signature page but repeating Donelan's twice.[44]  When Ingwall later assured Dr. Olivarius that she had not voted to terminate her, "for cause" or otherwise, she was telling the truth.[45]

184.    On July 1, Dubnow wrote Ingwall to explain why she and her father had violated their agreement with her.  Ingwall thought Dubnow was lying, as is evident from the notes she wrote in the margin of the letter (indicated in italics in the places where they appear in the text):

> We have…received your executed corporate resolutions reflecting the decisions reached by the Board of Directors during the June 7, 1996 Board meeting, exclusive of the resolution terminating Ann.  I understand that you have various concerns relating to the wording of this last resolution.  However, in light of the fact that both Dan and Bill have already executed this resolution in its current form, it will be awkward as well as risky for you to make further changes to it at this time.

> Unaware that you desired to further revise this resolution (*hard to believe given our conversation of 6/20*), the copy executed by Dan was sent to Bainton when Ann was informed that she had been terminated.  As a result, any changes that

---

Love, Joanne."   What office she intended to call, since Olivarius had been locked out of hers at the Endowment and was unemployed, was unclear.  She did not call that Monday or anytime soon.

[44]    06/25/96, McA-O 499.

[45]    Ingwall was greatly distressed by the Board's actions against Dr. Olivarius, and wished to dissociate herself from them as far as possible.  On June 24, she left the following message with Dr. Olivarius' child minder: "1.  As[c]h[e] advised against talking to anyone  2.  I called Sundermeyer today who is trying to reach Brendan [Sullivan]  3.  I voted no such thing [i.e. for termination].  You should know that….Love Joanne" Ingwall sent Olivarius a gift in August 1996 with a note reading: "I hope the lawyers will soon allow us to sit down for a cup of coffee together and talk.  I will call the office Monday.  As ever, Love, Joanne."

you now make to this Resolution likely will expose you to harsh questioning in discovery.  You likely will be asked in deposition about your refusal to sign the Resolution in the form signed by other Board Members, and Herzstein's counsel probably will attempt to establish either that you did not support a termination of Ann for cause, or alternatively, that you felt there were portions of the Resolution signed by Bill and Dan that were untrue.

Unless you do not believe that the facts as recounted in the Resolution are truthful, we would strongly urge you to reconsider signing this Resolution in its current form.  As I understand it, you voted for and continue to support the termination of Ann for cause and concur, at least in principle, with the reasons for that termination which formed the basis for the corporate Resolution signed by Dan and Bill.  Unfortunately, Ann's behavior precipitated a need for immediate action that was not anticipated at the time the revised Resolution was circulated. When neither our firm, Bill nor Dan heard back from you with comments following your receipt of the revised Resolution, everyone assumed that it met your approval. (*Not so—(1) conversation with Stacie on Thurs. afternoon [6/20]: reduce to 3 strongest [reasons for termination, rather than the longer list in Freishtat's draft], also discussed alt ways to terminate, she called back to leave message saying that David said that the termination had to be affirmed.  I faxed revised resolution to them 6/21 apparently.)*[46]

185.    Mistrustful of the Conspirators, Ingwall made a further attempt to provide Dr. Olivarius with the recourse to due process to which she was legally entitled.  She attempted to arrange a third-party review of Dr. Olivarius' ousting by Brendon Sullivan, which the Conspirators would not – indeed, could not – allow.  In fact, Friedman went to special lengths to preclude any participation by an independent party, going so far as to refuse to take Sullivan's call at the meeting of the Board in which he was invited to attend.

186.    "I am rejecting out of hand getting involved in some independent proceeding before a third party who is going to review the facts leading up to Ann's termination and decide for you whether or not you acted properly," Freishtat said bluntly.[47]

---

[46]    This "revised resolution" drafted by Ingwall is one more document the Endowment hid from Olivarius and the arbitrator, contrary to the arbitrator's orders.  It was not present in the Harvard/Ingwall files, but was sent to Freishtat and Dubnow and would be in their files.

[47]    06/24/96,  McA-O 305, H/I1063.

**ORIGINAL COMPLAINT – Page 40**

187.    That Freishtat could take such a tone with a Board Member underlines the authority he derived from his tacit collusion with the Endowment's enemies, Wachtell.  As he rewrote his relationship with Dr. Olivarius to elevate his position above hers, so he approached the Board and its Members.  He knew that Ingwall was deeply worried about facing one of the country's most feared legal firms, and this knowledge emboldened him.

188.    Facing, as she did, a $3 million law suit directed at her personally, Ingwall felt that her room for maneuver was limited.  In the end, just one crucial fact gave the Conspirators the leverage they required over her: their ability to withdraw the indemnity that the Endowment had voted to pay her legal costs in the New York case.

189.    Ingwall's notes for the June 20 meeting, at which the decision to terminate Dr. Olivarius was taken, show how much this preoccupied her: a prominent note was "Indemnification of me."[48]

190.    It was on precisely this concern that the Conspirators played.  In Dubnow's July 1 letter to Ingwall, her tone was more graceful than her father's, but its note of implicit threat was just as unmistakable: Ingwall would "be expose[d]…to harsh questioning in discovery" if she ventured to probe the Conspirators' ousting of Dr. Olivarius.

191.    "I understand that you have various concerns relating to the wording of this last resolution," wrote Dubnow.  "However, in light of the fact that both Dan and Bill have already executed this resolution in its current form, it will be *awkward as well as risky* for you to make further changes to it at this time" [emphasis added].

192.    It would be five years before Ingwall's conscience reasserted itself.

---

[48]        06/20/96, McA-O 1153, H/I 3027

**ORIGINAL COMPLAINT – Page 41**

### r.     The Knife Falls.

193.    On the morning of June 21, 1996, the day after the meeting at which the Conspirators flagrantly ignored all Ingwall's reservations about her termination "for cause," Dr. Olivarius was arguing a motion in a New York City courtroom.  Ranged against her were an unusually large number of lawyers from Wachtell.  They were laughing and joking, whispering among themselves.

194.    Their joviality was understandable.  They had just succeeded in removing their opponents' chief witness in a law suit that might have cost their clients, S&S, as much as $100 million.

195.    Freishtat, Friedman and Donelan had honored their part of their tacit bargain, and in the months that followed, Wachtell would honor theirs.  There would be no more talk of personal law suits against individual Endowment Board Members.

196.    The Conspirators could now devote themselves, at their leisure, to exploiting the Endowment for their own and varying ends.

### s.     Chairman of the Board, Friedman.

197.    Friedman was at last able to forget about the inconvenient fact that his appointment to the permanent Chairmanship of the Board was, in the opinion of at least one major Washington law firm, (Wilmer, Cutler, Pickering, Hale & Dorr, LLP), illegal.  However sadly diminished the assets eventually returned to the Endowment by S&S – and they would be sadly diminished indeed – there would always be sufficient funds to cover his hotel and administrative expenses.

198.    Importantly, also, he would be able to continue in his prestigious position without the inconvenience of having his inappropriate behavior monitored by a tiresomely conscientious President.

**t.    Endowment Treasurer, Donelan.**

199.    Donelan, up to this point frighteningly exposed to aggressive litigation by Wachtell, could rest easily at night after Dr. Olivarius' abrupt termination "for cause."  He had successfully survived the threat of litigation that had led Columbia to insist on the resignation of the Board's most visionary member, Weisfeldt.

200.    True, it was unlikely now that the Endowment's assets would be given over to Duke in the foreseeable future.  Donelan could, however, continue to ensure the annual flow of tens of thousands of dollars to that institution – and, now that Dr. Olivarius would no longer be on hand to supervise strict accounting practices, the duties required by what Donelan had called a "piddly" Endowment would be significantly less onerous.[49]

201.    The first indication Donelan gave of his new attitude was the complete lack of effort and energy he put into investigating any of the grievous financial improprieties of which Dr. Olivarius stood accused.

202.    It was not, of course, in Donelan's interests to apply his significant financial expertise to the question of Dr. Olivarius' alleged wrong-doing.  Like the other Conspirators, he knew that any investigation could only expose the conspiracy – which explains why he, a senior financial officer at a major university, did not even bother to investigate the allegations against Dr. Olivarius first hand.

---

[49]    Arbitration transcript, Day 2, p. 294.

203.     Donelan even went so far as to admit the extent of Freishtat's involvement in the removal of his former boss, though he gave no hint of their prior collusion: "Our counsel played a very major role in my decision of how I voted," he told the tribunal.[50]

204.     Of course, at no time was Freishtat a Board Member himself.  He had simply arrogated to himself the authority of that position.

u.     **Sometime Endowment Treasurer, Page**

205.     The resignation of Weisfeldt from the Board of the Endowment on March 12th 1996 had automatically triggered the resignation of Page, one of Herzstein's first protégés on the Board.

206.     Page was now free to reclaim the benefits and prestige that went with membership of the Endowment's Board.  Three months after Dr. Olivarius' termination "for cause" he was nominated once more.

207.     The Conspirators had succeeded in driving away or silencing those Board Members (Weisfeldt, Katz and Ingwall) who continued to share, with Dr. Olivarius, a vision for the Endowment as a world class institution.  No reservations were raised at the prospect of Page's return to the Board.  He was, in fact, accepted by unanimous written consent.

208.     His sponsor, unsurprisingly perhaps, was his best friend Friedman.

209.     Page had served as Treasurer of the Endowment and knew, just as Donelan and Ingwall knew, that the expense account allegations against Dr. Olivarius were fabricated.  Still, with other Conspirators, he did not hesitate to submit fraudulent insurance claims to recoup money that he falsely and deliberately claimed Dr. Olivarius had stolen from them.  Though

---

[50]     Arbitration Transcript, Day 2, p. 91.

Page knew that this was a scam in every respect, he nevertheless participated in it with vigor and authority.

### v.      Endowment Personnel, Savransky and Boyd

210.    Pleased with their success in removing Dr. Olivarius, Savransky and Boyd now moved boldly forward to drive home their advantage.

211.    The Conspirators rewarded lawyer Savransky by appointing her Director of Legal Affairs and giving her a salary to match.  Outwitted by the Conspirators, Ingwall demonstrated her loyalty to her old friend, Dr. Olivarius, in a manner at once touching and ineffectual:  she prevented Savransky from appropriating her title of General Counsel.

212.    As the Endowment's Director of Legal Affairs, Savransky should have exercised control over Freishtat and Dubnow.  But she testified later that she never criticized Freishtat's work, and for the remaining time of their involvement with the Endowment she gave the father/daughter duo *carte blanche* to do and bill as they liked.  She approved all their costly wrongdoings and aided and abetted them in whatever ways that she could.  She actively aided and abetted their pillaging of over $2 million from the Endowment's coffers.

213.    In return, Savransky got to devise a dream job.  She worked whatever hours she wished to work, and was more than amply compensated for her efforts.

214.    Savransky became Boyd's staunchest ally and worked tirelessly, while billing the Endowment for Boyd's promotion to Executive Director of the Endowment.  Like Savransky, Boyd demanded a better title for her successful efforts to oust Dr. Olivarius.  But again, it was Ingwall who thwarted Boyd's hopes of appropriating another of Dr. Olivarius' former titles, that of President.

215.    Boyd received a huge salary increase, and earns today, at a minimum, $85/hour – a staggering increase from the $18/hour she was paid during Dr. Olivarius' tenure.   Her performance at the Endowment has been a telling illustration of the dangers, and fiscal irresponsibility, of promoting someone beyond their qualification level: she has presided over $14 million in investment losses since taking charge, and has provoked serious criticism from Guidestar, the national evaluative firm of US charities.

### w.    Freishtat and Dubnow

216.    From the earliest stages of their work for the Endowment, Freishtat and Dubnow had shown their determination to extract as much money as possible from the institution they were employed to serve and protect.

217.    In tacit collusion with Wachtel, they had been instrumental in orchestrating the wrongful termination of the Endowment's counsel and star witness in the Maryland Litigation. With Dr. Olivarius now out of the way, the stage was set for one of the most lucrative undertakings of their careers.

218.    Freishtat and Dubnow had engaged at least once in suspect billing of the Endowment.   They had also strained to resist the involvement of any other outside counsel, however vital their association might be to the success of the Endowment's pursuit of its rightful inheritance.

219.    Now Freishtat and Dubnow could realize the full benefits of their conspiracy to remove Dr. Olivarius and to defraud the Endowment which she had left S&S to protect.   They began by removing any professional who might have an interest in checking or constraining their greed.   One by one, all the highly-qualified professionals put in place by Dr. Olivarius - with the support of Weisfeldt, Katz and Ingwall – were systematically removed.

**ORIGINAL COMPLAINT – Page 46**

220.    In order for the Conspirators to exploit the Endowment effectively, they needed to purge it of its dedicated core of professionals.  After Dr. Olivarius' departure, the Conspirators immediately fired every person who might question their actions. *(See two following charts.)*

221.    Under Donelan's supervision, they fired the Endowment's accountants, Joseph Romagnoli and Charles Cocke.

222.    They fired its bookkeeper, Michael Saylor.

223.    They fired its fund manager, Robert Morse of the Wall Street Fund, despite his excellent financial results.

224.    They fired pension expert Dorothy Hodgkin.

225.    They fired outside counsel Marsha Cohan,[51] who had supervised the creation of the Endowment's document retrieval system for the Maryland Litigation and had near-photographic recall of thousands of papers—exactly the kind of person Freishtat and Dubnow should have wanted at their side in the courtroom, especially with Dr. Olivarius gone, had they ever seriously contemplated going to court.

226.    They fired the expert insurance counsel Robert Shulman.

227.    Though Brendan Sullivan had been put on standby to consult on settlement terms, they never used him again.

228.    Everyone except Freishtat and Dubnow were purged.

229.    The Endowment was on the eve of a climactic battle for its survival and future. But once in control, the Conspirators' first act was to give it a lobotomy — they needed to destroy its institutional memory.  This was not rational viewed from the Endowment's perspective; it was rational only from theirs, and it starkly exposes their self-interest.

---

[51]    Freishtat's arbitration testimony, 04-05/98, McA-O 955.

**ORIGINAL COMPLAINT – Page 47**

230.    As Donelan later testified at the arbitration hearing which followed Dr. Olivarius' termination "for cause," "I became aware [of expense account fraud allegations against Dr. Olivarius] from the Endowment's litigation counsel, who I believe was made aware of it by members of the staff."[52]

231.    Outside counsels Bainton, Cohan and Shulman were dismissed, and their work (and income) taken over by Freishtat and Dubnow.[53]

232.    No new associates were hired to continue the struggle with Wachtell.[54]   No qualified independent General Counsel was hired to oversee the Litigation.  No professional with legal experience was appointed to the Board.  With Dr. Olivarius gone, there was no need for a real struggle of any kind and none of the other Conspirators had a serious interest in winning the Maryland Litigation.

233.    The lawsuit, once overseen with such passion and conviction by Dr. Olivarius, would be continued for the purposes of fee extraction, and in this Freishtat, Dubnow and Savransky would be highly successful.  A pretence of conducting the suit at arm's length would be maintained, primarily in order to maintain appearances for the judge who would finally preside over the settlement hearing.

234.    Freishtat and Dubnow brought in no other firm or consultant to replace the professionals whom they, with the full support of the other Conspirators, had dismissed.  They prepared only one expert witness and did not contact any of the experts Dr. Olivarius had retained and prepared for the Litigation.

---

[52]     Arbitration transcript, Day 2, p.15.

[53]     "Since Ann's departure, Freishtat['s law firm] performs all of the work associated with the litigation." Freishtat to Kenneth Forrest, November 26, 1996, H/I 1131, McA-O 638.

[54]     Freishtat to Bainton, June 26, 1996: "Although the case will require some additional staffing [which he never hired], we have no concerns over the number of attorneys S&S may array against us."  McA-O 444.

**ORIGINAL COMPLAINT – Page 48**

235.   Their professional concern, as it had been from the moment that Dr. Olivarius declined to grant them a contingency fee, was with quantity rather than quality.  They had no financial incentive to secure a win for the Endowment, and every incentive to bill as many hours as possible.

236.   Perhaps the most startling abuse of the Endowment's interests by Freishtat and Dubnow was their decision to plead "advice of counsel"[55] to justify the reasonableness of the Endowment's suit against S&S.

237.   The fact that the Maryland Litigation was clearly reasonable on its own terms (S&S had withheld the Endowment's rightful inheritance for over four years, and had caused losses in the region of $36 million in the process) did not deter Freishtat and Dubnow from embarking on a course of action that, while generating considerable motions practice and fees for them, could not be anything but catastrophic for the Endowment's case.

238.   Continuing the tacit arrangement with Wachtell that had characterized Freishtat and Dubnow's actions in the months leading up to Dr. Olivarius' termination "for cause," Freishtat and Dubnow – with the full consent of the other Conspirators – now sacrificed the Endowment's attorney-client privilege on the altar of personal gain.

---

[55]   Herzstein argued in the Maryland Litigation that the Endowment's attempt to get him to disgorge the estate was actually a violation of the Sarnoff will's "in terrorem" clause, which blocked anyone who contested the will from receiving under it.  This put the reasonableness of the Endowment's decision to sue S&S at issue. One way of defending the Endowment's reasonableness was to plead "advice of counsel"—to show that the Endowment's attorneys had recommended this course.  But this would open up a vast range of the Endowment's communications with its attorneys to discovery by S&S, allowing them to see how the Endowment and its lawyers assessed the strengths and weaknesses of its case, internal letters and memos, and otherwise fish through sensitive materials.  Shortly before she was fired, Olivarius forbad Freishtat to plead "advice of counsel."  There was no reason to take this risk because the whole point of the Endowment's action was to compel the executor actually to honor the will, i.e. to disburse Dr. Sarnoff's money as Sarnoff had wished (not to contest that charitable disbursement scheme) it, and it was possible for Olivarius to testify to the Endowment's views about the reasonableness of a suit without having to invoke advice of counsel.  But as soon as the Conspirators removed Olivarius, Freishtat and Dubnow pled "advice of counsel," and did so with the approval of the other Conspirators.

239.    Bainton and Cohn had warned against this.  Dr. Olivarius had forbidden it, when Freishtat broached the idea before she was terminated.  The result was disaster: a court order forcing the Endowment to turn over scores of sensitive internal documents to S&S.[56]

240.    These included the lengthy opinion letter that Freishtat and Dubnow had taken a year to produce, a document that set out in detail the strengths and weaknesses of the Endowment's case and their trial strategy.

241.    Freishtat had earlier warned that "if the opinion letter should fall into the hands of the opposition, it would be devastating," and that "disclosure of the contents of the opinion letter would inflict irreparable harm on the Endowment."[57]

242.    As a result of Freishtat and Dubnow's deliberate sacrifice of the attorney-client privilege, the Maryland court ordered the Endowment to make available to its (alleged) opponents scores of other documents that detailed its litigation strategy, revealed internal Board divisions, and critiqued its personnel, outside advisers and attorneys.

243.    All of this was sent by Frieshtat to Wachtell for use against the Endowment.

244.    With the boldness which had characterized his actions at the beginning of the conspiracy, Freishtat declared that he thought this was a wise strategy,[58] even though he had said, when Dr. Olivarius was fired, that he would *not* lose the attorney-client privilege.[59]

---

[56]    The judge disagreed with Freishtat and Dubnow's attempt to limit their disclosure of the opinion letter and related materials.  "[T]he motion to compel is granted as to the full text of all opinion letters and as to all communication between client and counsel relating to the preparation of this opinion letter.  Specifically not excluded from discovery is any communication relating to, or critical of the performance of counsel who issued such opinions."  "The defendant shall produce all non-privileged documents [from Olivarius]."  "Any communications with outside counsel relating to the development of any opinion letter is discoverable."  Memorandum Opinion and Order, Nov. 14, 1996.

[57]    Letter from Freishtat to Board, 2/14/96, p. 2,  McA-O 292.

[58]    Letter from Freishtat to the Board, 11/14/96, McA-O 474, H/I 1120.

[59]    Freishtat to Bainton, June 24, 1996, McA-O 404.

**ORIGINAL COMPLAINT – Page 50**

245.     Ignoring Judge Thompson's order that permitted them to withhold materials Dr. Olivarius had created in anticipation of litigation (the "attorney work product" privilege), Freishtat and Dubnow *turned over Dr. Olivarius' notes preparing for the Maryland case to Wachtell*. These included notes of conversations between Dr. Olivarius and Sara Jaramayan, Herzstein's secretary at S&S, who was considering testifying against him.

246.     As soon as S&S received them, Jaramayan was fired and publicly humiliated after a long career, losing all her accumulated seniority and benefits.  The Conspirators let Jaramayan believe that it was Dr. Olivarius who had betrayed her, rather than their own decision to sacrifice her to Wachtell.  Freishtat thus saved Wachtell the embarrassment and danger of Jaramayan's testimony.  This also queered other potential witnesses at S&S with whom Dr. Olivarius had carefully maintained contact.  As practicing attorneys, Freishtat, Dubnow and Savransky had to expect this outcome.

247.     The other Conspirators— Savransky as Legal Affairs director, Boyd as Executive Director, and the Board that approved these actions — actively participated in this process and were complicit in Freishtat and Dubnow's wrongdoing.

x.     **The Climax of the Conspiracy**

248.     Plaintiff observed above that it would become clear why the Conspirators could not simply remove Dr. Olivarius by terminating her and honoring the severance package agreed in her employment contract.

249.     It was an essential part of the tacit bargain which Freishtat and Dubnow had made with Wachtell that Dr. Olivarius be fired "for cause."  As Freishtat wrote to Dr. Olivarius, four

months before her termination "for cause," "One of S&S's principal strategies will be to attempt to malign and discredit you." [60]

250.    Unbeknownst to Dr. Olivarius, he had already agreed to spare Wachtell the trouble.

251.    As with each of Freishtat and Dubnow's carefully plotted actions throughout the course of the conspiracy, the logic of the steps and decisions they took can only be properly understood if viewed through a filter of astounding self-interest and criminal greed.

**y.    Why Dr. Olivarius Had To Be Terminated "For Cause".**

252.     When Freishtat and Dubnow deliberately broke their attorney-client privilege and so allowed Wachtell access to the Endowment's private papers from them and all previous counsel, they knew precisely what they were doing.  It was, in fact, the fulfillment of their tacit pact with Wachtel.

253.    The tarnishing of Dr. Olivarius' professional reputation allowed Wachtell's attacks on the Endowment for sloppy management and "private inurement" to be confirmed. [61] More importantly still, had Dr. Olivarius been terminated in the usual manner, she would have been able to give credible testimony on the Endowment's behalf in the Maryland Litigation.

254.    It was crucial to Wachtell that Dr. Olivarius be prevented from testifying in the Maryland Litigation.  She needed to be so thoroughly discredited that her insights into the machinations of S&S could be demolished in court.

255.    To achieve that end, and to garner the benefits they pursued so ruthlessly, the Conspirators had to act as they did.

---

[60]     McA-O 288, 2/1/96.

[61]     Wachtell made these arguments to Judge Thompson.  See Plaintiff's Memorandum of Law in Response to Request for Summary Judgment, March 3, 1997, pp. 37-8.

256.     It was Dr. Olivarius – and the Endowment she had given up her job at S&S to preserve – that suffered.

### z.     A Tragic Settlement

257.     In 1992, the Endowment had rejected a settlement offer of $42 million from S&S. In 1995 Freishtat had confidently stated that the case was worth $100 million.  As a result of the tacit collusion between Wachtell and the Conspirators (in which all parties sacrificed the Endowment to their own interests) the settlement ultimately agreed on was for $29 million.[62]

258.     Had the Endowment accepted the $42 million settlement offered in 1992 and invested it in a fund tracking the S&P 500, the Endowment would have accumulated reserves of $85.5 million by 1997.  A more conservative investment in U.S. Treasury bonds would have resulted in a corpus of $57 million.  Instead, after a lengthy and vastly expensive litigation, the Endowment ended up with just $29 million.

259.     The settlement eventually agreed upon, reached at the end of a process that had not been truly at arm's length since Freishtat's private meeting with Wachtell on April 10, 1996, represented only $5.5 million in damages beyond Sarnoff's core estate (which was sadly diminished by Herzstein's astonishing refusal to sell STI stocks when instructed to do so by the Board).[63]

260.     Freishtat and Dubnow did extremely well in the deal, extracting well in excess of $2 million in fees.[64]

---

[62]     See Exhibits A-8, A-9, A-10, A-12 – A-14.

[63]     See Exhibits A-4, A-5 (Settlement Charts).

[64]     See Exhibits A-6, a-7.

**ORIGINAL COMPLAINT – Page 53**

261.     Other professionals, brought in by the Conspirators after the departure of Dr. Olivarius, did very well, too.  In fact, after subtracting all professional fees paid to Freishtat and to other firms, the total of the Endowment's eventual damages economically amounted to a paltry $1.4 million.[65]

### aa.     A Fatal Flaw

262.     The Conspirators' plan was as seamless as it was ruthless.  The story of their developing (and continuing) misdeeds is the story of a group of disparate individuals and entities, each with their own agenda, coming together and forming a tacit and mutually advantageous pact, which had the purpose and effect of profiting from the vulnerability of a public charity.

263.     Opponents were neutralized, either by ensuring their removal from the Board (Weisfeldt) or their unwilling co-operation and continuing silence (Ingwall).

264.     The Conspirators made only two mistakes.

265.     They imagined that Dr. Olivarius wouldn't fight back.  They also believed, too hastily as it turned out, that they had successfully transformed Ingwall into one of them.

### THE 1998 ARBITRATION.

### Slow Start.

266.     Having been terminated "for cause" in the most calculatedly humiliating way possible, dismissed without notice or the opportunity to access any documents that might have contributed to her defense, Dr. Olivarius filed for arbitration with the Sarnoff Endowment on or about June 26, 1996.  She claimed an assortment of economic damages, damages for injury to her business reputation, and the right to know the answer to one question.

---

[65]        See Exhibit A-11.

**ORIGINAL COMPLAINT – Page 54**

267.    That question was a simple one:  Why?

268.    Over the next few months, the Conspirators would do their best to ensure that the answer to this question remained unavailable to her and to the arbitrator selected by Olivarius and the Endowment.  Furthermore, those Conspirators and their counsel,[66] would continue to employ the tactics that had allowed the Conspirators to take control of the Endowment so effectively: they began to bully and intimidate Dr. Olivarius.

269.    Events then took an almost tragic turn.

270.    On or about January 22, 1997, Dr. Olivarius was involved in a serious automobile accident, while driving her children to summer camp.  A teenage driver overshot a Stop sign and almost killed her, though fortunately her young family escaped unscathed.

271.    Dr. Olivarius sustained grave neurological damage, caused by a closed head injury.  As a result of the accident, she lost her color vision, suffered tunnel vision and endured cognitive function difficulties reflected in, among other things, a lower expression of her IQ, severe memory loss, a generally disoriented and depressed mental state, and the onset of numerical dyslexia.

272.    Seizing the opportunities provided by Dr. Olivarius' physical and mental incapacity, the Conspirators began at once to exploit her weakness.  Not content with filing a long list of allegations that were simultaneously vicious and flimsy, they attempted to form yet another covert alliance:  this one with Dr. Olivarius' insurers.

273.    Their intention was apparently two-fold: to starve her of the funds required to sustain prolonged litigation and, even more importantly, to destroy her capacity to engage in a

---

[66]    Rod Glover and Laurie Holmes, of the Washington, D.C. office of Gardner Garton & Douglas, LLP ("GCD") were the lawyers representing the Endowment in the 1998 Olivarius-Endowment arbitration proceedings.  Dr. Olivarius was represented by J. Joseph Bainton.

**ORIGINAL COMPLAINT – Page 55**

long and grueling legal battle.  The tactics of the Conspirators and their counsel at this time had an excellent provenance: they had learned them from Wachtel.

274.   After illegally obtaining Dr. Olivarius' medical records (including psychiatric records and other confidential medical materials) from Dr. Olivarius' disability carrier by means of an undisclosed subpoena, and without Dr. Olivarius' knowledge or consent, Endowment attorney Laurie Holmes proceeded to send these highly personal documents to Allstate.

275.   This was the insurance company for the teenager who had rammed Dr. Olivarius' car.  The Conspirators hoped to undermine Dr. Olivarius' chances of securing her rightful damages for the injury, and they even went so far as to offer to bring the matter up in their cross-examination at the arbitral hearing.

276.   "We fully expect that there will be testimony [at the arbitration] under oath from Ms. Olivarius regarding many issues, including the car accident for which she has made a claim under her Paul Revere policy and her alleged resulting 'injuries'…In fact, if Paul Revere has any particular area of interest, we would do our best to incorporate relevant questions into her cross-examination."[67]

### The Arbitration Hearing.

277.   Arbitrator Vaughn conducted the arbitration hearing against this intimidating backdrop.  The hearing was conducted in Washington, D.C., at GCD's offices, and lasted for twelve days in April and May of 1998.

278.   In the arbitration hearing, the battle lines formed predictably.   Plaintiff Dr. Olivarius sought to prove that she had been wrongfully terminated for cause," and that she was entitled to substantial compensation for the economic consequences of that termination.   The

---

[67]   Holmes to Christopher Collins, Paul Revere, 04/15/98, McA-O 380; Holmes to Nancy Hiner, Allstate, 3/24/98.  McA-O 800.

Defendants, sought to defend a termination of the Plaintiff that, with the passage of time, was becoming less and less comprehensible, and harder and harder to explain.

279.   As we have seen, Dr. Olivarius was terminated "for cause" as the result of a complex and tacit understand reached between Wachtell, certain Endowment Board Members (Friedman, Donelan, Page), Endowment Personnel (Savransky and Boyd) and Endowment Counsel (Freishtat and Dubnow).

280.   In order to make it seem as though Dr. Olivarius had been rightfully terminated "for cause," a post-termination version of events had to be constructed that would justify termination.  It was vital therefore that Dr. Olivarius be prevented from proving the truthful version events to the Arbitrator.

281.   The scene was set for an audacious fraud on the court, one that is ongoing to this day.

**Defendants' Concealment and Withholding of Key Documents.**

282.   Because the Endowment had confiscated her office computer and all of her files located in the Endowment offices, Dr. Olivarius did not have possession of most of the documents relevant to her defense at the outset of the arbitration .  Accordingly, the Arbitrator approved a subpoena on January 16, 1997 seeking relevant documents from the Endowment.  In the subpoena, Dr. Olivarius requested that the Endowment produce, among other things, the Second June 6 Letter.  Specifically, Dr. Olivarius requested

1.   All books, records and documents which relate, refer or arise from

    n.   Claimant's letter to the Board of Directors in early June 1996 discussing the possibility of advancing counterclaims in the New York suit against her and Ingwall.

283.    Dr. Olivarius requested other documents as well from the Endowment and third parties.  The Endowment repeatedly refused to produce documents, prompting Dr. Olivarius to repeatedly request the assistance of the Arbitrator.

284.    In response to Dr. Olivarius' requests, the Arbitrator directed the parties to exchange documents on several occasions.  For example, on March 13, 1998, the Arbitrator submitted a letter to both parties reiterating his prior oral ruling ordering the "mutual exchange of documents."   On the eve of the Arbitration, a by-now-frustrated Arbitrator reviewed the history of the parties' discovery requests and compelled the Endowment to produce exculpatory documents.  As Arbitrator Vaughn put it:

> I indicated that I did not want the record to be created where the Endowment has exclusive control of categories of records and submits only certain documents, denying access to Claimant to obtain other, assertedly exculpatory documents.

285.    In response to the Arbitrator's order and Dr. Olivarius' many requests, the Endowment produced documents and attested that it had produced all of the relevant documents in its possession.

286.    Among the documents the Endowment produced was the First June 6 Letter.  The Endowment did not produce the Second June 6 Letter.  Because the Endowment had confiscated all of her relevant files and repeatedly represented that it had produced all relevant documents in the face of multiple discovery orders, Dr. Olivarius and the Arbitrator assumed the correctness of the Endowment's representations that the First June 6 Letter was the only responsive letter that she had authored in the Endowment's possession.

287.    In fact, such assumptions are not warranted and when Dr. Olivarius obtained Dr. Ingwall's long-concealed documents on March 15, 2001 (on which more will be said later), it became clear that all of the documents assumed to have been produced had not been produced.

**ORIGINAL COMPLAINT – Page 58**

## Defendants' Misrepresentations Regarding Documents.

288.    In fact, on March 15, 2001, Dr. Olivarius discovered that the Endowment had concealed multiple documents during the arbitration that would have exonerated her from the Endowment's false charges.  The most damning of the documents that Dr. Olivarius discovered in Ingwall's files are described below:

- **Concealed Document No. 1:  The Second June 6 Letter**.

289.    Dr. Olivarius discovered the Second June 6 Letter in Ingwall's files, which should have been produced pursuant to the Arbitrator's orders.  The Second June 6 Letter, addressed to the Board, consists of six pages and bears a facsimile legend demonstrating that it was received by Ingwall between "23:04 and 23:07 June 6, 1996."  In the Second June 6 Letter, Dr. Olivarius addresses and reveals everything that the Endowment accused her of concealing during the June 7th meeting.  The letter openly discussed the status of her potential counterclaims, their potential effect on the Endowment, and established a comprehensive plan for avoiding any conflicts:

> (1)    BOARD APPROVAL OF COUNTERCLAIMS:  The letter gives Dr. Olivarius' written assurance that she would file counterclaims only with further Board discussion, after appropriate legal research had been completed, and "with the knowledge and written endorsement of a unanimous Board of Directors."
>
> (2)    ASSIGNMENT TO ENDOWMENT OF ANY RECOVERY:  Dr. Olivarius assured the Board that there would be no private inurement: "[I]n the event that counterclaims are brought on my behalf, and in the event that I should prevail and win a monetary award, I will assign to the Endowment the totality of that award.  This will prevent any concern that anyone may have concerning private inurement."  This assurance also eliminated any possibility of a conflict of interest arising between her and the Endowment about the perceived benefit of counterclaims.
>
> (3)    NOTICE THAT FREISHTAT RECEIVED REVISED AGENDA AT INGWALL'S DIRECTION:  The letter disclosed to each of the Board members that she had sent Freishtat an abbreviated agenda at Ingwall's instructions.  Attached to the letter is a copy of the abbreviated agenda.

(4)     APPROVAL OF FREISHTAT'S PARTICIPATION:  The letter fully disclosed her plans for obtaining Freishtat's advice by phone during portions of the meeting, which had been approved by Ingwall in advance.  It describes their reasoning for not having Freishtat present during the whole meeting: "I would like not to have David [Freishtat] participate in discussing Joe [Bainton]'s representation of Joanne [Ingwall] and me until the Board invites him to do so, and/or a Joint Defense Agreement is in place."  It nevertheless stated that Freishtat could participate in the entire meeting if the Board wished, and described her plans for having Freishtat stand by to join the call whenever the Board invited him to do so.

(5)     TRANSMITTAL OF FREISHTAT'S OPINION LETTER TO MR. BAINTON:  The letter confirmed that she had sent a copy of a Freishtat opinion letter in the Maryland Litigation to Mr. Bainton at the direction of Directors Donelan and Friedman.

(6)     NO CONFLICT OF INTEREST:  The letter confirmed that Dr. Olivarius and Ingwall had hired Mr. Bainton to represent them and the Endowment precisely to avoid a conflict of interest.  She wrote: "Under the ethical rules to which lawyers must abide, in a joint representation, a lawyer must represent equally the interests of both parties.  If these interests should conflict (*e.g.* you [the Board] want me to bring counterclaims and I don't), then the lawyer must drop both representations.  The lawyer's duty to be truthful, loyal and to act in the best interests of his clients attaches equally to both clients.  There can be no secrets between the parties.  So having Joe [Bainton of Ross & Hardies] represent the Endowment and Joanne simultaneously seems the most honest and effective way for us [Ingwall and Olivarius] to get the counsel that we need while avoiding being put into a conflict situation.  This is the only way that I know to make sure I cannot be seen to be in conflict with this Board and you with me.  The same is true for Joanne [Ingwall]."

(7)     FREISHTAT'S DIFFICULT PERSONALITY:  "Brendan Sullivan warned us before we retained Freishtat that Freishtat is a difficult personality who had to be managed carefully."

- **Concealed Document No. 2:  The July 8 Facsimile**.

290.     Dr. Olivarius also discovered that Ingwall re-faxed the Second June 6 Letter to Friedman on July 8 and again on July 9, 1996 (the "July 8 Facsimile").  Ingwall's files contained a seven-page fax that she sent to Friedman on July 8, 1996.  The first page is in Ingwall's handwriting and states:  "Dan, Could we set a time to talk by phone before next week's meeting [at which Dr. Olivarius' challenge to her termination would be discussed] – I have a number of issues to discuss which <u>cannot</u> wait – Hope you are OK – Joanne."  Ingwall wrote the number

**ORIGINAL COMPLAINT – Page 60**

"7" next to the space designated as "Number of Pages" on the fax cover sheet.  The Second June 6 Letter, a six-page document, is attached constituting the remainder of the seven-page transmission.  On the first page, in Ingwall's handwriting, are also written the words "Second request – 7/9/96" over which is stamped the word "FAXED."   Friedman was, and is, the Endowment's Chairman of the Board.

- **Concealed Document No. 3:   Ingwall's June 19 Handwritten Response To Freishtat's June 18, 1996 Letter**.

291.   Dr. Olivarius also found a handwritten letter dated June 19, 1996 from Ingwall responding to a June 18, 1996 letter from Freishtat (the "June 19 Letter").  The June 19 Letter fits squarely within the scope of Dr. Olivarius' request approved by the Arbitrator:

> 1.   All books, records and documents which relate, refer or arise from...
>
>> c.   Claimant's termination by Respondent including but not limited to: letters and correspondence to or from the Respondent or any of its employees, Board members, Stacie Dubnow, David Freishtat, or anyone else affiliated with [Freishtat's law firm]

At the Arbitration, the Endowment offered into evidence Freishtat's June 18, 1996 letter to the three Endowment directors addressing issues stemming from Dr. Olivarius' termination.  The Endowment, however, did not produce Ingwall's highly critical June 19 response, which clearly exculpates Dr. Olivarius.

292.   For example, the June 19 Letter corroborates the statements in the Second June 6 Letter that Ingwall --not Dr. Olivarius -- directed that Freishtat not attend the entire Board meeting:

> As our lawyer you do not "determine the extent to which you should participate in our Board meetings...."   I was/am also opposed to your being present during all of that Board meeting and told Ann [Olivarius] so.

Yet, the Endowment falsely claimed throughout the Arbitration that Dr. Olivarius unilaterally excluded Freishtat from the meeting thus justifying her termination.

293.    The June 19 Letter also corroborates Dr. Olivarius' statements in the Second June 6 Letter and at the arbitration that Freishtat has a difficult personality, which was why Ingwall decided to have Mr. Bainton make his initial presentation to the Board without any interference from Freishtat:

> You dominated all the discussion in NY even tho [sic] I was the one who need[ed] to choose counsel.  I did not want that to happen again.  I wanted to speak my mind and to hear Joe's [Bainton] opinions, his dialog with the other directors, etc. (as Stacie [Dubnow, Mr. Freishtat's daughter and law partner] says [different] lawyers have different approaches).

294.    Finally, Ingwall confirmed that she and Dr. Olivarius had no intention of unilaterally filing counterclaims.  Rather, they merely sought legal research to determine the validity of any potential counterclaims:

> In fairness to Joe [Bainton], he made it very clear (1) that he had not done enough research or thinking to even define what counterclaims could be considered, (2) that he agreed to bring any to the Board for discussion prior to any decision.  This seem[s] very correct to me. … I also wanted to hear your exchange with him – which I did not like!

> Please also distribute this letter [to other directors] if you like.

- **Concealed Document No. 4:  Dr. Olivarius' April 27, 1996 Letter To Friedman**.

295.    At the Arbitration, the Arbitrator ordered Dr. Olivarius to repay approximately $7,000 to the Endowment for old furniture and computer equipment that she had donated to charities.  The Arbitrator, however, found that this did not provide a basis for Dr. Olivarius' termination.  That aside, the Endowment withheld a document exonerating Dr. Olivarius from this charge.  A letter dated April 27, 1996 in Ingwall's files from Dr. Olivarius to Friedman,

Chairman of the Endowment, confirmed that Friedman had authorized her to dispose of assets that the Endowment claimed she misappropriated (the "April 27 Letter").  The letter was also sent to Directors Donelan and Ingwall, the Endowment's outside accountant, its bookkeeper, and its in-house administrator, and would as a matter of course have been placed in the Endowment's chronological file of correspondence.  Yet, once again the Endowment deliberately and without justification withheld this document.

- **Concealed Document No. 5:   The July 1, 1996 Letter From Stacie Dubnow With Ingwall's Notes**.

296.    Dr. Olivarius also discovered a letter dated July 1, 1996 from Stacie Dubnow to Ingwall (the "July 1 Letter").  The July 1 Letter contained Ingwall's handwritten marginalia refuting the assertions made by Dubnow in the letter.  The letter addressed Ingwall's refusal to sign the Board resolution to terminate Dr. Olivarius.  Ingwall refused to sign the resolution believing that there should be an independent third party to investigate Freishtat's claims against Dr. Olivarius, which she knew to be contrived.  In her letter, Dubnow states that she was allegedly unaware that Ingwall desired to further revise the resolution.  In a handwritten note to the side of this assertion Ingwall writes "Hard to believe given our conversation of 6/20."

297.    In page 2 of the letter Dubnow states that when her firm or the other directors "did not hear back from you for comments everyone assumed that they met your approval."  Ingwall's handwriting indicates "not so" and reflects a conversation with Dubnow to the contrary.  This document shows that Ingwall, who refused to sign the Board resolution, knew the Endowment had contrived the reasons for Dr. Olivarius' termination, and believed that Freishtat and Dubnow were misleading her and the Board.  Yet, the Board did not produce this exculpatory document or call Ingwall to testify at the arbitration.

## The Arbitration Closes In 1999.

298.    On August 12, 1998, Arbitrator Vaughn issued his award, finding for Dr. Olivarius on most issues, but concluding that she had not been wrongfully terminated due to positions that she had taken in the course of her June, 1996 disputes with Freishtat.   The arbitrator saw those as breaches of fiduciary duty.

299.    In that and in other respects, the opinion was rife with errors of fact and law, which errors were challenged in a pro se vacatur motion filed in the Superior Court of the District of Columbia.   That vacatur motion was denied, and the Endowment's cross-motion for confirmation was granted, on December 14, 1999.

300.    For fifteen months after the rejection of her vacatur motion, Dr. Oliverius attempted to put the past behind her and concentrated her energies on her physical recovery – the arbitration was in the past and she had no way of knowing that so much exculpatory evidence had been denied to her.

301.    Then Ingwall had a change of heart.

## The Harvard/Ingwall Papers

302.    Ingwall, a widely respected academic and a long-time Member of the Endowment's Board of Directors, a woman who shared the vision of Weisfeldt, Katz and Dr. Olivarius and who had employed Dr. Olivarius to transform the Endowment, felt terrible about the betrayal of her colleague and friend.

303.    As has been shown above, Ingwall was the last – and least willing – member of the conspiracy.   For months, she resisted the efforts of those who would soon be her co-Conspirators to coerce her into signing Dr. Olivarius' termination papers.

304.     Almost two years after the arbitration, Ingwall invited Dr. Olivarius to dinner at her home in Massachusetts.  She was emotional and admitted that what the Conspirators had done to Dr. Olivarius was "worse than evil": strong words from a clear-headed scientist not given to hyperbole.

305.     At the dinner, she advised Dr. Olivarius that she had, in her possession, a large number of papers that had been subpoenaed at the arbitral hearings and withheld by the Conspirators and their counsel.

306.     She also agreed to give these papers to Dr. Olivarius, through an intermediary.

307.     The Harvard/Ingwall files which Dr. Olivarius eventually received, in three installments beginning on March 15, 2001, comprised approximately 50,000 pages.  They were a revelation.  They contained scores of documents that the Conspirators had illegally hidden, though – or perhaps because – they illuminated the conspiracy and incriminated its members in multiple illegal acts.[68]

308.     The Conspirators were horrified to learn that Ingwall had turned over her files to Dr. Olivarius,[69] and quickly leaned on her again to limit the damage.

---

[68]     The Harvard/Ingwall files include many documents the Conspirators hid from the arbitrator and a Maryland judge, despite subpoenas to produce them.  Among the contents are Ingwall's notes of her conversations with Board Members, Fellows, outside contractors and outside counsel David Freishtat and Stacie Dubnow; correspondence among Board Members and between them and counsel; Board minutes; communications from Endowment employees Dana Boyd and Karen Savransky; transcripts of phone calls; correspondence between and among Endowment officers, directors, employees and counsel; reports from the accounting firm KPMG to the Board; and the sealed settlement documents in the Endowment's $100 million lawsuit against Shearman & Sterling.  Dubnow, Freishtat's daughter and law associate, once promised the other Conspirators that "Ann [Olivarius] would never see" these documents. In fact, the documents demolish the Endowment's manufactured case against Dr. Olivarius, and reveal a larger pattern of criminality of which that case was a part.  Nevertheless, by their nature, the Harvard/Ingwall documents are still incomplete.  Discovery will fill in the gaps.

[69]     Olivarius got access to the Harvard/Ingwall files on March 15, 2001.  Recognizing they contained many crucial documents the Endowment had hidden during the 1998 arbitration, she found she had only 30 days under applicable statutes to seek to reopen the verdict under the law of the District of Columbia, where the arbitration had been held. The brief window to find a lawyer, get him immersed in the substantial record of the case, and file a motion to reopen it meant she was able to draw on only half a dozen documents in those files to try to reopen the arbitration.  Since then she has reviewed the files thoroughly.  Counsel have now

**ORIGINAL COMPLAINT – Page 65**

309.    In the short term, this strategy worked.  Ingwall returned to the Conspirators' camp, asserting in an affidavit that she could no longer recall the June 6 letter that Dr. Olivarius had found in two places in her Harvard files.

310.    When Dr. Olivarius, amazed that the Endowment could be so brazen as to deny the June 6 letter's existence, asked for Ingwall's help authenticating it, she did not deny its validity.  Instead, it was clear that she was anxious about being bullied by her co-Conspirators: "I am very upset about getting dragged back into this," she wrote.

311.    The Harvard/Ingwall documents prove conclusively that the Conspirators have perpetrated a number of frauds on Dr. Olivarius, as well as the AAA arbitrators, on the pre- and even post-vacatur Superior Court and, even now, the District of Columbia Court of Appeals.

1.    **The Active Involvement Of Endowment's Counsel In The Suppression Of Evidence During Arbitral Discovery Was Crucial To The Success Of This Fraud On The Court.**

312.    Counsel for the Endowment actively participated in the suppression of evidence covered in outstanding discovery orders.  During the course of hearings conducted before the Arbitrator on discovery disputes, they knowingly misrepresented to the Court that documents subpoenaed by Dr. Olivarius, concerning her termination "for cause," did not exist or had already been provided.  In fact, those documents were available to defense counsel and to other members of the conspiracy, but had never been provided.

313.    On January 16, 1997, the Arbitrator issued a subpoena for documents that would have included, among other things, the June 6, June 19 and July 1 letters.[70]  Shortly before the

---

identified over 30 documents that implicate the Conspirators in a RICO conspiracy to defraud the courts as well as Dr. Olivarius.  A RICO suit will permit full-fledged discovery in the files of the Endowment, its directors, officers and contractors, revealing even more relevant documents and a more comprehensive picture of the conspiracy.

[70]    The subpoena directed the Endowment to produce, among other things, "all books, records and documents which relate, refer, or arise from: … claimant's letter to the Board of Directors in early June 1996,

hearing, he issued an oral order to the Endowment, which he then summarized, in writing, on April 18, 1998, as follows: "I indicated that I did not want the record to be created where the Endowment has exclusive control of categories of records and submits only certain documents, denying access to claimant to obtain other, assertively exculpatory documents."[71]

314.   No documents were tendered in response to those orders.  Although Freishtat and the Members of the Board, at a minimum, had copies of exculpatory documents that would have placed Dr. Olivarius on notice of the degree of complicity between the witnesses against her, these documents were never produced by Freishtat.  In fact, Board Member Ingwall gave them to Dr. Olivarius, for the first time, in 2001.

315.   If Dr. Olivarius had had possession of the Harvard/Ingwall Papers, she would have had evidence available to assist her, in her case in chief, in refuting allegations that her termination was warranted.  The then-absent evidence would also have provided her with a basis to cross-examine witnesses as to the falsity of their testimony, and as to their motivations for providing such testimony.

316.   The mere existence of the documents listed below, which represent less than 100 pages of at least 50,000 pages of withheld documents, would have, at a minimum, shown a serious discrepancy in the timeline that the Conspirators used in the arbitration to justify their conduct.

317.   The failure to produce documents pursuant to the Arbitrator's orders can only be characterized as unilateral, self help, lawless behavior which represented a co-opting of the judicial process.

---

discussing the possibility of advancing counter claims in the New York suit against her and Ingwall …." Subpoena, January 16, 1997, MCA-O501.

[71]   Order dated April 18, 1998, MCA-O922.

318.    Nevertheless, the Conspirators could leave nothing to chance.   The entire arbitration proceeding was designed to ensure that the cover-up of the illegal conspiracy's existence -- which had as its centerpiece, court approval, on fraudulent grounds, of the Maryland Litigation -- could never be overturned.   This represents fraud on the court in two separate proceedings:   the Maryland Litigation proceedings and the Washington, D.C. arbitration proceedings.

319.    The elimination of Dr. Olivarius, and the ratification of her termination, was accomplished through this second proceeding (the Arbitration).   The Conspirators, through the arbitration process, thereby insulated the corrupted findings of both the arbitration proceeding and the Maryland Litigation.

**2.**    **A Sample of a Few of the Harvard Papers, which suggest even greater, more extensive misdeeds.**

320.    The Harvard/Ingwall were at all times in the possession, custody and control of Freishtat and others.   They clearly show, at a minimum, that the charges against Dr. Olivarius were <u>unsupported at the time of her termination</u>.

321.    They also reveal a post-discharge campaign to justify her dismissal on grounds acceptable to all Conspirators, and illustrate how claims were bartered to ensure the support of those Board Members who had reservations about dismissing Dr. Olivarius "for cause.".

322.    The documents further show that Freishtat was weighing in on the nature and consistency of the post-hoc termination charges as they were being brokered and cobbled together.   His motive in doing so was to ensure that the charges, and the proof to be presented in the arbitration proceeding, was seamless.

**ORIGINAL COMPLAINT – Page 68**

323.    No one was ever meant to see the documents that Joanne Ingwall produced in 2001.  They proved what the Conspirators had tried so desperately to hide:  an orchestrated effort to perpetrate a fraud on the court.

**3.    The Impact of the Harvard Documents on the Charges Upheld by the Arbitrator**

324.    The Arbitrator dismissed four charges against her.

325.    The Arbitrator found the evidence presented by the Board in its position that Dr. Olivarius misrepresented the circumstances under which she left her prior employment with Goldman Sachs and Judge Patel, was insufficient.  He stated, "I am not persuaded that Claimant withheld from the Endowment information she was required to disclose."

326.    In fact, the Arbitrator found no basis to terminate Dr. Olivarius for cause based on alleged misappropriation of funds in the form of alleged improper or inflated expenses.  The Arbitrator stated, "in order to constitute cause for her termination, the abuse or falsification of expenses must have been known and relied on at the time the decision to terminate claimant was made on June 20, 1996 . . . ."

327.    "What is clear is the Endowment knew little of claimant's handling of her expenses at the time it terminated her; and Mr. Freishtat made his statements/assertions to the Board with respect to her expenditures on the most flimsy and conclusory basis".  (Tr. Freishtat, IV, 6-7).  What he knew with respect to claimant's expense submissions and what the Board relied on in this regard in terminating claimant on July 20th simply does not constitute a material breach of the agreement..

328.    Thus, the Arbitrator understood that the materiality of an allegedly fraudulent misrepresentation must be proven and known and relied on as of the date of the decision to

**ORIGINAL COMPLAINT – Page 69**

terminate claimant.  It stands or falls, as it must, on the adequacy of the pre-termination proof of dereliction developed by the Board.

329.     The Arbitrator also determined the Endowment had not proven a claim of gross negligence against Dr. Olivarius in either instructing the Endowment's staff to destroy expense reports "contrary to its legal responsibilities" or by inadvertently allowing the Endowments' corporate charter to lapse, for a period of short duration.

330.     The Arbitrator was further unpersuaded of the dissemination of the S&S directory contrary to the advice of the Endowment's counsel, and her possession of a privileged S&S document, which she withheld was provided sufficient cause to effect her termination.  The Arbitrator stated he was not persuaded that the referenced conduct was malicious or seriously detrimental to the Endowment such that it could serve as a basis for claimant's termination.

331.     The Arbitrator dismissed the majority of the charges against Dr. Olivarius.

332.     The only major grounds for termination upheld by the Arbitrator, operating in the absence of any documentary evidence which could support a contrary finding, were his findings that Dr. Olivarius had a conflict of interest insofar as she was contemplating the assertion of counterclaims in the New York Litigation, and that she had somehow misled the Board as to the nature and implications of the counterclaim issue.

333.     The Arbitrator found Dr. Olivarius guilty of wrongly sending the Freishtat opinion letter to Joe Bainton at Ross & Hardies.

334.     The Arbitrator found that Dr. Olivarius retained Endowment assets at her home for which she had to pay $7,188.75.

335.     The Harvard/Ingwall Papers clearly evidence the manufacturing of the conflict of interest charge post-termination.  The timeline of the documents refutes the allegation that there

were any serious ethical concerns about Dr. Olivarius' actions <u>before the need to fabricate a record justifying her termination "for cause" arose</u>.

336.    The Harvard/Ingwall Papers also make it clear that ethical considerations had nothing to do with the Conspirators' assessment of Dr. Olivarius' actions.  Those documents show, for instance, that <u>Ingwall (then the head of the Endowment's Litigation Committee) had authorized the hiring of outside Counsel for both herself and Dr. Olivarius.  They also show that Ingwall had authorized the altering of the agenda of the June 7th 1996 Board meeting to exclude Freishtat so that Board Members could freely discuss the need for outside Counsel</u>.

337.    That is, they showed that the alleged "conflict of interest" claims were not only baseless, but that Dr. Olivarius had acted consistently in the interest of the Company and at the direction of the head of the Board's Litigation Committee.

338.    Yet, Freishtat, *et al.* relentlessly attacked Dr. Olivarius on conflict of interest grounds, begging this question:   <u>If ethical considerations were motivating the actions of the Board, why did the Board not pursue disciplinary actions against Ingwall?</u>

339.    No Board action was ever mounted against Ingwall. If Dr. Olivarius' potential conflict of interest was a serious concern, as portrayed by the Conspirators in the arbitration proceeding, it applied <u>equally</u> to both Drs. Ingwall and Olivarius.  In fact, only one party was disciplined – and then with the severest sanction available.

340.    No evidence has ever been presented that suggests that Ingwall was disciplined for the same acts which apparently resulted in Dr. Olivarius' termination "for cause," a fact which points towards an unsavory, yet inescapable conclusion: that the Conspirators mounted this charge <u>after the fact </u>and only because it was likely to persuade the Arbitrator to ratify their illegal actions against Dr. Olivarius.

**ORIGINAL COMPLAINT – Page 71**

341.    The Harvard/Ingwall Papers also illuminate the role played by Freishtat and Dubnow in scripting the presentation and substance of the "proof" that was presented to the arbitral tribunal.  This could only be accomplished through repeated disobedience to discovery orders issued not only by the Arbitral Tribunal but by the State Court of Maryland in the Maryland Litigation.

342.    Having created this artful, but illegal, enterprise, Freishtat could leave nothing to chance.  It was vital that he <u>himself</u> present the version of events that he had crafted to the Arbitrator.  For this reason, he cast himself as the arbitration proceeding's star witness, and used his undoubted charisma to advance and support the fraud on the court that he had so assiduously designed.

343.    No one outside the conspiracy itself was left in a position to challenge the presentation made.  The findings in the arbitration award itself represent the second tier of judicial determinations, which served further to insulate Freishtat and the other members of the conspiracy from future prosecution for their illegal actions.

344.    The only existing record upon which the appellate court could have acted was irredeemably corrupted.  The information provided to Dr. Olivarius in the Harvard/Ingwall Papers, notifying her of the fraud, did not fit an appellate timetable.  She was consequently prevented from using this evidence in the appellate process.

345.    Each level of review only served to confirm the Conspirators' fraud on the court, and to insulate them even further from the possibility of eventual punishment.  The fraud continues to this very day, as represented in Petition of Dr. Ann McAllister Olivarius for rehearing by the division dated 9/23/04, and the appeals process is now in its sixth round.

**ORIGINAL COMPLAINT – Page 72**

346.     The standard of review at the appellate level is abuse of discretion.  Given that the evidence was withheld from Dr. Olivarius and the Court itself, appellate review could do nothing more than rubber stamp earlier conclusions that factual determinations made against Dr. Olivarius were proper.

## V.  CAUSES OF ACTION.

## A.     RICO ALLEGATIONS

347.     The federal Racketeer Influenced and Corrupt Organization Act ("RICO), 18 U.S.C. §§ 1961 *et seq.*, expressly provides for civil remedies for any "persons injured in [her] business or property by reason of a violation of [18 U.S.C. § 1962]."  RICO is to be "liberally construed to effectuate its remedial purposes."

## RICO's CONCEPTUAL FRAMEWORK

348.     Section 1962 sets out four general types of "prohibited activities" and, in so doing, gives content to the term "violations of [18 U.S.C. § 1962]."  More specifically, and for purposes of this lawsuit, it is unlawful for any of the RICO Defendants herein:

- "through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in control of any [RICO enterprise]";

- "employed by or associated with any [RICO enterprise] to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity"; and

- to conspire to violate any of the provisions of subsections (a), (b), or (c) of 18 U.S.C. § 1962.

Plaintiff Olivarius is asserting these claims, viz., claims pursuant to 18 U.S.C. § 1962(b)-(d).

349.     Three concepts permeate each category of prohibited activity:  (a) the concept of the RICO "person"; (b) the concept of a "pattern of racketeering activity"; and (c) the concept of

**ORIGINAL COMPLAINT – Page 73**

a RICO "enterprise."   The concept of a "pattern of racketeering activity" subsumes two other concepts:  (d) the concept of "racketeering activity" and (e) the concept of "predicate acts."

**RELEVANT RICO PERSONS**

350.    A RICO "person" is "any individual or entity capable of holding a legal or beneficial interest in property."   Plaintiff Dr. Ann Olivarius is a RICO "person," and she has been seriously injured in her business and property by reason of the Defendants' violations of Section 1962 of the RICO statute.

351.    The following individuals or entities are being sued for substantive violations of the Racketeer Influenced and Corrupt Organizations Act:  Dr. Daniel Friedman, Dr. Joanne S. Ingwall, William J. Donelan, Dr. Richard L. Page, Karen Savransky, Dana Quinn Boyd, Freishtat, Burke, Mullen & Dubnow, LLC, David Freishtat and Stacie Dubnow.   Collectively, they are referred to as the "RICO Defendants."   Each of them is also a RICO "person" under Section 1961(3) of the RICO Act.

**THE CORE GROUP ENTERPRISE AND THE ENDOWMENT ENTERPRISE.**

352.    Based upon Plaintiff's current knowledge, the following persons constitute a union or group of individuals associated in fact that Plaintiff refers to as the "Core Group Enterprise":  (1) Friedman; (2) Donelan; (3) Savransky; (4) Boyd; (5) Dubnow; (6) Freishtat; (7) Dubnow; and (8) FBMD.  The Core Group Enterprise is an "association in fact" enterprise.

353.    The Core Group Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

354.    Moreover, the Sarnoff Endowment itself constitutes a "legal entity" enterprise. The Plaintiff refers to this enterprise as the "Endowment Enterprise," which is and has been at all relevant times a legal entity engaged in and affecting interstate and foreign commerce.

355.    While the RICO Defendants participate in and are members and part of the Core Group Enterprise, they also have an existence separate and distinct from the enterprise.   In addition, some, but not all of the RICO Defendants, are employees of the Sarnoff Endowment, but they too have an existence separate and distinct from the Endowment Enterprise.

356.    To successfully obtain monies rightfully belonging to the Endowment, the RICO Defendants needed a system that allowed them to manipulate and control the Endowment's governance systems and conceal the manner in which that was done.   As explicitly described above, the only way to secure unhindered access to the Endowment was with the removal of Dr. Olivarius.   The Core Group Enterprise provided the RICO Defendants with the system and ability to remove Dr. Olivarius.   The RICO Defendants' control of and participation in the Endowment Enterprise was necessary for the successful operation of their scheme.   The RICO Defendants controlled and operated the Core Group Enterprise in at least the following ways:

(a)    By developing and institutionalizing the RICO Defendants authority, express and implied, over critical aspects of the Endowment; and

(b)    By controlling the Endowment's Board of Directors meetings and voting, so as to delegate a *de facto* transfer of authority to the RICO Defendants, such that informed board approval and oversight was rarely, if ever, necessary or existent.

357.    As set forth above, the Core Group Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the RICO Defendants engage.

358.    The RICO Defendants also controlled and operated the Endowment Enterprise to the great detriment and injury to Plaintiff's business and property interests.   The Endowment Enterprise also has an ascertainable structure separate and apart from the pattern of racketeering activity in which the RICO Defendants engage.

**ORIGINAL COMPLAINT – Page 75**

## PREDICATE ACTS.

359.    Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under, among others, 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud).  As set forth below, RICO Defendants have engaged in a pattern of conduct violating each of these laws to effectuate their scheme.

360.    In addition, in order to make their scheme effective, each of the RICO Defendants sought to and did aid and abet the others in violating the above laws within the meaning of 18 U.S.C. § 2.  As a result, their conduct is indictable under 18 U.S.C. §§ 1341 and 1343 on this additional basis.

### Violations of 18 U.S.C. §§ 1341 and 1343

361.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, the RICO Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things sent to be delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to agreements, correspondence, notes, reports, pleadings, memoranda and other data.

362.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, the RICO Defendants, also in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things that include but are not limited to agreements, correspondence, oral and written statements, faxes, memoranda, pleadings, data and other reports.

363.    The matter and things sent by RICO Defendants via the Postal Service, commercial carrier, wire or other interstate electronic media include, *inter alia*:

(a)    material containing false and fraudulent misrepresentations about Dr. Ann Olivarius' job performance, mental stability and purported alcohol problems;

(b)    material that concealed or did not disclose that RICO Defendants would and did intend on misappropriating Endowment monies and/or property for their own personal gain;

(c)    material containing false and fraudulent misrepresentations concerning Dr. Ann Olivarius' purported expense account abuse; and

(d)    material containing false and fraudulent misrepresentations concerning the purported value of a settlement of the Maryland Litigation as being in the "best interests" of the Endowment.

364.    Other material and things sent through or received from the Postal Service, commercial carrier, or interstate wire transmission by RICO Defendants included information or communications in furtherance of, or necessary to, effectuate the scheme.

365.    The RICO Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional and made for the purpose of deceiving others so that the RICO Defendants could obtain others' property for their gain.  The acts constitute mail and wire fraud:

- because all of the RICO Defendants intended to devise and did devise a scheme or artifice to defraud Olivarius, as well as the arbitrator and the courts before which she was trying to vindicate her business reputation and property rights; and

- because some or all of those Defendants (e.g., Defendants Freishtat, Dubow, FBMD, Boyd and Savransky) devised and implemented that scheme or artifice to defraud so as to obtain money or property for themselves by false of fraudulent pretenses, representations or promises; and

- because those Defendants' scheme operated on a national basis between and among lawyers based in Maryland and the District of Columbia, Endowment employees based in Virginia, and Endowment directors based in New Mexico, Massachusetts, North Carolina and Washington; and

- because those Defendants were dependent on the use of the nation's wires, mails and interstate carriers to communicate with each other regarding the matters most relevant here, and so engaged in a nationwide voice and written communications transmitted or caused to be transmitted by means of national and international wire and radio communication networks, deposited written communications with the Postal Service and private or commercial interstate carriers for delivery, and/or took or received such communications from the Postal Service and private or commercial interstate carriers; and

- because such wire, radio and mail communications were undertaken for the purpose of executing such a fraud or artifice, or – until Dr. Ingwall's disclosures on March 15, 2001 and thereafter – attempting to do so.

366. The RICO Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and were relied on as set forth above. As a result, RICO Defendants have obtained money and property, and Plaintiff has been injured in her business or property by the RICO Defendants' overt acts of mail and wire fraud, and by their aiding and abetting each others' acts of mail and wire fraud.

## PATTERN OF RACKETEERING ACTIVITY.

367. The RICO Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, *i.e.*, indictable violations of 18 U.S.C. §§ 1341 or 1343 as described above, within the past ten years. In fact, each of the RICO Defendants has committed or aided and abetted in the commission of hundreds of acts of racketeering activity spread over many years. Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, and had similar results and similar victims.

368.    The multiple acts of racketeering activity that RICO Defendants committed and/or conspired to or aided and abetted in the commission of were related to each other and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

369.    A few representative examples of the types of predicate acts committed by RICO Defendants pursuant to their scheme to defraud the Plaintiff and their conspiracy to violate RICO are set forth below.

### The Maryland Litigation Settlement.

370.    The Defendants engaged in a pattern of fraud that injured Plaintiff because it constituted a fraud on the adversarial system she intended to use to redress her wrongful termination from the Endowment.  Through misrepresentation and deceit, the RICO Defendants sent correspondence, pleadings and memoranda through the nations wires and mails that falsely portrayed the settlement of the Maryland Litigation as in the best interests of the Endowment.  In reality, it was far from the best interests of the Endowment and was a carefully orchestrated scheme to quickly end the Maryland Litigation so that the financial rewards due to the Endowment could more easily be siphoned off by the RICO Defendants for their own self-enrichment.

### The Olivarius Arbitration.

371.    The RICO Defendants were engaged in a concerted and prolonged scheme to smear Plaintiff's business reputation, thereby injuring her business and property.  The use of false and misleading statements and evidence during the 1998 Arbitration proceeding indisputably injured Plaintiff.  The result of the RICO Defendants' fraudulent representations to Plaintiff and the arbitrators was an adverse arbitration result procured only by fraud.  Many, if

not all, of the key misrepresentations were, at one time or another, served through the U.S. Mail, via facsimile, or otherwise completed via commercial interstate carrier.

## RICO VIOLATIONS.

### § 1962(b).

372.    Section 1962(b) of RICO provides that "it shall be unlawful for any person through a pattern of racketeering activity or through collection of any unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

373.    As alleged above, RICO Defendants acquired and maintained an interest and control of the Core Group Enterprise and through the Core Group Enterprise, the Endowment and its assets.

374.    In addition, the RICO Defendants acquired and maintained an interest and control of the Endowment Enterprise, and through that enterprise, the Endowment itself.

### § 1962(c).

375.    Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity …."

376.    Through the patterns of racketeering activities outlined above, the RICO Defendants have also conducted and participated in the affairs of the Core Group Enterprise and the Endowment Enterprise.

## § 1962(d).

377.    Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

378.    RICO Defendants' conspiracy to secure money rightfully belonging to the Endowment for their own use through the fraudulent schemes described above violates 18 U.S.C. § 1962(d).

379.    Each of the RICO Defendants agreed to participate, directly or indirectly, in the conduct of the affairs of the Core Group Enterprise and/or Endowment Enterprise through a pattern of racketeering activity comprised of numerous acts of mail fraud, wire fraud, and bank fraud, and each RICO Defendant so participated in violation of 18 U.S.C. § 1962(c).

## RICO COUNTS

## COUNT 1:  VIOLATIONS OF RICO 18 U.S.C. § 1962 (b) AND (c)

380.    Plaintiff incorporates and realleges all foregoing paragraphs as if set forth fully herein.

381.    This claim arises under 18 U.S.C. § 1964(c).

382.    As set forth above, RICO Defendants have violated 18 U.S.C. § 1962(b) by acquiring and maintaining an interest in an enterprise affecting interstate or foreign commerce through a pattern of racketeering activity; and have violated 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of the Core Group Enterprise and/or Endowment Enterprise through a pattern of racketeering activity.

383.    As a direct and proximate result, the Plaintiff has been injured in her business and property by both the predicate acts that make up the RICO Defendants' patterns of racketeering

and their participation and conduct of the affairs of the Core Group Enterprise and/or Endowment Enterprise.

**COUNT 2:  VIOLATIONS OF RICO 18 U.S.C. § 1962(d) BY
CONSPIRING TO VIOLATE 18 U.S.C. § 1962(b) AND (c)**

384.    Plaintiff incorporates and realleges all foregoing paragraphs as if set forth fully herein.

385.    This claim arises under 18 U.S.C. § 1964(c).

386.    In violation of 18 U.S.C. § 1962(d), RICO Defendants have, as set forth above, conspired to violate:  18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of the Core Group Enterprise and/or Endowment Enterprise through a pattern of racketeering activity.

387.    As a direct and proximate result, the Plaintiff has been injured in her business and property by both the predicate acts that make up the RICO Defendants' patterns of racketeering and their participation in the conduct or affairs of the Core Group Enterprise and/or Endowment Enterprise.

388.    Specifically, the Plaintiff has been injured in her business or property by the false misrepresentations and omissions designed to fraudulently end the Maryland Litigation and dupe various courts and arbitrators concerning the validity of Plaintiff's wrongful termination from the Endowment.

**B.    COMMON LAW CAUSES OF ACTION .**

   **1.    Count 4:  Fraud On The Arbitration And The Courts.**

389.    Plaintiff Dr. Olivarius realleges the facts set out in the preceding paragraphs, and incorporates those paragraphs herein for all purposes.

### a.      The Maryland Litigation.

390.   The Defendants engaged in a pattern of fraud that undermined the adversarial nature of the Maryland Suit.  Those efforts subverted the integrity of the proceedings before it.

391.   The Defendants' acts were of such a nature as to have prevented Dr. Olivarius, not a party to the proceeding, from being in a position to fully and fairly represent and protect her interests.

392.   As described above, the actions of the Defendants rose to the level of an unconscionable plan or scheme calculated to influence the Court in arriving at its decision to approve the settlement between the parties to the Maryland Litigation.

393.   That plan was to settle the Maryland Litigation for their own financial gain, not that of the Endowment.  The removal of Plaintiff Dr. Olivarius for "alleged cause" was the necessary predicate to the achievement of the Conspirator's illegal end.

394.   As part of the scheme, attorneys acting as officers of the Court represented that the settlement was in the parties' best interests, offered false argument and testimony to that effect, and withheld from the Court  documentary evidence and testimony that would show otherwise.

395.   The Court was therefore unfairly influenced in reaching its determination to approve the settlement based on the manipulations of the Core Group Enterprise, and the attorneys for the parties.

396.   As a result, from the presentation of the evidence at the evidentiary hearing to approve the settlement, Judge Thompson did not know, and had no way of knowing, that the parties to the suit were not dealing at arms length. The two victims of the unconscionable plan were the Endowment and Plaintiff.

**ORIGINAL COMPLAINT – Page 83**

### b.    The 1998 Arbitration Proceeding.

397.    The Defendants also engaged in a fraud on the 1998 arbitration proceeding, for the purpose of preserving the illegal gains of the conspiracy identified above, and ensuring that the existence of the conspiracy would not come to light, in the context of an ill-starred defense of their precipitous ouster of Plaintiff Dr. Olivarius.   Through their actions, the Defendants corrupted and defiled the integrity of the proceedings.

398.    The acts of Defendants were of such a nature as to have prevented Dr. Olivarius, from being in a position to fully and fairly represent and protect her interests in either her case in chief or in her cross-examination of the Endowment's case.

399.    As described above, the actions of the Defendants rose to the level of an unconscionable plan or scheme. Counsel for the Endowment, GCD, acting for the benefit and at the instance of the Defendants, were actively involved in the concealment and suppression of evidence during arbitral discovery that was crucial to the success of their fraud on the arbitrator.

400.    The same actions deprived Plaintiff Dr. Olivarius of key evidence that would have put her on notice of the complicity between the Defendants' witnesses to the arbitration proceeding and Endowment counsel. The withheld documents would have aided her in refuting the allegations that her termination for cause had been warranted.

401.    As described above, the Defendants rose to the level of an unconscionable plan or scheme calculated to unfairly eliminate Dr. Olivarius' claims, and obtain, based on false evidence, an unwarranted ratification of her termination.

### c.    The Arbitration Appeals.

402.    As shown above, the integrity of the appeals process relative to the arbitration award was also corrupted.   With each level of judicial review, the Defendants became further

insulated from the consequences for their illegal actions – as each court became further and further removed from the actual facts of the case.  That was so the only record upon which the appellate court could base its decisions was irredeemably corrupted.

403.    The information provided to Dr. Olivarius in the Harvard/Ingwall Papers notifying her of the fraud simply did not fit either an appellate timetable or the limited review process that usually (but not necessarily) occurs at that level.  As a result, the fraud continues to this very day.

404.    Through an ongoing pattern of activity, the Defendants engaged in a fraud on the arbitration appeals, for the purpose of preserving the illegal gains of the conspiracy identified above, and to ensure that the existence of the conspiracy would not come to light. Through its actions, the integrity of the proceeding was corrupted and defiled.

405.    The Defendants' acts were of such a nature as to have prevented Dr. Olivarius from being in a position to fully and fairly represent and protect her interests in the appellate process.

406.    Given that the evidence was withheld from Dr. Olivarius, the arbitrator, and the Courts, in the earlier proceeding, appellate review premised on the assumption that the arbitral proceedings had been fairly conducted (and not corrupted) could do nothing more than rubber stamp the earlier and corrupted conclusions that factual determinations made against her were proper.  In this way, the appeals were and are trapped in the corruption of the underlying proceedings.

407.    Plaintiff Dr. Olivarius was injured by reason of these continuing actions and failures to act in all three types of proceedings.  As a direct and proximate result of Defendants' complained-of acts, she suffered damages.

**ORIGINAL COMPLAINT – Page 85**

408.    Accordingly, the Defendants are liable to Plaintiff Dr. Olivarius for actual and punitive damages, interest, and costs.

**2.      Count 5:  <u>Common Law Fraud</u>.**

409.    Plaintiff Dr. Olivarius realleges the facts set out in the preceding paragraphs, and incorporates those paragraphs herein for all purposes.

410.    Defendants made the false representations to Plaintiff and/or the arbitrator and courts, which have been described above.

411.    The falsity of those representations was either known to the Defendants or the representations were made with reckless indifference to their truth.

412.    The misrepresentations was made for the purpose of defrauding the Plaintiff.

413.    The Plaintiff relied on the misrepresentations, and had the right to rely on them.

414.    Plaintiff Dr. Olivarius was injured by reason of these continuing actions and failures to act and, as a direct and proximate result of Defendants' complained-of acts, suffered compensable damages.

415.    Accordingly, the Defendants are liable to Plaintiff Dr. Olivarius for actual and punitive damages, interest, and costs.

**4.      Count 6:  <u>Negligent Misrepresentation</u>.**

416.    Plaintiff Dr. Olivarius realleges the facts set out in the preceding paragraphs, and incorporates those paragraphs herein for all purposes.

417.    Plaintiff asserts this negligent misrepresentation claim, as an alternative to her fraud claims.

418.    Defendants negligently asserted false statements to the Plaintiffs and/or to the arbitrator and courts, as described above.

**ORIGINAL COMPLAINT – Page 86**

419.    The Defendants intended that their statements would be acted upon by the Plaintiff and, to the Plaintiff's detriment, by the arbitrator and the courts.

420.    The Defendants had knowledge that the Plaintiff would probably rely on the statements, which, if erroneous, would cause loss or injury.

421.    The Plaintiff, justifiably, took actions in reliance on the statements.

422.    The Plaintiff suffered damage proximately caused by the Defendants' negligence.

423.    Plaintiff Dr. Olivarius was injured by reason of these continuing actions and failures to act and, as a direct and proximate result of Defendants' complained-of acts, suffered damages.

424.    Accordingly, the Defendants are liable to Plaintiff Dr. Olivarius for actual and punitive damages, interest, and costs.

**5.      Count 7:  <u>Civil Conspiracy</u>.**

425.    Plaintiff Dr. Olivarius realleges the facts set out in the preceding paragraphs, and incorporates those paragraphs herein for all purposes.

426.    The Defendants formed an association of two or more persons.

427.    That association had numerous unlawful objectives, including but not limited to the defrauding of the Plaintiff, the arbitration, the courts, and the willful corruption of arbitral and judicial processes.

428.    The Defendants had an agreement or understanding with regard to the objectives and the manner in which they were to be achieved.

429.    The Defendants committed numerous unlawful, overt acts in furtherance of the conspiracy.

430.    Plaintiff Dr. Olivarius was injured by reason of the Conspirators' continuing actions and failures to act and, as a direct and proximate result of Defendants' complained-of acts, suffered damages.

431.    Accordingly, the Defendants are liable to Plaintiff Dr. Olivarius for actual and punitive damages, interest, and costs.

**6.      Count 8:  <u>Defamation</u>.**

432.    Plaintiff Dr. Olivarius realleges the facts set out in the preceding paragraphs, and incorporates those paragraphs herein for all purposes.

433.    The Defendant published statements of alleged fact regarding the Plaintiff.

434.    The statements were false.

435.    With regard for the truth of the statements, the Defendants were:

    (1)     acting with actual malice;

    (2)     negligent; or

    (3)     liable without regard to fault.

436.    Plaintiff Dr. Olivarius was injured by reason of these continuing actions and failures to act and, as a direct and proximate result of Defendants' complained-of acts, suffered damages.

437.    Accordingly, the Defendants are liable to Plaintiff Dr. Olivarius for actual and punitive damages, interest, and costs.

**7.      Count 9:  <u>Tortious Interference With Contracts and Business Relations</u>.**

438.    Plaintiff Dr. Olivarius realleges the facts set out in the preceding paragraphs, and incorporates those paragraphs herein for all purposes.

439.   Plaintiff had valid contracts or business relations with, among others, her personal insurance companies, GEICO and Allstate.

440.   Defendants willfully and intentionally interfered with those contracts and/or business relations by reason of the acts described above.

441.   Plaintiff Dr. Olivarius was injured by reason of these continuing actions and failures to act and, as a direct and proximate result of Defendants' complained-of acts, suffered damages.

442.   Accordingly, the Defendants are liable to Plaintiff Dr. Olivarius for actual and punitive damages, interest, and costs.

## VI.   A NOTE ON LIMITATIONS.

443.   Defendants will undoubtedly respond to this complaint by, inter alia, seeking to claim the protection of the applicable statutes of limitation.  That would be inappropriate for at least three reasons.

444.   First, as set forth above, these Defendants have made numerous and material misrepresentations, by and through the Endowment and its lawyers at GCD, that they have honored all arbitral orders and subpoenas and produced all of the documents subject to those discovery requests and arbitral orders.  Now that the Harvard/Ingwall documents have actually been disclosed, and the falsity of those representations revealed, the Defendants must be and are equitably estopped from asserting limitations defenses.

445.   Second, this Complaint addresses the Defendants' systematic efforts at complying with arbitral and judicial processes from mid-1996 to the present.  As to those events that actually took place for the first time, within the last four years (viz, in vacatur proceedings in the Supreme Court that began on April 13, 2001, and in those appellate proceedings in the District of

**ORIGINAL COMPLAINT – Page 89**

Columbia Court of Appeals which began in the latter part of 2003), there should be little question as to the inapplicability of at least RICO's four year statutes of limitation to Defendants' acts and failures to act within that period.

446.   _Third_, as to those actions and failures to act challenged herein that occurred between June 20, 1996 and March 15, 2001, well-recognized deferred accrual and/or tolling doctrines such as the discovery rule, fraudulent concealment, the continuing tort doctrine, and the doctrine of equitable estoppel operate to preclude any defense assertion of such limitations defenses.

## VII.  **PRAYER FOR RELIEF.**

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff Dr. Olivarius respectfully requests that, upon trial of this matter to a verdict, this Court enter a judgment against the Defendants:

a.   incorporating such orders as are necessary, in the circumstances, to correct past misstatements Defendants have made regarding the Plaintiff and her termination, to permanently foreclose the promulgation of the same or similar misstatements in the future, and to restore her business reputation;

b.   awarding actual economic damages in the maximum amount permitted by the facts, law and/or equity;

c.   awarding statutory treble damages pursuant to 18 U.S.C. § 1964(c);

d.   because many of the acts and failures to act described above were committed with bad faith, intent, and/or knowing disregard or conscious indifference to the rights of Plaintiff Dr. Olivarius, awarding punitive or exemplary damages in the maximum amount permitted by the facts, law and/or equity;

e.      awarding pre-judgment and post-judgment interest on the foregoing damages at the maximum rate permitted by contract, law, or equity;

f.      awarding Plaintiff her investigative and litigation costs, including her reasonable attorneys' fees, to the maximum extent permitted by 18 U.S.C. § 1964, Fed. R. Civ. P. 54(d), law or equity; and

g.      awarding Plaintiff Dr. Olivarius such other and further relief as is appropriate in the circumstances.

DATED:  March 14, 2005.

Respectfully submitted,

**ZUCKERMAN SPAEDER LLP**

By:  ___/s Martin S. Himeles, Jr._____
        Martin S. Himeles, Jr.

100 E. Pratt St., Suite 2440
Baltimore, MD  21202
Tel: (410) 332.0457

**DIAMOND McCARTHY TAYLOR FINLEY
BRYANT & LEE, LLP**

By:  /s James D. McCarthy (by msh)
        James D. McCarthy
        State Bar No. 13367700

1201 Elm Street, Suite 3400
Dallas, Texas 75270
Tel: (214) 389-5300
Fax: (214) 389-5399

**COUNSEL FOR PLAINTIFF
DR. ANN McALLISTER OLIVARIUS**

**ORIGINAL COMPLAINT – Page 91**

79503.2