# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### NORTHERN DIVISION

| | | |
|---|---|---|
| DR. ANN McALLISTER OLIVARIUS | * | |
| Plaintiff | * | |
| vs. | * | Civil Action No.:<br>1:05-CV-00717-JFM |
| DR. DANIEL FRIEDMAN, et al. | * | |
| Defendants | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEFENDANTS FREISHTAT, BURKE, MULLEN & DUBNOW, LLC, DAVID FREISHTAT, AND STACIE F. DUBNOW'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

Defendants Freishtat, Burke, Mullen & Dubnow, LLC, [1] David Freishtat ("Freishtat") and Stacie F. Dubnow ("Dubnow") (together, the "Defendants" or "Freishtat"), by their attorneys Alvin I. Frederick, James E. Dickerman and Eccleston & Wolf, submit this Memorandum of Law in support of their Motion to Dismiss, or in the alternative, Motion for Summary Judgment.

This Court should enter a judgment as a matter of law dismissing the Complaint with prejudice on the ground that all of the claims alleged therein are barred by the applicable statutes of limitation. These stale claims relate to facts and events that occurred between 1995 and 1998.

---

[1] Freishtat, Burke, Mullen & Dubnow, LLC improperly is named as a defendant in this suit. The law firm of Freishtat & Sandler represented the Endowment during the time period in question.

## BACKGROUND FACTS

The following facts are included in this Motion solely by way of background, to provide the Court with a chronological framework and factual context for the allegations in the Complaint. The Defendants do not rely upon any of the facts set forth in the "Background Facts" portion of their Motion as the basis for the dismissal of the Complaint. Rather, the only facts on which the Defendants rely in support of their Motion are set forth in the Statement of Undisputed Facts, which indisputably demonstrate that the Plaintiff's claims are barred by the applicable statutes of limitation.[2]

In 1995, the Stanley J. Sarnoff Endowment for Cardiovascular Science, Inc. (the "Endowment"), a 501(c) (3) charity, engaged the services of the law firm of Freishtat & Sandler ("F&S") to provide it with an opinion concerning whether the Endowment had any causes of action against the law firm of Shearman & Sterling ("S&S"), a partner in the firm by the name of Robert Herzstein ("Herzstein") or others arising out of events that transpired following the May 1990 death of Stanley J. Sarnoff ("Sarnoff"), the founder of the Endowment.  The Endowment's board of directors engaged F&S on an hourly basis.[3]

When Sarnoff died in 1990, he bequeathed his residuary estate to the Endowment. As of the date of death, this estate was valued at approximately $29,000,000.00.  In his

---

[2]   The Complaint is fatally flawed in many other respects, as well. For example, the doctrine of res judicata bars most, if not all, of the Plaintiff's claims; the RICO claims do not properly state a cause of action under the Fourth Circuit's interpretation of RICO; and the common law claims all are lacking at least one requisite element. These flaws are not addressed in this Motion, since all of the claims indisputably are barred by the applicable statutes of limitations.

[3]   Although various board members inquired regarding the firm's willingness to take the case on a contingency fee basis, F&S advised the Endowment that, although the firm often represented clients on a contingency fee basis, it was not in the Endowment's best interests to do so in a case of this nature. F&S expressed the opinion that the Endowment likely would pay less in legal fees on an hourly fee basis than on a contingency fee basis.

Will, Sarnoff appointed Herzstein as the personal representative of his estate, and Herzstein in turn engaged his law firm, S&S, as counsel for the estate.

From approximately 1991 until the fall of 1992, Plaintiff Ann Olivarius ("Olivarius" or "Plaintiff") was employed as an associate of S&S, providing legal services to the Endowment and other firm clients. In the late summer of 1992, Olivarius left S&S to accept a position at the Endowment as president, chief executive officer and general counsel.

On May 1, 1996, the expiration date of a previously executed tolling agreement between the Endowment and S&S, F&S filed on behalf of the Endowment a Complaint against Herzstein, S&S and others in the Circuit Court for Montgomery County, seeking substantial monetary damages, as well as to compel the distribution to the Endowment of the residue of the Estate.  On this same date, Herzstein filed a Complaint against the Endowment in the Montgomery County Circuit Court, seeking a declaration by the Court that the Endowment had forfeited its entire inheritance from Sarnoff on three grounds: (1) private inurement, (2) by challenging an in terrorrem or no contest clause in Sarnoff's Will, and (3) under the cy pres doctrine.  S&S also filed a complaint in  New York, suing Plaintiff Olivarius and an Endowment board member in their individual capacities.  The New York suit was predicated upon alleged wrongs committed by Olivarius during her employment by S&S.

F&S represented the Endowment in the Maryland litigation, but not in the New York lawsuit. Nor did F&S represent the Plaintiff in the New York litigation; instead, she was represented by J. Joseph Bainton (Bainton"). The New York law firm of Wachtel,

Lipton, Rosen & Katz, as well the Maryland firm of Venable, Baetjer and Howard, represented Herzstein and S&S in the Maryland litigation.

The thrust of Herzstein's and S&S's arguments in support of the Endowment's forfeiture of its inheritance on the grounds of <u>cy pres</u> and private inurement was wrongdoing by the Plaintiff in operating the Endowment. In particular, Herzstein alleged that because of Plaintiff's wasteful spending, excessive salary, frivolous use of Endowment funds for travel, entertainment and other non-charitable, private purposes, payment of unjustified and excessive fees to its many lawyers and other professionals (many of whom were alleged to have personal relationships with Olivarius), the Endowment no longer was carrying out the goals and objectives of a charitable organization devoted to cardiovascular research. Herzstein further claimed in his Complaint that the Endowment had colluded with the Plaintiff to breach her fiduciary duties to S&S, that the Plaintiff had promised the Endowment favorable testimony in exchange for her lucrative salary, and that the Plaintiff had stolen voluminous S&S files relating to the Endowment and others for the Endowment's use in its lawsuit against Herzstein and S&S when she left the firm.

Following commencement of the lawsuit in New York against the Plaintiff, she informed Freishtat and Dubnow in various telephone conversations that she wanted to file counterclaims against S&S and, that if she did so, she intended to request that the Endowment indemnify her for the legal fees and other costs associated with bringing these claims. She further advised that she was considering engaging as additional personal counsel in the New York litigation a Massachusetts attorney by the name of Dan Cohn ("Cohn").

4

Freishtat and Dubnow advised Olivarius that although the Endowment was required to indemnify the Plaintiff and its board member for the cost of defending themselves in the New York litigation, neither the by-laws nor Plaintiff's employment agreement entitled the Plaintiff to indemnification for any personal, affirmative claims that she might choose to assert against S&S.  F&S further advised Olivarius that the use of Endowment monies to fund personal counterclaims against her former employer not only would constitute an inappropriate use of charitable funds since any damages that the Plaintiff recovered would benefit her personally, not the Endowment, but that such a use of the Endowment's monies further would endanger the Endowment's bequest by strengthening Herzstein and S&S's claim in the Maryland litigation that the Endowment was using charitable funds for improper purposes.

Importantly, F&S explained to the Plaintiff that her filing of personal counterclaims against S&S would place her in an impermissible conflict of interest with the Endowment because she would then be in a position to control the Endowment's ability to settle the Maryland litigation by refusing to dismiss her personal counterclaims, even if a reasonable settlement was negotiated.

In addition to discussing with the Plaintiff the conflict of interest that would be created through her assertion of personal counterclaims in the New York litigation, Dubnow also strongly advised Olivarius against the engagement of Cohn, given the fact that the Endowment's use of charitable funds to pay lawyers was under vigorous attack in the Maryland litigation.[4]  Dubnow informed Olivarius that hiring Cohn not only would

---

[4]    In the Maryland litigation, Herzstein and S&S alleged as a basis for the Endowment's forfeiture of its bequest the many hundreds of thousands of dollars of the Endowment's charitable funds that had been paid to the dozens of attorneys, financial advisers and other professionals whom Olivarius had engaged over the years that she was president.

increase the Endowment's legal fees, but would strengthen Herzstein and S&S's contention that the Endowment was wasting charitable funds.

The Plaintiff disagreed with Freishtat's advice concerning the adverse impact on the Endowment of her proposed actions in the New York lawsuit. Unbeknownst to F&S, Olivarius began to prepare corporate resolutions for execution by the Endowment's board of directors, obligating the Endowment to fund her personal counterclaims against S&S, and began to prepare engagement letters between the Endowment and her New York counsel, Bainton and Cohn.[5]

In addition, also unknown to F&S at the time, Olivarius began to send Bainton and Cohn confidential documents protected by the attorney-client privilege between the Endowment and F&S.  Olivarius also secretly began to forward F&S's draft motion papers, affidavits and other pleadings to Bainton and Cohn for their review and comments; upon the Plaintiff's receipt of her lawyers' revisions, she then forwarded these changes to F&S, representing them to be her own changes.[6]

On or about June 5, 1996, the Plaintiff advised Freishtat that a teleconference board meeting was scheduled for June 7th, during which Plaintiff's New York counsel would be introduced to the board and during which the board would routinely approve his engagement. She told Freishtat that because the board meeting would be short and uneventful, there was no reason for his or Dubnow's participation.

---

[5]   Importantly, the Endowment was not a party to the New York litigation. As a result, any engagement letters relating to the New York litigation should have been between Olivarius and Ingwall, individually, and their counsel.

[6]   The Endowment's employees reported the foregoing to Freishtat and Dubnow as it occurred.

On June 6, 1996, Olivarius sent a packet of documents for next day delivery to the Endowment's board members, enclosing the agenda for the board of directors' meeting scheduled by teleconference for the next day, as well as the documents that she intended to present for approval and execution by the board members. Later the same day, Defendant Karen Savransky ("Savransky"), an Endowment employee, telephoned Dubnow to advise that the Plaintiff intended to present to the Endowment's board of directors at the June 7th board meeting corporate resolutions in which the Endowment agreed to fund the Plaintiff's personal counterclaims against S&S, as well as to present for board approval engagement letters between Plaintiff's New York counsel, Bainton and the Endowment, making the Endowment, rather than the Plaintiff, the client in the New York litigation.[7]   Savransky further informed F&S that the documents that the Plaintiff intended to present for approval to the board contained an agreement by the Endowment to pay the legal fees of Cohn.

Concerned that the Plaintiff not only was placing her own personal interests before those of the Endowment, but was attempting to conceal the firm's legal advice from the Endowment's board members, Freishtat telephoned Olivarius and asked her to fax to F&S the agenda for the board of directors meeting scheduled for the next day, June 7, 1996.   Although the Plaintiff frequently asked F&S to attend board meetings by telephone and sent F&S the agendas for board meetings, she reiterated to Freishtat on June 6th that nothing of importance was on the agenda for the board meeting the next day

---

[7]   The Endowment's office consisted of Olivarius, Savransky, Defendant Dana Boyd ("Boyd"), and a part time employee. As a result, Savransky and Boyd had close daily contact with Olivarius, as well as frequent contact with F&S in connection with the pending Maryland litigation.

and that his presence would be unnecessary. Given the contrary information that F&S had received from Savransky, Freishtat pressed for a copy of the agenda.

Thereafter, the Plaintiff sent to F&S a document entitled "draft agenda", stating "this is essentially what we are planning to discuss during tomorrow's conference call." Shortly after the firm's receipt of this "draft agenda", Boyd advised F&S by telephone that she had just left Olivarius' house, where following Olivarius' telephone call with Freishtat, she had asked Boyd to delete from the final board meeting agenda to be faxed to Freishtat all references to the subject of counterclaims, engagement letters, indemnification for legal fees, and corporate resolutions to be presented for approval by the Endowment's board of directors the next day.  The Plaintiff further directed Boyd to add the word "draft" to the agenda sent to F&S, as well as the language "this is essentially what we are planning to discuss during tomorrow's conference call." Savransky and Boyd told Freishtat and Dubnow that earlier that day, the Plaintiff had sent the Endowment's directors the final agenda, corporate resolutions and other documents that she intended to present for their approval at the board meeting.

Concerned that, absent F&S's legal advice, the Endowment's board of directors might pass corporate resolutions and approve engagement letters without an understanding of the likely adverse impact of those actions on the Maryland litigation, Freishtat telephoned the board members to relate to them the firm's legal advice to the Endowment on the subject of the Plaintiff's assertion of personal counterclaims in the New York litigation, as well as her request that the Endowment find these counterclaims and pay the legal fees of Cohn. Further, F&S concluded that, as counsel to the Endowment, it had an affirmative duty to disclose to the board that the Plaintiff had: (1)

lied to F&S concerning the subjects to be addressed at the June 7th board meeting, (2) materially altered the agenda that she sent to F&S, (3) attempted to conceal F&S's advice from the board members and, in the firm's opinion, (4) breached her fiduciary duty to the Endowment by placing her own best interests before the best interests of the Endowment.

On the morning of June 7, 1996, Savransky and Boyd telephoned F&S to inform Freishtat and Dubnow that the Plaintiff had forbidden them from providing the call-in number to the Endowment's board of directors' meeting to be held by conference call that evening.  Upon his receipt the morning of June 7th of his board packet from the Plaintiff for the meeting that evening, board member and Defendant Donelan faxed to F&S copies of all of the documents that Olivarius had sent to him, which confirmed her attempted deception of both F&S and the Endowment's board members.

Between June 10, 1996 and June 20, 1996, F&S communicated in detail to the Endowment's board members the circumstances relating to the Plaintiff's  alteration of the corporate agenda and attempted deception of both F&S and the Endowment.[8]  During this same time period, Savransky and Boyd informed F&S that they had discovered evidence of improper expense reimbursements by the Plaintiff.

On June 20, 1996, the Endowment's board unanimously voted to terminate the Plaintiff for cause. On or about June 19, 1996, at the Endowment's request, F&S prepared draft corporate resolutions terminating the Plaintiff for cause and forwarded these resolutions to the board members for their review.  The decision was made to inform the Plaintiff of her termination when she was out of town in order to protect the

---

[8]     During this same period of time, Savransky informed F&S that on or about June 10th, Olivarius had executed engagement letters with Bainton that she had not yet received authorization from the board to execute, and that Olivarius continued to share confidential, privileged Endowment documents with Bainton and Cohn.

Endowment's documents and other assets. Savransky, Boyd, the board members, as well as F&S anticipated a vehement response by the Plaintiff. As a result, on June 21, 1996, a day on which the Plaintiff was in New York with her attorneys, F&S delivered to the Plaintiff, care of her New York counsel, a letter informing the Plaintiff of the board's decision to terminate her for cause.

On June 26, 1996, the Plaintiff commenced arbitration proceedings against the Endowment, alleging wrongful termination.[9]   On or about August 6, 1996, the Endowment engaged the Washington, D.C. law firm of Gardner, Carton & Douglas to represent its interests in the arbitration commenced by Olivarius.[10]   Although F&S continued as counsel for the Endowment in the Maryland litigation, F&S at no time represented the Endowment in connection with the arbitration, as the firm deemed itself to be a material witness in this proceeding.

In October of 1996, F&S filed on behalf of the Endowment a Motion for Summary Judgment in Herzstein's action for a declaratory relief against the Endowment. The Endowment moved for a judgment as a matter of law that it did not forfeit its bequest

---

[9]   In an opinion by Arbitrator Vaughn dated August 12, 1998 (discussed in more detail, *infra*.), Arbitrator Vaughn concluded:

"Claimant's version of her communications with Mr. Freishtat was set forth in her post-termination letter and at the hearing. Mr. Freishtat forcefully and credibly denied Claimant's version. Nothing else he did or the Board did after that communication corroborates Claimant's version, but the events unfolded consistent with his description of the communications. I credit Mr. Freishtat's testimony and reject Claimant's version of her June 6, 1996 conversation with Mr. Freishtat." (Exhibit 1, p. 45).

[10]   Arbitrator Vaughn further concluded in his August 12, 1998 Opinion:

"After nearly forty years of litigation experience, Mr. Freishtat well knew that he did not want Claimant [Olivarius] to be in a position to control his client's ability to settle a multi-million dollar litigation by her assertion of counterclaims. By attempting to block Mr. Freishtat's involvement, I am persuaded that Claimant sought to push through her own agenda, which included having the discretion to assert counterclaims in the New York litigation, contrary to the advice received from Mr. Freishtat that to do so would place her in a conflict of interest with the Endowment." (Exhibit 1, p. 48).

from Sarnoff by: (1) filing suit in 1993 and again in 1996 in an effort to compel the distribution of its inheritance, (2) under the cy pres doctrine, (3) as a result of the alleged private inurement of the Endowment's charitable funds, or (4) as a result of a brief lapse in the Endowment's corporate charter following Sarnoff's death.

In approximately the spring of 1997, an Order was entered granting the Endowment's Motion for Summary Judgment on three of the four counts of Herzstein's Complaint. Within a matter of weeks of this victory by the Endowment, Wachtel, Lipton approached the Endowment to initiate settlement discussions. On or about June 1997, the Endowment, S&S and Herzstein reached a settlement of the multiple pending lawsuits. F&S believed the terms of this settlement to be in the Endowment's best interests and the Endowment's board of directors voted unanimously to approve this settlement.[11]   The terms of this settlement are the subject of a confidentiality agreement.

An overview of the background facts further can be obtained from the various pleadings and Court decisions attached hereto. Specifically, the arbitrator's decision is attached as Exhibit 1; the March 21, 2002 Order of the Superior Court of District of Columbia denying the Plaintiff's Motion to Vacate the Arbitration Award is attached as Exhibit 2; the June 11, 2002 Order of the Superior Court for the District of Columbia reaffirming its earlier decision to deny the Motion to Vacate is attached as Exhibit 3; and the District of Columbia Court of Appeals decision in *Anne McAllister Olivarius v. The*

---

[11]   Although the Endowment was in a strong position following the Court's Order granting the majority of its Motion for Summary Judgment on Herzstein's Complaint for declaratory relief, the Endowment's affirmative suit against S&S and Herzstein was not without its serious risks, in part due to strong evidence (unknown to F&S until late into its engagement) that Olivarius may have misused charitable funds and may have stolen many of S&S's client documents relating to STI and others when she left the firm to join the Endowment. If proven true, the Endowment likely would be precluded from relying upon many of the documents needed to prove its case of fraud and other wrongdoing.

*Stanley J. Sarnoff Endowment for Cardiovascular Science, Inc.* (decided November 9, 2004), is attached as Exhibit 4.

## STATEMENT OF UNDISPUTED FACTS

1.      On June 21, 1996, the Endowment terminated the Plaintiff for cause from her position as President, Chief Executive Officer and General Counsel.  (Complaint, ¶193).

2.      On or about July 6, 1996, the Plaintiff sent a letter to certain Board members of the Endowment concerning the Endowment's decision to fire her for cause. (A copy of the letter is attached as Exhibit 5).  In this letter, the Plaintiff stated, among other things: "The cost to me is obvious.  You have publicly branded me a liar, rendering me virtually unemployable as a lawyer, without any advance warning or hearing or chance to clear my name.  There are also serious costs to the Endowment.  I know now that David Freishtat did not give you a true picture of the facts before you decided to fire me." (Exhibit 5, at p. 1).

3.      On or about June 26, 1996, the Plaintiff filed for arbitration with the Endowment, claiming she suffered economic business damages and damage for injury to her reputation as a result of her wrongful termination from her positions at the Endowment.  (Complaint, ¶266).

4.      On August 12, 1998 the arbitrator issued his Opinion and Award, concluding that the Endowment was justified in terminating the Plaintiff for cause. (Exhibit 1, p. 66).

5.      In his Opinion, the arbitrator stated in pertinent part:

"Specifically, I conclude that Claimant [Olivarius] attempted to conceal from the Board material information relating to the actions proposed in the Agenda for the June 7, 1996 Board meeting; attempted to deprive the Board of the advice of its counsel on the actions proposed; intentionally altered the Agenda forwarded to [Freishtat] to prevent [Freishtat] from participating in and providing advice to the Board at the June 7, 1996 Board meeting; concealed material information from the Board relating to the risks and possible adverse consequences to the Endowment of Claimant's assertion of counterclaims in the New York action; deceived the Board by advising it during the Board meeting that [Freishtat] did not wish to be present at the Board meeting due to a 'conflict'; and attempted to conceal from [Freishtat] that she intended to present to the Board for approval resolutions which would enable her to obtain indemnification and, at she and her counsel's discretion, assert counterclaims in the New York action. Those actions breached Claimant's fiduciary obligations to the Endowment and constituted, as indicated, prohibited conflicts of interest. I conclude that the Endowment had ample cause for the termination of Claimant and that it properly terminated Claimant pursuant to the resolutions unanimously adopted by the Board on June 20, 1996." (Exhibit 1, pp. 54-55)

6.      In his Award, Arbitrator Vaughn concluded, in pertinent part:

"Respondent The Stanley J. Sarnoff Endowment for Cardiovascular Science, Inc. proved that the termination of Claimant Ann McAllister Olivarius was for cause, within the meaning of the Agreement. Claimant shall not be awarded compensation or damages as a result of her termination. Claimant's reputation was not damaged as a result of Respondent's actions terminating her or as a result of Respondent's alleged publication of the termination and reasons therefore. Claimant shall not be awarded compensation from Respondent for damage to her reputation." (Exhibit 1, p. 65)

7.     On November 16, 1998, the Plaintiff filed with the Superior Court of the District of Columbia pleadings that the Court construed as a Motion to Vacate the Arbitration Award.  (Docket sheet from the Superior Court of the District of Columbia in *Olivarius v. Stanley J. Sarnoff*, attached as Exhibit 6, p. 2; Complaint §299).

8.     On November 20, 1998, the Endowment filed an action to confirm the arbitration award.  (Exhibit 6, p. 2; Complaint §299.)

9.     On December 14, 1999, the Superior Court of the District of Columbia entered an Order granting the Endowment's motion to confirm the arbitration award and denying the Plaintiff's request to vacate the award.  (Exhibit 6, p. 3; Complaint ¶299).

10.    On April 13, 2001, the Plaintiff filed in the Superior Court for the District of Columbia a motion and petition to vacate in part arbitration award, alleging that the Endowment withheld from her and the arbitrator material documents that would have exonerated her and thus "the arbitration award was procured by fraud, corruption and other undue means."  (Exhibit 6, p. 3).  In her motion, the Plaintiff alleges that she first discovered that the Endowment had concealed multiple documents during the course of the arbitration that would have exonerated her on March 15, 2001.  (Complaint, ¶288, 307, 315, 320; Exhibit 2).

11.    On March 21, 2002, the Superior Court for the District of Columbia entered an Order denying the Plaintiff's motion and petition to vacate in part arbitration award.  (*See* Exhibit 2).  In reaching its decision, the Court concluded that the allegedly concealed documents were available to the Plaintiff as of May 2000.  (Exhibit 2, p. 1.)

12.     After the Plaintiff filed a Motion for Reconsideration, the Superior Court for the District of Columbia on June 11, 2002 entered another Order reaffirming its earlier decision to deny modification of the arbitration award.  (Exhibit 3). Specifically, the Court found that the Plaintiff "was on inquiry notice of the allegedly concealed documents, particularly the June 6 facsimile, by no later than May 16, 1998, the final day of the arbitration hearings."  (Exhibit 3, p. 2).

13.     Subsequently, the Plaintiff filed an appeal to the District of Columbia Court of Appeals, challenging the Superior Court's denial of her Motion and Petition to Vacate in part Arbitration Award, and the Court of Appeals, in an Opinion dated September 9, 2004, affirmed that denial.  (Exhibit 4).

14.     The Plaintiff filed a Petition for Rehearing, which was denied in an Order dated March 21, 2005.  (Docket entries of the District of Columbia Court of Appeals, attached hereto as Exhibit 7, p. 8.)

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the statute of limitations governing the action at issue has expired. *Frederick Road Ltd. Partnership v. Brown & Sturm*, 360 Md. 76, 94, 756 A.2d 963, 972 (Md. 2000). The date on which a cause of action accrues is usually a legal question for the court. *Poffenberger v. Risser*, 290 Md. 631, 633, 431 A.2d 677, 679 (1981); *Moreland v. Aetna U.S. Healthcare, Inc.*, 152 Md. App. 288, 296, 831 A.2d 1091, 1095 (Md.App. 2003); *see Miller v. Pacific Shore Funding*, 224 F.Supp.2d 977, 985 (D.Md. 2002) ("If there is no genuine issue of material fact regarding the accrual of a cause of action, a court may determine the date of accrual as a matter of law.").

Once the moving party provides the court with a prima facie basis for granting summary judgment, the burden shifts to the non-moving party to produce sufficient facts admissible in evidence to demonstrate a genuine dispute of material fact. *Dual Incorporated, et al. v. Lockheed Martin Corporation*, 383 Md. 151, 162, 857 A.2d 1095, 1101 (2004) (citations omitted); *see Williams v. Prince Georges County Hospital Center, et al.*, 932 F.Supp. 687, 689 (D.Md. 1996) ("… the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine issue of material fact*."). The party opposing a motion for summary judgment is precluded from relying upon unsupported allegations, denials or conclusions of law. *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988).

Because courts have an affirmative duty to prevent unsupported claims from proceeding to trial, Freishtat respectfully requests that this Court grant its Motion for Summary Judgment and dismiss the Complaint as a matter of law.

## **ARGUMENT**

## 1.   **THE PLAINTIFF'S COMMON LAW CLAIMS ARE BARRED BY THE APPLICABLE STATUTES OF LIMITATIONS**

Section 5-101 of the Courts and Judicial Proceedings Article provides that "[a] civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." Md. Code §5-101 (1957, 1998 Repl. Vol.); *Bank of New York v. Sheff*, 382 Md. 235, 244 (2004). The Maryland Court of Appeals described the policy underlying the state's adoption of statutes of limitation in *Frederick Road Ltd. Partnership v. Brown & Sturm*, 360 Md. at 94-95:

The adoption of statutes of limitation reflects a policy decision regarding what constitutes an adequate period of time for a person of reasonable diligence to pursue a claim. Such statutes are designed to balance the competing interests of each of the potential parties as well as the societal interests involved. Thus, one of the purposes of such statutes is to assure fairness to a potential defendant by providing a certain degree of repose. This is accomplished by encouraging promptness in prosecuting actions; suppressing stale or fraudulent claims; avoiding inconvenience that may stem from delay, such as loss of evidence, fading of memories, and disappearance of witnesses; and providing the ability to plan for the future without the uncertainty inherent in potential liability.

A cause of action under Maryland state law generally accrues when a plaintiff discovers, or through the exercise of ordinary diligence, should have discovered, its injury (the "Discovery Rule"). *Hahn v. Claybrook*, 130 Md. 179, 186-187, 100 A. 83, 85-86 (1917); *Pennwalt Corp. v. Nasios*, 314 Md. 433, 437, 550 A.2d 1155, 1157-1158 (1988); see *Dual Incorporated, et al. v. Lockheed Martin Corp.*, 383 Md. at 167 ("The discovery rule is premised on the discovery of the harm, even if the aggrieved party may not be aware of the extent of the harm, the source of the tortious conduct, or other intimate details of the tort."). As a result, limitations begin to run when a plaintiff gains knowledge or information that is sufficient to place the plaintiff on inquiry notice of the wrong. *Lumsden v. Design Tech Builders, Inc.*, 358 Md. 435, 447-48, 749 A.2d 796, 803 (2000) (quoting *Poffenberger v. Risser*, 290 Md. at 637). The Court of Appeals recently affirmed the definition and application of the Discovery Rule in *Sheff*, 382 Md. at 244 ("Under [the discovery] rule, the statute of limitations begins to run when the plaintiff has knowledge of circumstances that which would cause a reasonable person in the position of the plaintiff toto undertake an investigation which, if pursued with reasonable

diligence, would have led to knowledge of the alleged cause of action.") (citations omitted).

Thus, as of the date on which a plaintiff is on inquiry notice of a wrong, the plaintiff is charged with notice of all facts that a diligent investigation likely would have disclosed. *Lumsden v. Design Tech Builders, Inc.*, 358 Md. at 447-48. Importantly, the commencement of the statute of limitations is not delayed until the plaintiff concludes its investigation. *Id.*; *see Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993) (inquiry notice is triggered by evidence of possibility of fraud, not by complete exposure of alleged scam); *Miller v. Pacific Shore Funding*, 224 F. Supp.2d at 986 (knowledge of facts, not knowledge of their legal significance, begins running of statute of limitations); *Moreland v. Aetna U.S. Healthcare, Inc.*, 152 Md. App. At 297 (discovery rule applies to discovery of facts, not to discovery of law); *Doe v. Archdiocese of Washington*, 114 Md. App. 169, 188, 689 A.2d 634, 644 (Md.App. 1997) (once a plaintiff is aware that it has been harmed, "a potential plaintiff is charged with responsibility for investigating, within the limitations period, all potential claims and all potential defendants with regard to the injury").

Maryland's Discovery Rule ordinarily applies to all causes of action that are governed by its three-year statute of limitations, including all tort claims.[12] *Poffenberger v. Risser*, 290 Md. at 633. As a result, the Plaintiff was required to assert her claims for fraud, common law fraud, negligent misrepresentation, civil conspiracy, and tortious interference with contracts and business relations within three years of the date on which

---

[12]   Because no other provisions of the Maryland Code provide for a different statute of limitations, the Plaintiff's counts for fraud, common law fraud, negligent misrepresentation, civil conspiracy, and tortious interference with contracts and business relations are governed by a three-year statute of limitations. Md. Code Ann., Cts. & Jud. Proc. §5-101 (1998).

she discovered, or in the exercise of reasonable diligence should have discovered, her alleged injury or otherwise gained knowledge or information sufficient to place her on inquiry notice of the wrongs committed against her.  The Plaintiff's cause of action for defamation is governed by a one-year statute of limitations. Md. Cts. & Jud. Proc. Code Ann. §5-105.

Accordingly, with regard to the Plaintiff's claims for fraud, common law fraud, negligent misrepresentation, civil conspiracy, and tortious interference with contracts and business relations, this Court must determine whether the Plaintiff discovered her alleged injury, or otherwise was on inquiry notice of a wrong, prior to March 14, 2002, more than three years before she filed this action. With regard to her defamation claim, this Court must determine whether the Plaintiff discovered her alleged injury prior to March 14, 2004, more than one year before she filed this action.

The Plaintiff's claims are barred by the applicable statute of limitations based upon the facts set forth on the face of the Complaint. According to Olivarius, she discovered the allegedly concealed documents on March 15, 2001.[13]  (*See, e.g.* § 288 of the Complaint)("In fact, on March 15, 2001, Dr. Olivarius discovered that the Endowment had concealed multiple documents during the arbitration that would have exonerated her from the Endowment's false charges.").  There can be no legitimate dispute that the statute of limitations began to run on the Plaintiff's claims as of this date, March 15, 2001.

---

[13]   As set forth in Section 2, the District of Columbia Court determined that the Plaintiff was on notice of the allegedly concealed documents as of May 2000; as a result, the Plaintiff is barred by the doctrine of *res judicata* from challenging that determination.

Each of the causes of action are premised on the allegations that Freishtat and various board members of the Endowment conspired to remove the Plaintiff from the Endowment and to preserve the alleged gains derived from her removal by withholding documents in the subsequent arbitration proceeding that would have vindicated the Plaintiff. Specifically, as to the Fraud Count (Count 4), see Complaint, §§ 311, 312, 315, 318, 319, 324-346, 393, 394, 397, 399 and 400; as to the Common law Fraud Count (Count 5), see Complaint, §410; as to the Negligent Misrepresentation Count (Count 6), see Complaint, § 418; as to the Civil Conspiracy Count (Count 7), see Complaint, §427; as to the Defamation Count (Count 8), see Complaint, §433; and as to the Tortious Interference with Contracts and Business Relations (Count 9), see Complaint, § 440.

As of March 14, 2001, the Plaintiff knew that there were documents that had not been produced during the arbitration proceeding that she contends would had vindicated her.  She also had reached the conclusion that Freishtat had conspired with members of the board of the Endowment to have her terminated. (See Plaintiff's July 6, 1996 letter to two of the board members of the Endowment, attached as Exhibit 5).  In that letter, the Plaintiff alleged, among other things:

- "I know now that David Freishtat did not give you a true picture of the facts before you decided to fire me. (p. 1)

- "Freishtat decided to get rid of me very hastily, so much so that he put together a very sloppy case and made sure that the Board heard nothing but his version of the 'facts' before reaching its conclusion. That his actions have put my career in terrible jeopardy is obvious." (p. 1)

- "Firing me the way he decided to do it will likely cost the Endowment many millions of dollars…." (p. 1)

- "As I understand it, Freishtat made two arguments that convinced you I was threatening the Endowment and being

20

dishonest with you. His arguments are demonstrably false." (p. 1)

- "… I understand that Freishtat argued to you that I had not fully disclosed to the Board all of the ramifications of pursuing a counterclaim. This is false." (p.2)

- "In retrospect, of course, I wonder if he [Freishtat] was already laying the groundwork for my removal." (pg. 4, footnote 2)

- "Freishtat is now using his control over the Endowment to ask its employees (people I hired, who live in my small town, who know my friends and my children) to find additional grounds for firing me, an indication he isn't entirely secure with the first batch." (p. 5)

- "Before undertaking his smear campaign, did Freishtat ask me to explain any of the expenditures he is so certain are bogus? … Whose interests is he advancing by trying to smear me?" (p. 6)

- "I am sure Freishtat has made many other wild allegations." (p. 6)

- "In his [Freishtat's] fever to get me, he also hurt a potential witness for the Endowment and the Endowment's case." (p. 6, footnote 3)

- "Freishtat was in such a hurry to make sure Shearman & Sterling had this proof that he even called Paul Vizcarrando of Wachtell, Lipton shortly after the Board meeting to tell them I had been fired." (p. 8)

- "I think Freishtat perceives a powerful financial interest in controlling the Endowment's legal strategy…" (p. 9)

- "… he [Freishtat] may have felt his chances to become wealthy from the Endowment were higher if I was gone." (p. 9)

- "Because Freishtat has such a big investment in keeping me pinned to the mat, I believe he will claim that I am lying in this letter." (p. 9)

- "… the employees saw Freishtat swoop down, change the locks on the office, seize my papers, … call people I have worked with for years to trumpet that I was fired for cause, and try to prove me an expense account cheat." (p. 11)

- "Freishtat prevailed upon you to throw me overboard…" (p. 13)

- "Freishtat has protected his own interests at the expense of the Endowment and its Board…" (p. 13)

Thus, at the very least, the Plaintiff, as of March 15, 2001, had knowledge of circumstances that would have caused a reasonable person to conduct an investigation, which if pursued with reasonable diligence, would have led to knowledge of her alleged claims.   *Sheff*, 382 Md. at 244.   The Fraud, Common Law Fraud, Negligent Misrepresentation, Civil Conspiracy and the Intentional Interference with Contracts and Business Relations all have a three-year statute of limitations and, consequently, these claims were barred as of March 15, 2004.  The defamation claim has a one-year statute of limitations and, accordingly, it was barred as of March 15, 2002.[14]

Arguably, the statute of limitations began running even earlier.  The Superior Court of the District of Columbia concluded that the concealed documents that the Plaintiff contends she discovered on March 15, 2001 were available to the Plaintiff significantly earlier.  Specifically, the Court concluded that Court of Appeals stated that it "finds that Dr. Olivarius was on inquiry notice of the allegedly concealed documents, particularly the June 6th facsimile, by no later than May 1998, the final day of the

---

[14]   In the Complaint, the Plaintiff baldly asserts that the statute of limitations has not run due to the application of various deferral or tolling doctrines "such as the discovery rule, fraudulent concealment, the continuing tort doctrine, and the doctrine of equitable estoppel."  *See* Complaint, § 446.  These doctrines, however, even if applicable, relate to when the causes of action accrue, but do not stop the statute once it has accrued.  The Plaintiff acknowledges that her cause of action accrued as of March 14, 2001.  Thus, these doctrines are inapplicable.

arbitration hearings."  (See Exhibit 3, page 2).   The Plaintiff is barred by the doctrine of judicial estoppel from challenging that conclusion.

The Court of Appeals in *Washington Suburban Sanitary Commission v. TKU Associates*, 281 Md. 1, 18-19 (1977), provided that collateral estoppel can be evoked if the following requirements are met:

> (1)    Was the issue decided in the prior adjudication identical with the one presented in the action in question?

> (2)    Was there a final judgment on the merits?

> (3)    Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?

> (4)    Was the party against whom the plea is asserted given fair opportunity to be heard on the issue?

Stated differently, to establish collateral estoppel, a party must establish the following elements:

> (1)    there was a final judgment on the merits in the prior litigation;

> (2)    the party against whom collateral estoppel is asserted was a party or in privity with a party in the prior litigation;

> (3)    the issue decided in the prior litigation is identical with the issue presented in the subsequent litigation;

> (4)    the issue actually litigated was essential to the judgment in the prior action

*Deitz v. Palaigos*, 120 Md. App. 380, 395 (1998).  Each of those elements is present here. There was a final judgment in the District of Columbia proceedings, which the Plaintiff unsuccessfully appealed to the District of Columbia Court of Appeals.  (See Exhibit 7). The Plaintiff was a party to prior proceedings and the issue – the date on which the Plaintiff was on inquiry notice of the existence of the allegedly concealed documents -- is

23

identical.  (Exhibit 7, p. 2).  Finally, this issue was essential to the judgment in the prior action since, based on this ruling, the Court concluded that that the Plaintiff's motion to vacate was untimely.  (Exhibit 7, p. 4).

As all of the elements of collateral estoppel are present, the Plaintiff is precluded from relitigating the issue of when she was on inquiry notice of the existence of the allegedly concealed documents.  *Colandrea v. Wilde Lake*, 361 Md. 371, 391 (2000). Thus, as a matter of law, the Plaintiff was on inquiry notice as of May 16, 1998, which means that all of  her common law claims are barred by the applicable statutes of limitations.

Alternatively, the Plaintiff's termination for cause from the Endowment on June 21, 1996 is the alleged wrong that underlies all of her causes of action.[15]  By July 6, 1996, the date on which the Plaintiff sent her letter to two of the board members concerning the Endowment's decision to fire her for cause, the Plaintiff was aware that Freishtat had recommended that the Endowment terminate her for cause. (See Exhibit 5).  In her 1996 letter, the Plaintiff accused Freishtat of misrepresenting facts to the board of directors and of conspiring to terminate her employment for their own self-serving, improper purposes. (*Id*).

A review of that letter makes clear that the Plaintiff had knowledge as of July 6, 1996 not only of her injury, but of Freishtat's alleged role in causing this injury, including but not limited to his purported collusion with the Endowment's employees to

---

[15]  Although throughout her complaint, Olivarius complains of alleged harm and wrongs to the Endowment, she has no standing to assert these claims. She is not an employee, agent or representative of the Endowment and has not been in any way associated with the Endowment since June of 1996. *See Clark v. U.S.*, 609 F.Supp. 1249 (D.Md. 1985)(standing is a requirement that complaining party shows he has personally suffered some actual or threatened injury).

achieve his alleged goals of money and control over the Endowment. Further, Freishtat disclosed in detail in his sworn testimony during the arbitration proceedings in April and May of 1998 the firm's advice to the Endowment to terminate the Plaintiff for cause, including the facts and circumstances that led to that advice. (*See* Exhibit 1). As a result, by no later than May of 1998, the date the arbitration concluded, the Plaintiff was aware of Freishtat's active role in her termination.

Accordingly, the Plaintiff was aware of her injury, as well as of Freishtat's alleged wrongs against her, as early as June 21, 1996, the date she was fired, but at the very latest, by May 1998, at the conclusion of the arbitration hearing. As a matter of law, the Endowment's termination for cause of its employment contract with the Plaintiff on June 21, 1996 put the Plaintiff on inquiry notice to investigate the circumstances surrounding her termination, including all potential claims that might arise from her termination and all potential defendants that may have had a role in her injury. *Dual Incorporated, et al. v. Lockheed Martin Corp.*, 383 Md. at 167-168, 857 A.2d at 1104-05 ("Absent any specific facts demonstrating fraud or concealment designed to frustrate a potentially aggrieved party's ability to discover evidence of wrongdoing connected with the termination of a contract, the statute of limitations begins to run when the harmed party becomes aware of the termination."); *Lumsden v. Design Tech Builders, Inc.*, 358 Md. at 447-48 (statute of limitations for tortious interference with contractual relations begins to run with knowledge of termination of the contract); *see D'Arcy and Assocs., Inc. v. K.P.M.G. Peat Marwick, L.L.P.*, 129 S.W.3d 25, 30 (Mo.App. 2004) (tortious conduct is complete when defendant causes or induces a breach of contract) (cited with

approval by the Maryland Court of Appeals in *Dual Incorporated, v. Lockheed Martin Corp., supra.).*

Based on the foregoing, Olivarius' claims for fraud (Count 4), common law fraud (Count 5), negligent misrepresentation (Count 6), civil conspiracy (Count 7), and tortious interference with contract (Count 9) are time-barred. Regardless of whether these claims accrued on June 21, 1996, the date of the termination of the Plaintiff's employment contract, or in May 1998, at the conclusion of the arbitration hearing, the statute of limitations on these claims expired by no later than May 2001. As a result, this Court should grant summary judgment dismissing Counts 4, 5, 6, 7 and 9 of the Complaint with prejudice. In addition, this Court should grant summary judgment on the Plaintiff's claim for defamation in Count 8, since under the applicable one-year statute, the time for filing this claim expired many years ago, but under no circumstances later than July 6, 1997, one year after the Plaintiff's July 6, 1996 letter to various board members detailing Freishtat's alleged actions causing damage to the Plaintiff's name and reputation.

## II.    THE PLAINTIFF'S RICO CLAIMS SHOULD BE DISMISSED AS TIME-BARRED

This Court also should dismiss as time-barred the Plaintiff's counts against Freishtat alleging violations of RICO, 18 U.S.C. §1961 *et seq.* (Counts 1 and 2). The Plaintiff's RICO claims are governed by a four-year statute of limitations. *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 156-57, 107 S.Ct. 2759, 2767-68, 97 L.Ed2d 121 (1987); *Potomac Elec. Power Co. v. Electric Motor and Supply, Inc.*, 262 F.3d 260, 266 (4th Cir. 2001).

Federal law is well established that the four-year statute of limitations for a private RICO claim accrues on the date on which a plaintiff discovers, or should have

discovered, her injury, not when the plaintiff discovers the other elements of her claim, including the pattern of racketeering activity. *Rotella v. Wood*, 528 U.S. 549, 555, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000); *see Detrick v. Panalpina, Incorporated*, 108 F.3d 529, 539-40 (4th Cir. 1997) (statute of limitations for private RICO claim begins to run on date that plaintiff discovers injury, not when plaintiff discovers cause of action); *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 220 (4th Cir. 1987) (RICO claim accrues and statute of limitations starts to run "when a plaintiff knows or should know of the injury that underlies his cause of action."); *Brumbaugh v. Princeton Partners*, 985 F.2d at 162 ("Commencement of a limitations period need not …await the dawn of complete awareness.").

As a result, if this Court concludes that the Plaintiff discovered her alleged injury prior to March 14, 2001, four years before she filed this suit, then this Court should grant judgment as a matter of law in favor of Freishtat on the Plaintiff's RICO claims in Counts 1 and 2 of the Complaint.

In *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, *supra.*, a case arising out of the unilateral cancellation by the defendant of a mining agreement with the plaintiff Pocahontas, the plaintiff filed a complaint on December 19, 1984, alleging civil RICO and federal and state antitrust violations. The defendants moved to dismiss the complaint on the ground that it was time-barred, claiming that because the mining agreement was terminated on May 1, 1979, Pocahontas was put on inquiry notice of its injury more than four years prior to the filing of suit.

In an effort to toll limitations, Pocahontas claimed that it did not discover until 1984 the existence of the interrelationships among the various defendants, as well as the

defendants' specific actions taken in connection with the conspiracy, all of which allegedly formed the basis for its RICO claims. However, the United States District Court for the Southern District of West Virginia concluded, and the Fourth Circuit affirmed, that the plaintiff's RICO claims were time-barred since the plaintiff's injury occurred in May 1979, when its contract was terminated.   *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d at 218.  The Court of Appeals further held that even if within the four-year statute of limitations defendants continued to perform overt acts in furtherance of their conspiracy, unless the plaintiff's injury also fell within this limitations period, its RICO claims were time-barred. *Id.* at 218.

The Fourth Circuit in *Detrick v. Panalpina, supra*, similarly rejected a claim by plaintiffs that their private RICO claim did not accrue until they discovered the underlying fraud that caused their injury. There, plaintiffs abandoned a warehouse contract with the defendants in April 1990 as a result of contract disputes between the parties. plaintiffs filed suit against defendants on March 9, 1995, within four years of the date on which they claimed they discovered a false shipping invoice, placing them on notice of defendants' alleged earlier fraudulent activities. The trial court held, and the Fourth Circuit affirmed, that the plaintiffs' injury occurred when they abandoned their warehouse contract with the defendants, more than four years before they filed suit -- not later in time when they discovered the alleged fraud that formed the basis for the RICO scheme. *Detrick v. Panalpina, Incorporated*, 108 F.3d at 543.

The Fourth Circuit's determination that the statute of limitations begins to run in a RICO claim when the plaintiff is on inquiry notice that he or she has been injured is consistent with the Supreme Court holdings in *Rotella*, and in *Klehr v. A.O. Smith Corp.*,

512 U.S. 179 (1997) that rejected the last predicate act rule and the injury and pattern discovery rule (a civil RICO claim accrues only when the claimant discovers, or should discover, both injury and a pattern of RICO activity).[16] *See also Potomac Electric Power Company v. Electric Motor and Supply, Inc*., 262 F.3d at 266 ("Private RICO suits are governed by a four-year statute of limitations, which runs from the date when the plaintiff discovered,, or should have discovered, the injury.")

Here, as already stated, the Plaintiff had knowledge of her alleged injury on June 21, 1996, the date on which she learned that she had been fired. Neither her alleged March 2001 discovery of fraudulently concealed documents nor any of the other subsequent acts of which she accuses Freishtat in furtherance of their alleged fraudulent scheme and conspiracy toll the statute of limitations for the Plaintiff's RICO claims. The Plaintiff's RICO claims accrued when she discovered her alleged injury, not when she discovered the elements of her claim, the alleged interrelationships between the Defendants, the details of the alleged conspiracy, or the alleged pattern of racketeering activity. Because the Plaintiff was aware of her injury in 1996 when she was terminated for cause, the statute of limitations on her RICO claims expired in 2000. For all of the reasons set forth, this Court should grant Freishtat's Motion for Summary and dismiss Counts 1 and 2 of the Complaint as time-barred.

WHEREFORE, for the foregoing reasons, Defendants Freishtat, Burke, Mullen & Dubnow, LLC, Freishtat and Dubnow respectfully request that the Court dismiss with

---

[16]   The Court in *Rotella* left open the question of whether the statute of limitations in a RICO claim begins to run when the plaintiff suffers the injury, whether it is discovered or not. *Id* at 554, n. 2.

prejudice the Complaint as to them, or, alternatively, grant summary judgment in their favor and against the Plaintiff.

_____/s/_____
Alvin I. Frederick  (Fed. Bar No. 01459)
James E. Dickerman (Fed. Bar No. 10687)
ECCLESTON AND WOLF, P. C.
729 E. Pratt Street, 7th Floor
Baltimore, MD 21202-4460
(410) 752-7474
*Attorneys for Defendants Freishtat, Burke, Mullen & Dubnow, LLC, David Freishtat and Stacie F. Dubnow*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 26th day of May, 2005, a copy of the foregoing

Memorandum of Law in Support of the Motion to Dismiss or, in the Alternative, Motion

for Summary Judgment was mailed first class, postage prepaid, to:

> James D. McCarthy, Esquire
> Diamond, McCarthy, Taylor, Finley, Bryant & Lee, LLP
> 1201 Elm Street, Suite #3400
> Dallas, Texas 75270
> *Attorneys for Plaintiff*
>
> Laurie A. Holmes, Esquire
> Gardner, Carton & Douglas
> 191 N. Wacker Drive, Suite #3700
> Chicago, Illinois 60606-1698
> *Attorneys for Defendants Daniel Friedman, Joann Ingerwall,*
> *William Donelan, Richard Page, Karen Savransky and*
> *Dana Boyd*

_____/s/_____
James E. Dickerman