# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### NORTHERN DIVISION

| | | |
|---|---|---|
| **DR. ANN McALLISTER OLIVARIUS,** | § | |
| | § | |
| **Plaintiff,** | § | **Civil Action No.** |
| | § | **JFM-05-CV-0717** |
| **vs.** | § | |
| | § | |
| **DR. DANIEL FRIEDMAN, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

## DECLARATION OF JAMES D. McCARTHY

I, James D. McCarthy, offer this declaration in support of the Plaintiff's and my own responses to the two motions for sanctions filed by the Defendants in the above-styled and numbered litigation. This declaration is also offered in support of the cross-motions for sanctions to be submitted by the Plaintiff, Dr. Ann McAllister Olivarius, and by me.

1.     I am a partner with the law firm of Diamond McCarthy Taylor Finley Bryant & Lee, LLP., a law firm with offices in Dallas, Houston and Austin, Texas  I represented the Plaintiff in the above-captioned litigation.

2.     I am a graduate of Yale Law School, and I hold additional undergraduate and graduate degrees.

3.     I am a member in good standing of the State Bar of Texas. I am also admitted to the bars of numerous federal district and appellate courts and have practiced before many others on a *pro hac vice* basis.

4.     I have represented clients in business litigation/arbitration matters in the federal and state courts of Texas and, more often, in federal and state courts throughout the United States. I have also represented clients in international business litigation and arbitration matters.

85874v4

## I. <u>MY INITIAL CONTACTS WITH DR. ANN OLIVARIUS</u>.

5.      I first talked to Dr. Olivarius about the possibility of representing her in a telephone call on February 17, 2005.  The next day I e-mailed my firm's brochure and related materials to her, and also expressed our interest in the potential representation.

6.      My initial conversation with her was minimal, as we were still running conflict checks.  By way of follow-up, she was to call me on February 25, 2005.  She did and, in that conversation, indicated that she wished to have my firm represent her.

7.      After that February 25, 2005 telephone conversation, she began to send boxes of documents to my office and to arrange for others to send them.  The first substantial set of documents was received on February 28, 2005.  Thereafter, they came in periodically, by mail, Fed Ex, fax, or e-mail.

8.      Between February 25th and March 9th, my team had begun to review what eventually became a large number of boxes of documents, as well as certain summary and general background materials prepared by Dr. Olivarius and/or her prior lawyers, and to do general background research.  However, Dr. Olivarius needed to be physically present in Dallas if we were to understand and effectively use those documents and my team's skills to investigate and develop a lawsuit – and do so within the very short time frames available.

9.      That is how I first physically met Ann Olivarius – on March 9, 2005, when she arrived in Dallas to work on the research for and drafting of the proposed lawsuit.

10.     I was engaged in other matters during this time period, of course, and had not yet fully and formally committed to represent her in any respect before March 10, 2005.  By that date, however, I had met with Dr. Olivarius and become convinced that she had been wronged by the Defendants, and entered into an engagement letter with her.  That engagement letter was

then made retroactive to February 25, 2005, to encompass the initial reading and background work we had done between February 25th and March 10th.

12. In light of my other commitments, I was only able to represent Dr. Olivarius because I had previously blocked off March 9th and the week thereafter for surgery to remove my thyroid (and for the recovery therefrom). Given her very near-term needs, as I learned of them, I elected to reschedule that surgery for April 5, 2005.

12. I did not know and had never heard of Dr. Ann Olivarius prior to the initial contacts described above. Until then I had never heard of either the Sarnoff Endowment or Dr. Olivarius' past history with regard to the Endowment.

## II. THE COMPLAINT-DRAFTING PROCESS.

13. By March 9, 2005, when Ann Olivarius arrived in our offices, I was acutely aware of an impending limitations deadline that could have the effect of barring any claims not brought by her before March 15, 2005. In light of that deadline, I had assembled a team of two lawyers (myself and Sabrina Skeldon), two paralegals (Tonia Perry and Kerry Norvell) and a double shift of secretaries (Lesley Stills and Lynn Dickson) to assist in researching, drafting, and filing a Complaint that would protect Ann Olivarius' right to hold accountable any persons who had wronged her. Other Diamond McCarthy resources stood ready to (and did) help.

14. I was also aware that an important motion for rehearing was then pending before the District of Columbia Court of Appeals, in a proceeding by which Dr. Olivarius was seeking to reopen her arbitration with the Stanley J. Sarnoff Endowment for Cardiovascular Science, Inc. (the "Endowment"). In consequence, I was also aware that any civil action to be initiated by March 14, 2005 should not be so drafted as to either interfere with or appear to interfere with that wholly separate proceeding – for fear that the Complaint would be misused in that proceeding.

15.    In light of those issues, from March 9th through midnight on March 14, 2005, the members of that team, working together with Ann Olivarius, did everything humanly possible to investigate and develop her case against the final list of Defendants, and to turn that case, once it was determined that she had a viable case, into a Complaint. In that frantic six-day period, team members seldom slept and, when they did, it was as often on an office or lobby couch as it was in their own beds. Like me, the other team members came to believe that Dr. Olivarius had been seriously wronged and, like me, they worked around the clock to do their best for her.

16.    From March 9th – 14th, the Diamond McCarthy team applied all of its considerable energy (and hundreds of man-hours) to reviewing documents, and interviewing Ann Olivarius and others as to those documents, as well as to the extensive array of facts that underlay the dispute between Dr. Ann Olivarius and the individual Defendants, and to doing the follow-on legal and factual research necessary to support any lawsuit. The Diamond McCarthy team did not do so in a vacuum, however.

17.    Dr. Olivarius was fully engaged herself. So was her husband, Jef McAllister, himself a Yale Law Graduate, Oxford Ph.D and Marshall Scholar. Throughout the same six-day period, Jef performed both his day job as Time Magazine's London Bureau chief and his night job as legal writer and researcher, document finder, and all-around factual and legal resource to the team. Dr. Olivarius' lawyers in the Endowment arbitration (Joe Bainton) and in the D.C. Court of Appeals proceedings (Jeff Poston) also pitched in with legal and factual insights, and with their comments on seemingly endless drafts of the Complaint. Dr. Olivarius also called in her chits from numerous lawyer friends, and from non-lawyer friends with factual knowledge of the underlying events and personalities. They read the drafts of the Complaint as well, made comments, and made it better in the process. Whenever Richard Mason, a South African writer

visiting Dallas, was freed up from doing his interviews for his next book, he was drafted into such proofreading and fact checking tasks as were then available. Once Marty Himeles came on board as local counsel, he also helped make the Complaint a better product.

18.     In the time prior to Dr. Olivarius' arrived in Dallas, my paralegals had gone through the summary materials provided by Dr. Olivarius prior to March 9th, with a view to identifying the potential Defendants to the case, as well as the potential witnesses in the case. The identification of these persons early was a first priority, as the ultimate list of Defendants would determine or at least influence the claims to be brought, as well as the nature of the jurisdictional and venue issues to be addressed in the pre-filing period. In the event that a Texas venue was not chosen, these determinations would then guide our need for local counsel.

19.     Once Ann Olivarius arrived in Dallas, this effort accelerated, as she and the team members focused on selecting or deselecting the final list of Defendants from a much larger list of potential Defendants scattered throughout the United States. In light of that evolving list of Defendants, the team researched the jurisdictional and venue issues, and the potential claims that might be asserted, against each of those Defendants, as well the defenses to those claims that might be anticipated. We did that research as to numerous potential Defendants, numerous potential claims and defenses, and in regard to the law of numerous jurisdictions.

20.     While all that investigative work and research ultimately produced a Complaint and a lawsuit, it was not a "given" that an Olivarius Complaint would be filed against anyone before Dr. Olivarius arrived in Dallas,.

21.     The final list of Defendants that appeared on the Complaint was also not a "given" at the time Dr. Olivarius arrived in Dallas, and many more potential Defendants were de-selected than selected.

22.    Nor was it a given that this case would be filed in Maryland.  Many potential forums were considered before deciding, in light of the final list of Defendants, that Maryland was the most appropriate forum, and that Dr. Olivarius would need Maryland local counsel.

23.    The lawsuit triggered by the Complaint was filed, and took the shape it ultimately took, because – in light of the documentary and non-documentary evidence, in light of all of the legal and factual research that could be done in the time available, and in light of the knowledge and powers of analysis of many fine and dedicated people (both inside and outside my firm) that result was required.  I signed the Complaint knowing that I and the augmented Diamond McCarthy team had done absolutely the best possible job in the circumstances.

### III.  THE PLAINTIFF'S INITIAL EFFORTS TO OBTAIN MARYLAND LOCAL COUNSEL.

24.    Dr. Olivarius did not come to Dallas, Texas with the thought of filing a lawsuit in Maryland.  Maryland was only one venue option.  So was Texas.  So were many other states.

25.    However, once the factual and legal research indicated that Maryland was the most logical of a number of forum choices, Dr. Olivarius had to hire local counsel.  That task fell to her, and not to me, for the simple reason that only she could negotiate the fee arrangements.  Nevertheless, at her request, I did participate, with her and without her, in a number of conversations with potential local counsel.

26.    For all the reasons stated in Dr. Olivarius' Declaration, that search was extremely frustrating.

27.    Fortunately, very near the end of our available time Martin S. ("Marty") Himeles, Jr., of the Baltimore office of the Zuckerman Spaeder firm, agreed to step up and help Ann Olivarius get her Complaint on file, even though he and Dr. Olivarius knew that he could not remain as local counsel for the duration of the litigation.  He did not do so without due attention

to his professional obligations, but out of the concern (similar to my own) that Dr. Olivarius should be able to act, in the face of a limitations deadline, to preserve her rights against the Defendants.

28.     From the time he joined the team to the time of filing, Marty Himeles read documents, reviewed drafts of the Complaint, argued legal and factual points, asked the right questions, and gave the task at hand the very professional attention that all lawyers should (but often don't) give to a potential lawsuit.  It was a pleasure to work with him, and I was personally sorry that his firm's connections with Mr. Sandler prevented him from staying on the case for the longer term.

## IV. FILING THE COMPLAINT.

29.     On March 14, 3005, just before midnight, Marty Himeles filed the Complaint at issue in these proceedings.  He literally had to run to the courthouse in Baltimore to do so.

30.     The Complaint was lengthy (91 pages, plus 14 pages of exhibits), was detailed in its allegations, and was as complete and true and correct as was possible in the time available before the potential limitations deadline.  Because the Defendants never answered the Complaint, to this date we do not know which portions of that Complaint they would have admitted, and which portions they would have denied.

31.     Because the Non-Freishtat Defendants Motion for Sanctions misrepresents that Complaint, let me be clear as to what the Complaint concerned and did not concern.

   a.     The Maryland Litigation was brought against eight named individuals and
          the law firm of Freishtat, Burke, Mullen & Dubnow, LLC.  None of these
          Defendants (including the Freishtat Defendants) had ever before been sued
          for the actions and failures to act that were the subject of the lawsuit.
          None were or could have been parties to the arbitration between Dr.
          Olivarius and the Sarnoff Endowment, as none were parties to the
          underlying arbitration agreement.

b.  The Maryland Litigation does <u>not</u> address Dr. Olivarius' wrongful termination by the Sarnoff Endowment.  That was the subject of the arbitration.  The Maryland Litigation addresses the <u>post-termination</u> conduct of the individual Defendants as they sought – by, we believe, inappropriate means – to insulate themselves from the consequences: (1) of those of their decisions that led up to Dr. Olivarius' wrongful termination; and (2) the resultant deterioration (in their own self-interest and on their watch) of the Endowment.

c.  It was and is the Plaintiff's view, as asserted in the Maryland Litigation, that the Defendants committed and continued to commit actionable torts (including but not limited to violations of RICO), from the time of the arbitration to the present, by reason of their willful concealment of key documents and information in the arbitration and subsequent proceedings, and by their equally tawdry efforts to maintain their positions vis-à-vis the Sarnoff Endowment.  Those practices, taken together with the Defendants' pattern of misrepresentations to the arbitrator and to subsequent courts (as we see them), corrupted the integrity of the arbitral and judicial processes in which they surfaced, and damaged and defrauded the courts as well as Dr. Olivarius.

32.  The Complaint simply raised the question of the consequences, for each of the individual Defendants, of their involvement in the post-termination acts that were the subject of the Complaint.  This was an entirely new question, directed at them for the first time, and not one raised in the prior arbitration with the Endowment.  The lawsuit was filed in an effort to obtain an answer to that new question.

33.  **To the best of my knowledge, information and belief, formed after the inquiry described above:**

a.  **nothing in the Complaint was presented in bad faith or for any improper purpose;**

b.  **the claims and legal contentions of the Complaint were clearly warranted by existing law or by non-frivolous arguments for the extension, modification, or reversal of existing law or the establishment of new law; and**

c.  **The factual allegations made therein had evidentiary support, and were likely, in our judgment, to have even more evidentiary support after a reasonable opportunity for further investigation or discovery.**

34.     The inquiry into the facts and law of the case that I and my team (and Dr. Olivarius) made in the circumstances was far more than the "reasonable" inquiry "under the circumstances" that the law requires. It was, we believed, almost heroic.

## V. THE CONTINUING PROBLEM OF IDENTIFYING AND RETAINING LOCAL COUNSEL.

35.     It had been Marty Himeles' intention to resign as local counsel immediately after the Complaint was filed. However, he remained in place longer so as to give Dr. Olivarius more time to locate a replacement.

36.     However, when Dr. Olivarius had not secured a replacement by April 1, 2005, Mr. Himeles moved to withdraw for the reasons stated to Dr. Olivarius even before the Complaint was filed. The Court granted his motion on April 5th.

37.     The same difficulties that had plagued Dr. Olivarius in securing local counsel prior to the filing continued after the filing. Indeed, they were made the more difficult by the "word" about town (noted by several potential local counsel candidates) that Defendant Freishtat would be filing motions for sanctions against all those who had a hand in the lawsuit. By at least April 4, 2005, in fact, those threats had been reduced to writing. After that, of course, each prospective local counsel was being asked to join a case in which that lawyer and his firm might also be threatened with sanctions.

38.     Unfortunately, this inability to secure local counsel had one extremely pernicious effect: it kept me from achieving *pro hac vice* status. That was so because the local rules require that an applicant for that status not only be sponsored, but also identify the person who would be acting as his or her local counsel.[1] I could have gotten Maryland lawyers who were members of

---

[1]     See D.Md. L.R. 102.1(b); Para E of D. Md. "Attorney Admissions Information"; D. Md. Form "Motion for Admission Pro Hac Vice" at ¶ 6.

85874v4

this Court's bar to sponsor me, but none of them, including Mr. Himeles, could say that they would be acting as my local counsel. Nor could I identify (at least until Dr. Olivarius ultimately hired Andy Levy to serve as local counsel) the person who would be acting as local counsel. By then, however, there was no lawsuit in which I could participate *pro hac vice*.

39.    The artificial Catch 22 situation that was created for me by the intersection of events and local rules on *pro hac vice* status unfortunately resulted in man-without-a-country status for me. Though I had filed the case lawfully, I was non-existent insofar as the Clerk of the Court was concerned. That caused great problems for me and for Dr. Olivarius at the time, as the Clerk's office would almost always refuse to accept filings from me.[2] The Defendants, then and now, and even in connection with their motions for sanctions, have exploited that fact.

40.    As I have already noted, Andy Levy, another Baltimore legal stalwart in the Marty Himeles mold, ultimately agreed to serve as local counsel, effective June 7, 2005. However, between April 5, 2005 and June 7, 2005, Plaintiff Olivarius was without local counsel and, as a result, I was without *pro hac vice* status.[3]

---

[2]    After Marty Himeles withdrew, the Clerk's office would not accept from me anything other than the waiver of service by the Non-Freishtat Defendants that I sent to the Clerk of the Court on May 9, 2005. The filing of that document was entered on May 20, 2005, with an effective file date of May 13, 2005.

[3]    In the early days of my efforts to get the case dismissed, I was talking to Ms. Mary Boyle, who was friendly, helpful, and even sympathetic to the bind in which I found myself, but also adamant that I would not be allowed to file anything in light of the local rules – even dismissal documents. (Among other things, she indicated that Mr. Frederick had called to remind her of that proscription.) She also had no idea as to what I could do to get around this bind. (Neither did the Maryland lawyers of my own and my client's acquaintance.) On June 6th, however, Ms. Boyle referred me to Claudia Gibson, to whom she had obviously described my problem. Ms. Gibson was also friendly and helpful and sympathetic from the first. She asked me to write the Court, directly or in care of her office, and she would follow-up to see if the Court would be willing to release me from the procedural limbo in which I found myself. I was actually writing that letter when I learned that Andy Levy would come on board as local counsel for the purpose of dismissing the case.

**DECLARATION OF JAMES D. McCARTHY – Page 10**

## VI. <u>THE DECISION TO DISMISS THE COMPLAINT.</u>[4]

41.     During the latter weeks of April, 2005, and in early May, Dr. Olivarius and I exchanged our views as to the status of the case and the costs and benefits of pursuing it further – as to some or all of the Defendants – especially in light of the District of Columbia Court of Appeals' willful failure to address fraud on the Court issues originally, and its subsequent refusal to address them in its March 21, 2005 (post-Complaint) ruling on Dr. Olivarius' Motion for Reconsideration (copy enclosed as Exhibit "1").  Dr. Olivarius' husband, Jef McAllister, was involved in some of these exchanges and discussions, as was my colleague, Sabrina Skeldon.

42      In those discussions, Dr. Olivarius determined that, on a cost-benefit basis, she would not continue the litigation against the Freishtat Defendants, who lacked the power to grant her the relief (exoneration and the restoration of her business reputation) that she wanted most. My seriously-obstructed efforts to follow through and dismiss the litigation against the Freishtat Defendants are discussed in Section VII below.

43.     As to the Non-Freishtat Defendants, Dr. Olivarius wished to and did attempt to pursue party-to-party settlement discussions with them. I was not (and – by definition – could not be) personally involved in this effort, but it is my understanding that the May 12, 2005 (Olivarius) and May 25, 2005 (McCann) letters that are attached to the Savransky Declaration as Exhibits 10 and 11, respectively, were part of that effort, as was the transmission of the

---

[4]     While the reasons for Dr. Olivarius' decision to withdraw her Complaint are legally irrelevant to the issues before this Court, I dissent strongly from the statements on that subject made in ¶ 37 of Dr. Olivarius' Declaration.  In my view, based on my own knowledge, they are incorrect.

However, I am wholly in agreement with Dr. Olivarius' recollection that the sanctions threats of the Defendants did not cause her to withdraw her Complaint.  They influenced her only as to the timing of her withdrawal, as she (and her counsel) expected that an earlier rather than later withdrawal would provide Dr. Olivarius (and her counsel) with the clear benefit of Rule 11's "safe harbor."  Unfortunately, that expectation was dashed, as the Defendants' motions were ultimately filed without the slightest regard for the safe harbor provision.

85874v4

Complaint to Dr. Rolett on or about May 21, 2005. <u>See</u> the attachment to Exhibit 14 to the Savransky Declaration.[5]

44.    When those discussions failed, Dr. Olivarius also determined to dismiss the Non-Freishtat Defendants with prejudice.[6]

45.    At no time did Dr. Olivarius doubt the merits of her case against the Defendants named in the Complaint. She simply declined, for her own reasons, to spend more years and more millions trying to rectify the injustices she had suffered at the hands of these Defendants.

46.    The Defendants' threatened sanctions motions (discussed more fully below) were a factor only insofar as the dismissal of the Maryland Litigation within the Rule 11 "safe harbor" period would save her the unnecessary cost of responding to those then-threatened but unfiled motions.

47.    By their later filing of these motions for sanctions in the face of the safe harbor period, and by forcing Dr. Olivarius and me to respond to them, the Defendants have effectively negated the safe harbor provision and the costs savings (ironically – for <u>both</u> sides <u>and</u> this Court) that Rule 11(c)(1)(A)'s safe harbor provision was intended to provide.

---

[5]    I was first made aware of this document when Laurie Holmes, acting as the attorney for the Non-Freishtat Defendants (subject to protest), sent it to me by e-mail on June 20, 2005, nearly a month after Dr. Rolett had received the package in question. By a June 21st response e-mail, I agreed to look into the matter once Dr. Olivarius was available to discuss it. <u>See</u> Exhibit "2" to this Declaration. In the exchange of e-mails enclosed as Exhibit "3" to this Declaration) I advised Ms. Holmes that the package had been sent to Dr. Rolett solely because Dr. Olivarius believed that he might be involved in the settlement discussions that were then a possibility, and not as a broader distribution of the complaint. That explanation seemed to satisfy Ms. Holmes. <u>Id.</u>

[6]    The determination to do so was made in late May of 2005, and communicated to Laurie Holmes at that time. By May 31st, the Rule 41 papers to dismiss the case against <u>all</u> Defendants had been sent to Baltimore for filing. <u>See</u> Exhibit "4" hereto. However, in one of the more surreal episodes of the long sequence of surreal events described in Part VII above, we learned on June 1st that Mr. Frederick, on behalf of the Freishtat Defendants, had worked to block the dismissal of not only his clients, but the dismissal of the Non-Freishtat Defendants.

Eventually, of course, the Non-Freishtat Defendants were dismissed on June 7, 2005, when Andy Levy joined the team and effected the filing of the dismissal documents.

## VII. THE FREISHTAT DEFENDANTS' EFFORTS TO OBSTRUCT THE DISMISSAL OF THE COMPLAINT AGAINST THEM.

48.     In light of the discussions described above, on the evening of May 16th, I sent an e-mail to Alvin Frederick, the Freishtat Defendants' attorney, that stated, in relevant part, that Dr. Olivarius "has determined to drop your clients from the lawsuit, with prejudice and to focus her efforts on those Defendants who can give her the relief she really wants most: the recission of their original determination that she was properly terminated 'for cause'.  Your clients cannot afford her that relief".  See Exhibit "5" to this Declaration.

49.     I did not know it at the time, but I had just started down the longest and most difficult road to a voluntary dismissal imaginable.  What was not imaginable was that Mr. Frederick, on behalf of the Freishtat Defendants, would so consistently act to frustrate (rather than implement) the dismissal, with prejudice, of his own clients.

50.     In that May 16th e-mail, I also stated that: "Tomorrow, we will file a voluntary dismissal (with prejudice) pursuant to Fed. R. Civ. P. 41."  See Exhibit "5" hereto.  On May 17th, I sent multiple copies of the executed "Rule 41 Notice of Voluntary Dismissal, with Prejudice, of Defendants Freishtat, Burke, Mullen & Dubnow" to Marty Himeles' office for filing the next day.  See Exhibit "6" hereto.  Mr. Himeles had volunteered his staff for the courier work.

51.     On that same day, May 17th, in response to my May 16th e-mail, Mr. Frederick asked me to fax a copy of the Rule 41 dismissal document to him.  I replied, by e-mail, that I would do so.  Accordingly, I mailed and/or faxed and/or e-mailed that very "plain vanilla" Rule 41 dismissal document to him on the 17th of May.  See Exhibit "7" hereto.

52.     The next day (May 18th), because I couldn't recall whether I had sent him a signed copy, I also e-mailed Mr. Frederick a "scanned" replica of the Rule 41 dismissal document that was signed by me.  See Exhibit "8" hereto.  Thus, on May 17[th,] or May 18th at the

85874v4

latest, Mr. Frederick had, in his hands, Rule 41 dismissal papers signed by me and dismissing his clients from the Maryland Litigation.

53.     That same day (May 18th), or the day before (May 17th), I pre-cleared the hand filing of the dismissal document with the Clerk's office.  However, when Mr. Himeles' courier brought the Rule 41 dismissal document to the Clerk's office, they refused to file it.  Later, I was told (I believe by Ms. Boyle) that they would not accept the document from me (as a non-admitted attorney) because it dismissed only some of the Defendants.  However, she said they would accept a filing from me (still a non-admitted attorney) that dismissed all of the Defendants.  She apologized for the confusion.

54.     By the end of the day on May 18th, Mr. Frederick was loudly complaining that the dismissal document had not been filed.  In light of the Clerk's refusal to file the document, I thought I had the solution: as an admitted, qualified Maryland attorney, he could file it.  See Exhibit "9" hereto.  He refused – on the ground that: "I am unaware of any method by which a defendant would or remotely should file a dismissal on behalf of the plaintiff, particularly when the defendant's counsel has not entered an appearance." Id.[7]

55.     I responded by noting that: "I had thought you might accommodate me in this request, as the entry of the dismissal would be of interest to your clients, even if it would entail your appearance." See Exhibit "10" hereto.  Nevertheless, Mr. Frederick still refused to assist in the filing of the dismissal document, this time elevating his refusal to a "legal and ethical" decision.  Thus, by nearly 6:00 p.m. on May 18th, my first bright idea had been rejected by Mr.

---

[7]     It is worth noting that the legal and ethical problems with an appearance that Mr. Frederick proclaimed on May 18th did not stop him from appearing eight days later to file the wholly frivolous, wholly obstructionist and wholly unnecessary  pre-service and pre-discovery Motion to Dismiss or in the Alternative for Summary Judgment (and related filings) that he filed on May 26, 2005, or from entering an appearance to challenge the dismissal order in the case, or from filing a Rule 11 Sanctions motion in clear violation of the Rule's safe harbor provisions.

Frederick – who had not only refused to e-file it but to hand-file it, though be conceded that he had only to walk "to a building I can almost see from my window and [hand] a paper to a clerk". See Exhibit "10". In his view, it was either "illegal" or "unethical" (or both) to do either. Nevertheless, he demanded that I find some other way to file it.

56.     Then I had my second bright idea. I asked him if he would "agree to file it if we refiled it as a stipulated dismissal". See Exhibit "10". That May 18th request was met by an out-of-office auto message that Mr. Frederick would be out of the office until May 23rd, five days later. See Exhibit "11" hereto.

57.     On Friday, May 20th, however, Mr. Frederick responded by e-mail that he would not file a stipulation of dismissal, that he had talked to Mary Boyle of the Clerk's office, and that he now wanted: (1) Dr. Olivarius to file the documents *pro se*; and (2) demanded that she do so by May 25th (three business days later). See Exhibit "12" hereto. Mr. Frederick then dropped off the radar screen as he had originally indicated.[8]

58.     The Frederick demand that Dr. Olivarius file the dismissal documents *pro se* was not one that could be easily satisfied. She lives in London, travels frequently and widely, and is not always so easily reachable by reason of time differences as well as travel. Nevertheless, I attempted (unsuccessfully) to arrange such a filing, and to arrange it by the (thoroughly unreasonable) date of May 25th. It simply could not be done.

59.     On the afternoon of May 25, 2005, Mr. Frederick inquired as to whether the *pro se* dismissal had been filed. See Exhibit "13" hereto. I responded the next day, noting that: "I've

---

[8]     It is interesting to note that, according to his autoreply messages, Mr. Frederick, who is based in Baltimore, was hardly available at all between May 18th and May 31st. Yet he demanded that Ann Olivarius, who is based in Europe, not only be available, but that she draft and get documents filed in Baltimore in less than three business days, and then attempted to use her failure to do so to "justify" his motion to dismiss what she was already trying to dismiss.

been out the last three days.  Ann was going to do it *pro se*, as you had suggested.  Hard to check now, as she's in the U.K., I believe.  Should know tomorrow."  Id.  Mr. Frederick's response was another autoreply message – that same day – that he would be out of the office until May 31st.  See Exhibit "14" hereto.

60.     By the time Mr. Frederick returned, it had been determined that Dr. Olivarius would also be dismissing her case against the Non-Freishtat Defendants as well as the Freishtat Defendants.  Accordingly, on May 31st, I sent Mr. Frederick, by e-mail, a copy of the Rule 41 dismissal document, dismissing all Defendants, and stating in the email that: "The attachment will be filed tomorrow.  We anticipate no difficulties in getting it filed."  See Exhibit "15" hereto.

61.     That May 31st e-mail triggered the most astonishing response imaginable, as Mr. Frederick then disclosed, on June 1st, that on May 26th, apparently just before leaving town for five days, he had filed a pre-service pre-discovery motion to dismiss and for summary judgment that was clearly intended to negate Dr. Olivarius' ability to unilaterally (under Rule 41(a))[9] dismiss Frederick's own clients -- and even the other Defendants.

62.     The extraordinary June 1st e-mail chain (see Exhibit "15") reads, in sequence, as follows:

---

[9]     Rule 41(a) of the Federal Rules of Civil Procedure, in relevant part, states that "an action may be dismissed by the plaintiff without further order of court . . . by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment . . ."  There is no doubt that Mr. Frederick's clients intentionally and cynically interposed this motion for summary judgment as an "obstacle".  He actually calls it an "obstacle", and then indicates his willingness to remove that "obstacle" for a price.

        Two other points:  First, this factually dense case is transparently not a summary judgment case – and not one that, in light of the Supreme Court's decision in Celotex, can be disposed of without allowing Plaintiff Olivarius a reasonable opportunity for discovery.  Second, this sort of gamesmanship is not cost free.  It imposes burdens on the courts and on the parties.  Indeed, in this case, the inability to dispose of the matter under Rule 41(a), "without further order of the court", generated a whole separate controversy over the nature of a dismissal order/settlement order that this Court need never have entered.

85874v4

### Frederick to McCarthy (June 1st, 8:29 p.m.)

"Mr. McCarthy

Perhaps I'm missing something but:

1.  You are still unadmitted and have no local counsel, therefore the clerk's office will accept no filing from you.

2.  Contrary to the representations in the draft pleading you sent me, my clients, have in fact, filed a Motion to Dismiss or in the Alternative Motion for Summary Judgment.  <u>On the basis of either of those facts it appears impossible to file what you forwarded</u>.

If I am in fact missing something, please fill me in.  Otherwise I suggest you get admitted pro hoc vice, or obtain local counsel.  It is respectfully suggested you review rule 8.5 of the Rules of Professional Conduct for Maryland Lawyers."

June 1, 2005 E-mail from Alvin Frederick to Jim McCarthy (emphasis added).

### McCarthy to Frederick (June 1st 1:0l p.m.)

"1.  The Clerk's office advised us that it would accept the filing if it disposed of the entire case.

2.  Until this morning, I was unaware of your MSJ filing.  Now I am simply mystified by it, especially in light of your prior refusals to provide the most mundane and ministerial assistance in dismissing the case against your own clients."

June 1, 2005 E-mail from Jim McCarthy to Alvin Frederick.

### Frederick to McCarthy (June 1st 4:33 p.m.)

"You represented to us that a dismissal in compliance with the rules would be filed by May 25, when it was not, and you failed to respond to the email I forwarded to you, I acted to protect my client and filed, in accordance with Maryland practice.

Your definition of 'mundane and ministerial' is inconsistent with mine and the Federal Rules of Civil procedure.  My office has been consistently informed that inasmuch as you are not admitted to practice in our Federal Court, they are, in essence, treating this case as a pro se filing and will accept nothing unless signed by your client.  You were so advised by me, in writing.

I suggest strongly, you comply with the rules and either have your client file the dismissal, get admitted yourself and file it, or have local counsel do so.  <u>Subject to</u>

**DECLARATION OF JAMES D. McCARTHY – Page 17**

my clients' right to proceed under Rule 11, we would consent to dismissal, with prejudice, so that the filing I made is no obstacle to dismissing this case."

June 1, 2005 e-mail from Alvin Frederick to Jim McCarthy (emphasis added). It is impossible to imagine what Mr. Frederick was protecting his client from. A Rule 41 dismissal with prejudice?

63.     In fact, there is only one way to analyze this extraordinary set of events. Through Mr. Frederick, on May 26th, the Freishtat Defendants had moved to dismiss a case that the Plaintiff had been trying to dismiss for 10 days. They had elected to do so rather than hand-file or e-file the Rule 41 notice that had been in Mr. Frederick's hands since May 18th. They elected to do so rather than enter into the agreed stipulation they had refused on May 20th. They elected to do so rather than tell Ms. Boyle that they had no objection to Dr. Olivarius' filing of Rule 41 dismissal papers – instead of telling her that she should not be filing them.

64.     Through Mr. Frederick, the Freishtat Defendants also filed that pre-service, pre-discovery motion for summary judgment, which can have had no purpose other than to block the unilateral Rule 41 dismissal of the Freishtat Defendants, and so to require Dr. Olivarius to make concessions to the Freishtat Defendants in order – quite remarkably – that she might have the ability to dismiss the Freishtat Defendants.

65.     The last e-mail in the June 1st chain of e-mails made it clear as to the concession the Freishtat Defendants wanted: in exchange for a consent to dismiss them, they wanted the right to bring a Rule 11 motion that the rule itself did not entitle them to bring. As Frederick so shamelessly and transparently put it: "Subject to my client's right to proceed under Rule 11, we would consent to dismissal, with prejudice, so that the filing I made [as an intentional obstacle to dismissal] is no obstacle to dismissing this case" (emphasis and comment added).

66.     Fortunately, by June 6th, Andy Levy had been retained by Dr. Olivarius, and by June 7th this case had been dismissed, as it should and could have been weeks before. However,

the failure to extort an agreement to an unlawful Rule 11 motion by blocking the dismissal of these proceedings has not stopped the Freishtat Defendants from filing that unlawful Rule 11 motion.

67.     That motion is now before this Court.

### VIII.   THE FINAL DISMISSAL OF THE COMPLAINT WITH PREJUDICE.

68.     On June 7, 2005, Andy Levy of the Baltimore law firm of Brown, Goldstein & Levy, LLP entered the case on behalf of Dr. Olivarius.  He appeared as "local counsel for the Plaintiff for the limited, special purpose of filing a Stipulation of Voluntary Dismissal."

69.     That same day, Mr. Levy and Mr. Frederick, on behalf of the Freishtat Defendants, executed and filed a "Stipulation of Voluntary Dismissal With Prejudice", pursuant to Rule 41(a), that dismissed the Maryland Litigation with prejudice.  That is, Mr. Frederick agreed to do, with Mr. Levy, on June 7th, precisely what he had refused to do for me on May 20th.

### IX.   THE DEFENDANTS' MERITLESS AND UNLAWFUL POST-DISMISSAL MOTIONS FOR SANCTIONS.

**A.    DEFENDANTS' SANCTIONS THREATS.**

**1.    The Freishtat Defendants' Threats.**

70.     From the outset of the engagement, Dr. Olivarius expressed the view that Defendant David Freishtat and those associated with him would threaten sanctions and file a motion for sanctions if he were to be sued.  In the pre-filing period that estimation was confirmed time and time again by those familiar with the Baltimore legal community.

71.     It was therefore no surprise to receive Mr. Frederick's vituperative April 4, 2005 letter threatening sanctions, or his May 31, 2005 letter threatening sanctions or his colleague, James Dickerman's threatening letter on June 21, 2005.  See Exhibits "16", "17", and "18", respectively.

**DECLARATION OF JAMES D. McCARTHY – Page 19**

72.     These were consistent, of course, with Mr. Frederick's May 31st e-mails attempting to hold up the dismissals – unless given the right to file a motion for sanctions. Those threats and letters were also consistent with the we-want-to-file-a-sanctions-motion brouhaha over the order dismissing the case. That mini controversy occupied this Court from June 7, 2005 through June 24, 2005.

73.     However, it was still surprising to receive, on June 29, 2005, twenty-two days after the Complaint had been withdrawn, a proposed Rule 11 motion that Mr. Frederick intended to file another twenty-two days hence. See Exhibit "19" hereto.

74.     When that long-threatened motion for sanctions was actually filed, on July 28, 2005, in the face of the Plaintiff's clear presentation of major legal and factual flaws in that proposed document, it could not have been clearer that the Freishtat Defendants' desire for retribution, not the law, and not the facts, had simply taken the Freishtat Defendants' serial threats to their irreversible conclusion.

2.      **The Non-Freishtat Defendants' Threats.**

75.     By comparison with the Freishtat Defendants' sanctions threats, the Non-Freishtat Defendants' threats were quite muted, if no less insistent.

76.     In an April 14, 2005 letter, Laurie Holmes, who was representing those Defendants (subject to our objections), joined in the Frederick demands made on April 4th. See Exhibit "20". I wrote that we would respond to her when we responded to Mr. Frederick. See my April 21, 2005 letter to Laurie Holmes (Exhibit "21" hereto).

77.     However, by the time we were to respond to Mr. Frederick, Dr. Olivarius had determined that she would dismiss the Freishtat Defendants, which we attempted to do (over their obstruction) from May 16, 2005 to June 7, 2005. In consequence, and because of what

turned out to be a unilateral settlement discussion then ongoing with the Non-Freishtat Defendants, I wrote Ms. Holmes, on May 18, 2005, to advise her of the fact that we would not be responding to Mr. Frederick, and inquiring whether she still wished a response to her April 14, 2005 letter. See Exhibit "22" hereto.

78.     Ms. Holmes did want a response and again threatened sanctions in her May 20, 2005 letter to me (See Exhibit "23" hereto).

79.     Not long after, Dr. Olivarius determined that she would dismiss the suit against the Non-Freishtat Defendants as well as the Freishtat Defendants.  When that happened, I believed the dispute, as between Dr. Olivarius and the Non-Freishtat Defendants was over. Rodney Glover's June 7, 2005 letter, transmitting a proposed sanctions motion, proved me wrong.  See Exhibit "24" hereto.

### 3.     The Plaintiff's And My Own Efforts To Demonstrate To The Defendants The Impropriety Of Their Sanction Threats.

#### As To The Freishtat Defendants

80.     Plaintiff Olivarius and her counsel carefully and professionally weighed all of the Defendants' threats of sanctions, whether conveyed before or after the case was dismissed.

___     As to the Freishtat Defendants' letters, Dr. Olivarius and her counsel responded with my nineteen-page July 20, 2005 letter to Mr. Frederick.  That letter systematically spelled out all of the factual and legal errors in the Freishtat letters, including the error in assuming that a Rule 11 motion at this (post-dismissal) stage of the pleadings would be legally permissible.

81.     Mr. Levy then followed up with Mr. Frederick to ask him to withdraw his earlier threats.  Consistent with the earlier "message" he had delivered (through Mr. Levy) to Dr. Olivarius and her counsel – that his clients would not be standing down because they wanted to "inflict pain" – Mr. Frederick declined to withdraw those threats.

85874v4

82. Mr. Frederick's only substantive response to my letter was to emphasize his belief that non-mutual collateral estoppel would bar the Plaintiff's claims. He also provided Dr. Olivarius and her attorneys with two cases which he alleged to be on-point and dispositive. They were not, and were quickly dispatched in a July 27, 2005 letter from Andy Levy to Mr. Frederick. Mr. Frederick's only response to that letter was to advise Mr. Levy that he would not be withdrawing his clients' sanctions threats and would be filing a motion for sanctions.

83. Perhaps unsurprisingly, the Freishtat Defendants' Motion for Sanctions, when filed, did not attach either my July 20th letter or Mr. Levy's July 27, 2005 letter (though he attached his own April 4th letter, to which my letter responds). That defect is remedied here. My July 20, 2005 letter is attached hereto as Exhibit "25". Mr. Levy's letter is attached hereto as Exhibit "26".

84. Though both letters put the Freishtat Defendants on notice that their proposed motion was fundamentally defective, they filed the motion the next day. The Plaintiff's analytical letters had no effect whatsoever. The motion was filed virtually unchanged from the motion that had been proposed prior to the Plaintiff's July 20th and July 27th letters.

### As To The Non-Freishtat Defendants

85. When the Non-Freishtat Defendants served a proposed motion for sanctions on June 7, 2005, I was surprised. My recent discussions with Laurie Holmes had been amicable, and they seemed to be pointed toward the end of the dispute. I immediately asked (by e-mail) whether the Wiley Rein lawyers who had e-mailed the proposed motion were aware of the fact that the case had been dismissed. I got no answer.

86. Since Rule 11 clearly did not apply in such circumstances, I inquired of Allison Barnes, one of the Wiley Rein lawyers on the case, whether they maintained that we needed to

respond to their proposed motion. <u>See</u> the June 28th e-mail that is attached hereto as Exhibit "27". Mr. Barnes replied that we did not need to do so as his clients "do not intend to seek relief pursuant to Fed. R. Civ. P. 11 at this time." <u>Id.</u> I incorrectly took that as a sign that the Non-Freishtat Defendants would not be filing a motion for sanctions, despite their joinder in the June 2005 "settlement order" controversy.

87.    I was therefore surprised again when, beginning on July 5th, Andy Levy and I began receiving pieces of an actual motion for sanctions, which looked more like an injunction action. In a July 7th e-mail, I asked Mr. Barnes to explain it to me. <u>Id.</u> No response was forthcoming.

88.    After having read the motions for sanctions, I e-mailed Mr. Barnes informally to suggest to him that he and his colleagues and clients ponder Local Rule 105.8(a), in light of the complete absence of any evidence (and almost no substantive allegation) to support their motion for sanctions against me and/or my firm. <u>See</u> Exhibit "28" hereto.

89.    Andy Levy made the same point more formally in an August 5th letter (Exhibit "29" hereto). I elaborated on these points, in detail and as they applied to me and my firm, in an August 14, 2005 letter to Mr. Barnes (Exhibit "30" hereto), advising him once again that given the complete lack of evidence to support their claims for sanctions under Section 1927 and the Court's inherent powers, they should withdraw the motion. <u>Id.</u>

90.    On August 17, 2005, Mr. Barnes advised me that the motion for sanctions against me and/or my firm would <u>not</u> be withdrawn. <u>See</u> Exhibit "31" hereto. The exchange concluded with my comments regarding what I believed to be lawyers' duties in the face of irrational demands by vengeful clients. <u>Id.</u>

91.    Those comments had no effect either.

**B.     THE DEFENDANTS' MOTIONS FOR SANCTIONS.**

92.     On July 7, 2005, some thirty (30) days after the dismissal of the Maryland Litigation, the Non-Freishtat Defendants filed "Defendants' Motion for Sanctions", their "Memorandum in Support of Defendants' Motion for Sanctions", and miscellaneous materials (collectively the "Non-Freishtat Defendants' Motion for Sanctions").

93.     Included among the materials submitted with the Non-Freishtat Defendants Motion for Sanctions was the Declaration of Karen Savransky (the "Savransky Declaration").

94.     The Motion for Sanctions ultimately filed by the Non-Freishtat Defendants essentially altered the Motion for Sanctions threatened on June 7, 2005 in four ways:  (1) it removed Marty Himeles as a subject of the motion; (2) it added their allegations regarding out-of-court events, though those events had apparently occurred well before the Non-Freishtat Defendants had served their proposed motion; (3) it attempted (but failed) to remove the Rule 11 language from the motion and to substitute Section 1927 and inherent powers language for that language; and (4) it added a demand for prospective injunctive relief that reads more like an injunction action than a motion for sanctions.

95.     On July 28, 2005, fifty-one days after the dismissal of the Maryland Litigation, the Freishtat Defendants filed their "Motion for Sanctions Pursuant to Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and the Court's Inherent Power", with a supporting memorandum of law, certain exhibits, and a request for hearing (collectively the "Freishtat Defendants' Motion for Sanctions").

96.     Despite my nineteen page letter of July 20th demonstrating the numerous factual and legal errors the Freishtat Defendants had made in their proposed Motion for Sanctions – including the fundamental error of filing a Rule and case-law defying Rule 11 motion at this

stage of the proceedings – the Freishtat Defendants made only one small change in the motion they actually filed on July 28th. They added footnote 7 on page 8 of the Non-Freishtat Motion for Sanctions. That footnote, if anything, makes me question whether counsel for the Freishtat Defendants ever read the July 20th letter.

## X. THE NON-FREISHTAT DEFENDANTS' FRIVOLOUS AND BASELESS EFFORTS TO ENJOIN ME AND PLAINTIFF OLIVARIUS.

97.     I have closely reviewed those portions of the Non-Freishtat Defendants' Motion for Sanctions that ask this Court to enjoin me and/or Dr. Olivarius from, in substance, the prospective out-of-court harassment of the Non-Freishtat Defendants. See the Non-Freishtat Defendants' Memorandum of Law at pp. 2, 7 (¶ 21), 11-12, and 14-17.

98.     I have also reviewed those portions of the Savransky Declaration that are apparently offered in support of this request for injunctive relief against me and/or Dr. Olivarius.

99.     The injunctive relief requested by the Non-Freishtat Defendants varies from page to page:

a.     The actual "Motion for Sanctions" makes no request for injunctive relief of any kind

b.     At Memorandum p.2, the Non-Freishtat Defendants ask this Court to issue sanctions "to further restrict them ["Plaintiff and her counsel"] from filing such claims in yet another forum or engaging in a pattern of harassment of the defendants in the future."

c.     At Memorandum p.7, those Defendants ask this Court to enjoin "Plaintiff" [not me] from further frivolous litigation on the underlying facts and should be restricted from further defamation and misrepresentation designed solely to harass, embarrass, and/or injure the defendants".

d.     At Memorandum p.12, those Defendants argue that any sanctions award pursuant to this Court's inherent powers "should account for the harm and disruption both inside the courts and out." The term "this harm" apparently refers to the Non-Freishtat Defendants' allegations (at Memorandum p.12) regarding "the related activities of the Plaintiff", described therein as "not only . . . the concerted activity in which she engaged but also the extent of the disruption and harm caused to the

Endowment by her activities." No mention is made of any activity of mine. Nevertheless, the award of sanctions pursuant to this Court's inherent powers is sought against me as well as against Dr. Olivarius.

e.  Pages 14-17 of the Non-Freishtat Defendants' Memorandum offer several more formulations of the injunctive relief requested. At p.14, they ask this Court to impose a sanction that "Plaintiff" [not me] "Be Enjoined from Pursuing Future Litigation and Harassing Behavior Against the Endowment and the Defendants". By page 16, the injunctive relief requested against the "Plaintiff" [not me] is either "from any further suits and harassment against the Endowment, its current, past or future Board members, preceptors, fellows, employees, agents, or affiliates for anything in any way related to her prior employment, termination, or subsequent litigation" or "from further litigation or harassment against the Endowment, its current, past or future board members, preceptors, fellows, employees, agents, or affiliates based upon the allegations raised in this action."

100.  As to these claims for relief, which are sometimes directed at me and sometimes not directed to me, I would emphatically state that:

a.  I have not in the past and do not intend in the future to file claims in another forum against these Defendants. See Memorandum at pp. 2, 7, 14, 16). I have filed one Complaint in one forum against those Defendants and done nothing to "harass" them. The Non-Freishtat Defendants and their counsel knew that when they filed their Motion for Sanctions against me.

b.  I have not in the past and do not intend in the future to harass the Non-Freishtat Defendants or to engage in a pattern of doing so. See Memorandum at pp. 2, 7, 14, 17. I have filed one Complaint in one forum against those Defendants. Nothing more. The Non-Freishtat Defendants and their counsel knew that when they filed their Motion for Sanctions against me.

c.  I have not in the past and do not intend in the future to file "frivolous litigation" (Memorandum at p.7). Similarly, I have not in the past and do not intend in the future to "defame" or "misrepresent" the Freishtat Defendants (Id.). I have filed one non-frivolous Complaint against these Defendants in the past. That is all. As a matter of fact and law, that complaint was non-defamatory. I also know of no misrepresentation in it. The Non-Freishtat Defendants knew that when they filed their Motion for Sanctions against me.

d.  I have not in the past and do not intend in the future to cause any harm or disruption inside the court or outside it (Memorandum at p.12). I have

85874v4

filed one Complaint in court, and engaged in a few related and non-controversial activities regarding related filings in this Court." As is demonstrated below, I had no knowledge of or involvement in the out-of-court activities of which the Non-Freishtat Defendants have complained. The Non-Freishtat Defendants knew this at the time they filed their Motion for Sanctions against me.

e.    I have never engaged in litigation against the Endowment. Nor have I ever harassed the Endowment – in court or out. Nor do I intend to do either in the future (Memorandum at pp. 14, 16). The Non-Freishtat Defendants knew these facts at the time they filed their Motion for Sanctions against me.

f.    I do not know the identities of all of the Endowment's "current, past, or future Board members, preceptors, fellows, employees, agents or affiliates" (Memorandum at pp. 16), which I assume to be a broad array of individuals and entities. As such, I do not know if I have prosecuted litigation against any of them in the past or will do so in the future. I have certainly not engaged in litigation against any such persons "based upon the allegations in this action" (Id.) or based on "anything in any way related to her [Dr. Olivarius'] prior employment, termination or subsequent litigation" (Id.).

To the extent any of the individual or partnership Defendants in the Maryland Litigation fit within these descriptions (as some surely do), then I have filed one Complaint against them in one proceeding in this Court. I have no intention of filing any further Complaints against them in this or any other Court that relate to the "allegations in this action" or to Dr. Olivarius' "employment, termination or subsequent litigation." Indeed, I would note that the existing Complaint is not directed at the circumstances of her employment or termination, but to her mistreatment by these Defendants after those events. The Non-Freishtat Defendants knew all of these facts before they filed their Motion for Sanctions against me.

101.    As to the individual out-of-court events of the past upon which the Non-Freishtat Defendants based their efforts to enjoin and/or sanction me, I would make the following observations:

a.    Except as set forth below, these are addressed by the declarations of Dr. Olivarius and Richard Mason.

b.    I have never attended and do not intend to attend any meetings of the Endowment, annual or otherwise.

c.   I have no personal knowledge of the circumstances of Richard Mason's attendance at the 2005 Annual Meeting referenced at pp. 2, 12 of the Memorandum.  I only learned of his attendance after that meeting.

d.   I have no personal knowledge of the allegedly fabricated e-mails and documents, or the allegedly malicious flyers, or the circumstances of their creation.  Memorandum at pp. 2, 12.

e.   I had never seen Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 12, 13, and part of Exhibit 14 to the Savransky Affidavit, before the filing of (and my receipt of) the Non-Freishtat Defendants' Motion for Sanctions, and I have no personal knowledge of the circumstances of their creation.

f.   I did not know of the Endowment's 2005 Annual Meeting until I received (by e-mail) the April 27, 2005 letter from Laurie Holmes of Gardner Carton & Douglas that is attached to the Savransky Declaration as Exhibit 9.  That letter demanded that I advise Dr. Olivarius "that should she or any agent on her behalf make any effort to disrupt the Endowment's annual meeting this weekend in Washington, D.C., she or such agent will be escorted from the premises."  Ms. Holmes purported to represent the Non-Freishtat Defendants at the time.

g.   By an e-mailed letter dated May, 2005, see Exhibit "__" to this Declaration, I responded to Ms. Holmes April 27th letter.  As to Ms. Holmes' non-disruption demand, I responded that "Dr. Olivarius will neither attend nor disrupt any such meeting.  You need not threaten her".

h.   My May 1, 2005 letter had been expressly approved by Dr. Olivarius before I sent it.

i.   Well after the 2005 Annual Meeting, I received a letter from Ms. Holmes dated May 20, 2005.  See Exhibit "__" to this Declaration. That letter demanded that I inform Dr. Olivarius that:" she and her clients "were well-aware (although we presume that you are not)[10] that she orchestrated the disruptions at the Endowment's Annual meeting last month, including the appearance of Richard Mason and the distribution of a flyer by 'Citizens for Integrity in Science.'  We also know that she has been sending defamatory emails to the Endowment community, using names such as 'a Concerned Fellow' and 'Harvard

---

[10]   It will not escape the Court's attention that though Ms. Holmes correctly "presumed" that I had no knowledge of the out-of-court events in her May 20th letter, and I strongly affirmed my lack of knowledge immediately, her clients and her former colleagues at Gardner Carton still filed a motion for sanctions against me, and sought to enjoin me, on the basis of those same events.

Alum.' The electronic evidence is rather compelling. We are hopeful that a pointed conversation with your client on these subjects will convince you of the importance of dismissing this lawsuit before you become caught up further in her mounting misdeeds. The individual Defendants and the Endowment believe that only by obtaining and enforcing sanctions and likely seeking other remedies against your client will they put an end to her obsessive desire to harm the Endowment."

j.   I responded to Ms. Holmes with a May 23, 2005 e-mailed letter to Ms. Holmes, stating as to her Annual Meeting allegations, that: "As you know, I have received your May 20, 2005 letter. Dr. Olivarius will respond to it on the merits, as she is familiar with the complaints you make therein, and I am not. To the extent my assurance to you, made in my May 1, 2005 letter, that Dr. Olivarius would be doing nothing to disturb the Endowment's Annual Meeting proves incorrect, I apologize. It was certainly correct in all respects at the time the letter was sent. Indeed, it may still be correct. I simply have no knowledge."

k.   To this date, as noted above, I have no personal knowledge as to the events that are the subject of these Annual Meeting-related allegations, and would rely on Mr. Mason's declaration, as well as those portions of Dr. Olivarius' declaration that address those allegations.

**102.   I do know, however, and know it unequivocally, that I personally had nothing to do with any of the out-of-court events that are the subject of those allegations allegedly supporting the Non-Freishtat Defendants' motion for sanctions under this Court's inherent powers or their multiple and confused requests for injunctive relief. I also know unequivocally that the Non-Freishtat Defendants knew that I had no such involvement long before they filed a totally frivolous motion for sanctions seeking to sanction me and enjoin me by reason of those events.**

I declare under penalty of perjury that the foregoing is true and correct.

**DATED**:  August 31, 2005.

_____
James D. McCarthy

**DECLARATION OF JAMES D. McCARTHY – Page 29**