IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | | |
|---|---|---|
| DR. ANN McALLISTER OLIVARIUS, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 1:05-cv-0717-JFM |
| DR. DANIEL FRIEDMAN, et al., | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \*oOo\* \* \* \* \* \* \* \*

## AFFIDAVIT OF DR. ANN McALLISTER OLIVARIUS

Dr. Ann McAllister Olivarius deposes and states:

1. My name is Dr. Ann McAllister Olivarius. I am over the age of 18 and am competent to testify to the matters set forth herein. I hold British and American citizenships and am a resident of London, England.

2. I have a doctorate in Economics from Oxford University where I studied as a Rhodes Scholar. I hold a J.D. from Yale Law School and an M.B.A. from Yale's School of Management.

3. From 1991 to 1996, I served as General Counsel to The Stanley J. Sarnoff Endowment for Cardiovascular Science, Inc. ("Endowment"), a nonprofit organization whose mission is to identify cures for cardiovascular disease. From 1992 to 1996, I was further appointed to serve the Endowment as its President, CEO and Director of Scientific Programs.

4. I have received the motion papers moving to sanction my counsel, James McCarthy, and myself. I have also received and reviewed their attachments, including a Declaration by Karen Savransky. In those papers it is falsely alleged, among other things, that I disrupted the Endowment's Annual Meeting by (a) arranging to have author Richard Mason attend it as my agent; (b) fabricating anonymous emails and evaluation forms by those who attended the Annual Meeting; and (c) organizing "colleagues" to circulate malicious flyers about the Sarnoff Defendants through the medium of a group called Citizens for Integrity in Science. This Affidavit responds to these allegations and other issues mentioned in the motion papers.

**Richard Mason.**

5. Several months ago, I was approached by the author Richard Mason ("Mason") who told me that he was writing a book on the ethics of non-profits. He asked to interview me.

6. I first heard of Mason in the late 1990's. My husband, Dr. Jef McAllister, brought home Mason's first novel, The Drowning People, which he had been given by a colleague.

7. I met Mason shortly afterwards at a dinner party in his honor given by a senior editor of TIME. Mason had already developed a reputation as a rising literary star. He appeared earnest and thoughtful about tackling South Africa's intractable and interlinked problems of poverty, HIV and illiteracy.

8. When Mason re-introduced himself, I knew a lot more about him than when we had first met in 1999. For example, with some of the money Mason had earned on his first book he had established a charity for disadvantaged South African children: the Kay Mason Foundation, named after his late sister. I understand that Mason funds the overhead and administrative expenses of the charity himself, allowing donor money to go directly to the children. Archbishop Tutu is a patron of the Kay Mason Foundation. I have personally heard him speak glowingly of Mason's groundbreaking work in providing quality education to underprivileged South Africans.

9. I understood Mason's motivations, as I have made similar choices in my own life. I left a lucrative position at the law firm Shearman & Sterling to work for the Endowment, in whose mission I passionately believe, and had donated over $140,000 of my personal funds to the Endowment. I currently serve as a Director of a charity in Britain called GenerationNext which supports educational opportunities in South Africa for its neediest orphans and poorest kids. My husband and I pay the overhead, much as Mason does for his charity, so that all money raised goes directly to the children. No charitable money is spent on administrative expenses or on running the charity. All Advisors and Directors donate their time. We are in our third year of work on this project and are now in the process of helping to educate over 40 children.

**The Harvard-Ingwall Files.**

10. When he interviewed me, Mason asked me about the Endowment and I briefed him on developments since I had last seen him. Mason asked to see the evidence to support my views. I arranged to show him the arbitration transcripts and the files that Joanne Ingwall had maintained at Harvard (the "Harvard-Ingwall files"), which she had initially concealed.

11. Although these files had been subject to subpoena during the arbitration over the circumstances of my termination by the Endowment, Ingwall concealed them. Subsequent to the arbitration, Ingwall had a change of heart and, having concluded that the Endowment's behavior was, in her words, "worse than evil," she allowed me access to the previously-withheld documents beginning on March 15, 2001.

12. My review of the Ingwall files eventually convinced me that, at a minimum, a number of

individuals associated with the Endowment had indeed committed unethical, tortious, and even criminal, acts, and that had these documents been produced when they should have been the result of the arbitration relating to my termination from the Endowment would have been different.

13. At the time Mason re-introduced himself to me, I was attempting to get the arbitration re-opened so that some of these wrongly withheld documents might be examined in open court.

14. I had also begun preparing a database of those files, which are voluminous, to support a civil action against the people at the Endowment and its counsel who had harmed me and had squandered the Endowment's great inheritance. This action was to be an action separate and wholly different from the efforts I was making in the District of Columbia to reopen the arbitration. It would involve claims, including mail and wire fraud, insurance fraud, obstruction of justice, and violations of RICO, arising from events occurring subsequent to my termination. These claims had never been litigated before, and would be brought against new defendants, based on operative facts that had been unknown to me prior to my review of the Harvard-Ingwall files beginning in March, 2001.

**The Complaint.**

15. I first was given the opportunity to review the Harvard-Ingwall files, consisting of approximately 35,000 pages, on March 15, 2001. Thus, any RICO action based on what I learned from them would arguably have to be filed no later than March 14, 2005, or be time-barred.

16. In March 2005, I travelled from London to Dallas to meet with Mr. James McCarthy whom I proposed to retain to represent me in the proposed action. Mr. McCarthy has long experience with RICO cases and enjoys a reputation as a first-class litigator. For Mr. McCarthy, I had my office prepare summaries of the evidence from the Ingwall files. I also brought a substantial portion of the Harvard-Ingwall files -- including all of those files that I believed to be relevant -- to Dallas for his review and analysis.

17. I asked Mr. McCarthy to evaluate whether I had viable claims under applicable law, including RICO. Mr. McCarthy spent tens of hours submerging himself in the documents and talking on the phone with previous counsel (Joseph Bainton, Jeff Poston, Jef McAllister), analysing the merits of the claims we were considering.

18. I have never brought a RICO case and have no experience in RICO litigation. I have never practiced as a criminal lawyer. However, Mr. McCarthy ultimately concluded, based on the voluminous documentary and non-documentary evidence that I and others had provided to him, and his other investigation, all of which is described in his own affidavit, that in his professional judgment I had a *bona fide* case. I relied on his judgment and experience in that regard in authorizing the filing of the lawsuit. Certainly, had he informed me that he did not believe I had a legitimate case I would not have gone forward. He has never done so, then or since. I believed then, and continue to believe, that our claims against the defendants were meritorious.

19. One of the questions that needed to be decided was where to bring the action, given the number of potential claims and defendants. Shortly before filing we agreed that the most viable venue for bringing the action -- in fact the only venue where we could capture every defendant -- was in Maryland.

20. I spent most of my time in those last days before filing attempting to retain Maryland counsel. I spoke to some two dozen firms. Most felt that the case was too big for them at that time or that they were conflicted because of relationships they had with Paul Sandler, an ex-partner of David Freishtat's, who could be found vicariously liable for damages should Freishtat lose this action.

21. Many cautioned that Baltimore was a small legal community and that Freishtat had a difficult reputation and would be vindictive and hateful if criticized, and so declined the representation on that basis. Every firm wished me well after they read one or more of the drafts of the complaint, and offered me recommendations as to whom I could ask to serve as local Maryland counsel

22. One of the lawyers I contacted was Martin Himeles of the Zuckerman Spaeder firm. Mr. Himeles was recommended by colleagues as a gentleman and a "lawyer's lawyer." When I asked Mr. Himeles if he would serve as local Maryland counsel on the matter, he explained that he was enormously busy, as was his firm at that time, and that he didn't know if he could help us. He also indicated that he had a partner who had a close relationship with Paul Sandler. Mr. Himeles felt that this relationship would cause his partner to ask the firm not to take on the representation.

23. In the end, however, given my difficulties with finding local counsel in the available time frame, and the rapidly approaching limitations deadline, and after numerous conversations with me and Mr. McCarthy and a close review of several late drafts of the Complaint, Mr. Himeles agreed to act as local counsel for the purpose of filing the case. However, he was explicitly clear from the outset that because of Paul Sandler his partner would not allow him to continue with the representation and we would need to replace him once the case was filed.

24. Before departing for Dallas to meet with Mr. McCarthy, I had received a call from Richard Mason telling me that he was going to be in Dallas to research a piece on the Christian Right, as part of the preparatory work for his third novel. He asked if he could meet Mr. McCarthy, and spend some time seeing firsthand how a law firm operated and how a complaint was prepared. I called Mr. McCarthy, who warmly welcomed Mason.

**The Endowment's Annual Meeting.**

25. Some time afterward, I heard from Mason that Mrs. Lily-Charlotte Sarnoff and Dana Boyd had invited him to attend the Annual Meeting of the Sarnoff Endowment in Washington, DC. Mason also indicated that Mrs. Sarnoff had volunteered to introduce him to important Endowment Directors and Fellows so that he could interview them for his upcoming book.

26. When Mason told me of his invitation to the Annual Meeting by Mrs. Sarnoff and Dana Boyd, I had only just heard of the Annual Meeting. Since 1996 when I was wrongfully terminated from the Endowment, I have never attended an Annual Meeting of the Endowment, and I had no intention to begin doing so now. In any event, I did not attend the 25th Annual Meeting of the Sarnoff Endowment.

27. I understand from Mason that he flew from Europe to attend the annual meeting. It is suggested in the motion papers that somehow I sent Mason to the annual meeting to find out about the Endowment. There is no truth whatsoever to that allegation. Richard Mason does not do my bidding. If he did, I would certainly not have asked him to attend the Endowment's annual meeting at a time when I was hoping to negotiate a settlement of the lawsuit. Moreover, I doubt that there was anything Mason could "find out" about the Endowment that I did not already know.

**Eleanor LeCain and Citizens for Integrity in Science.**

28. The motion papers further allege that I disrupted this year's Annual Meeting by causing a local Washington, DC watchdog group, Citizens for Integrity in Science ("CIS") to hand out leaflets informing the public of the Endowment's financial mismanagement, its large salaries, extravagant expenses on meals and meetings, and substantial investment losses. There is simply no truth to this allegation.

29. Eleanor LeCain is the founder and head of CIS. I am not now, nor have I ever been, a member of CIS. LeCain was Assistant Secretary of State in Massachusetts and has extensive experience in the philanthropic sector. Most recently she worked in Afghanistan developing educational programs. Among other notable achievements, she is responsible for the development of a highly regarded strategic plan for the Committee for Responsive Philanthropy. To the best of my knowledge, LeCain first had contacts with the Sarnoff Endowment many years ago when she gave her time, for free, to serve as an advisor to it.

30. Savaransky in her Declaration concludes that because Eleanor LeCain is the head of CIS, and because she appears in my personal rolodex, I am responsible for any actions that LeCain took at the Annual Meeting of the Endowment. There are currently over 2,200 names in my rolodex, including President Clinton and Prime Minister Tony Blair. Because LeCain appears in the rolodex does not mean that I direct her in her work, any more than I direct Bill Clinton or Tony Blair in theirs. LeCain is a strong-willed, independent person who makes her own decisions.

**Savransky, Boyd and Holmes Make Further False Allegations**

31. In the motion papers and their attachments, and in a letter written by Endowment Counsel Laurie Holmes, I am accused of having written anonymous emails purporting to be from Sarnoff Fellows and (by extension) of having prepared false evaluation forms of the Annual Meeting, for distribution to the Fellows, via these anonymous emails. Like the other accusations that were made against me, these are baseless. I could not have written or prepared these documents, and in any event, did not do so.

32. After the meeting, Richard Mason contacted me to ask me to prepare a financial analysis of CIS's allegations and to help him evaluate the financial data that he had received from various Fellows, and I agreed to do so. The results of these analyses showed further and deeper problems at the Endowment than even CIS had reported.

33. I received this request while at the offices of Edward McCann, who had served as the Endowment's financial advisor in its most difficult days and who was assisting me to prepare a settlement offer. Mason also asked me to review the Endowment's Form 990s from 1995 until and through its most recent public filings. My analyses were done both on my computer and on Mr. McCann's. Accordingly, documents that I forwarded to Mason will bear the electronic signatures of those machines.

**Withdrawal of the Complaint.**

34. The Defendants have repeatedly alleged that our decision to dismiss the litigation is itself proof that the action was meritless. This is nonsense. In reality, the decision to dismiss had absolutely nothing to do with my views of the merits of the claims, which I continue to believe are valid.

35. In fact, after we filed the action, lawyer Sabrina Skeldon from Mr. McCarthy's offices travelled to London to review all of the remaining papers to make sure that a proposed First Amended Complaint would develop those claims, including the RICO claims, to an even greater degree than had been possible at the time of the original filing. To that end, Skeldon came and worked in the London offices of McAllister Olivarius for two weeks.

36. Before filing the First Amended Complaint, however, I wished to try to settle with the Defendants to avoid publicly airing these matters in further detail. I therefore embarked on settlement negotiations through Mr. McCann, who has long enjoyed the respect of the Endowment's Board of Directors. McCann and I both wrote Donelan, Ingwall and Friedman to see if they would rescind their vote to terminate me. Ingwall's files prove that the two grounds on which they based their decision to terminate me -- employee dishonesty and an alleged conflict of interest -- are false. When settlement efforts failed, I was prepared to go forward with the litigation, including the prompt filing of an amended complaint and would have done so but for other developments.

37. Subsequent to the filing of the complaint, Mr. McCarthy experienced some health-related issues. When I left Dallas after the complaint was filed, McCarthy and I had agreed on a plan whereby a First Amended Complaint would be filed as soon as possible, preferably before the initial Complaint was served. He agreed that Sabrina

Skeldon should come to London immediately to review additional materials and obtain further support for our claims, which she did. McCarthy went on a long-planned two-week vacation to France, and upon return entered the hospital. These developments impeded the speed with which the First Amended Complaint could be prepared. In addition, Skeldon, the only person at Diamond McCarthy other than Mr. McCarthy thoroughly briefed on this case, decided to move to another firm. Finding a replacement for McCarthy was not feasible given the costs that would entail and the fact that sanctions were already being threatened.

38. I also had continued difficulty finding Maryland counsel who would take on Freishtat, since the seriousness of the charges made in the Complaint guaranteed a vicious battle ahead for any potential Maryland counsel, and further complicated the retention of such counsel.

39. I ultimately concluded that I had no choice but to dismiss the case. I agreed to do so for reasons unrelated to the Defendants' claims that the lawsuit was frivolous. Indeed, I remain absolutely convinced of the case's essential merits, both legally and factually.

40. During the period in which the Freishtat Defendants were insisting that I personally dismiss the Complaint, I was travelling in Denmark on business and attending a funeral there, and I could not possibly have done what they asked, even had I been aware of it, which I was not. When I left for Denmark, I had thought that this matter had been taken care of, and was surprised upon my return home to find that the dismissal had not yet been filed.

I, ANN McALLISTER OLIVARIUS, DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY PERSONAL KNOWLEDGE.

_____
Ann McAllister Olivarius

Executed on this 31 day of August, 2005