**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

DR. ANN McALLISTER OLIVARIUS,       \*

                          Plaintiff,      \*

v.                                \*    Civil Action No. 1:05-cv-00717-JFM

DR. DANIEL FRIEDMAN, *et al.*,          \*

                          Defendants.    \*

\*  \*  \*  \*  \*  \*  \*  \* o0o \*  \*  \*  \*  \*  \*  \*  \*

**DR. OLIVARIUS' MEMORANDUM IN OPPOSITION**
**TO THE FREISHTAT DEFENDANTS' MOTION FOR SANCTIONS**

Dr. Ann McAllister Olivarius, the Plaintiff in these proceedings, by and through her undersigned counsel, respectfully opposes the Motion for Sanctions filed by David Freishtat, Stacie F. Dubnow, and Freishtat, Burke, Mullen & Dubnow, LLC (the "Freishtat Defendants").

As explained below, the Freishtat Defendants' Motion is factually and legally frivolous and should be summarily denied.[1]

I.     **Introduction.**

This action (the "Maryland Litigation") has been administratively closed since June 7, 2005, the day on which it was voluntarily dismissed by the Plaintiff. Despite the dismissal, and long after the dismissal, the Freishtat Defendants filed their Motion for Sanctions. Among other things, that motion is proscribed by the "safe harbor" provisions of Fed. R. Civ. P. 11 ("Rule

---

[1] This memorandum also constitutes the response of James D. McCarthy and/or the law firm of Diamond McCarthy Taylor Finley Bryant & Lee, LLP. However, it is not at all clear that the Freishtat Defendants seek sanctions against Mr. McCarthy's law firm, Diamond McCarthy Taylor Finley Bryant & Lee, LLP. and, in the absence of any specific claim for relief from that firm, we will assume that such firm is not a subject of the motion for sanctions. In the event, however, that the Freishtat Defendants <u>do</u> intend to move for sanctions against that firm, this response also constitutes the firm's response.

11") and by the law of this Circuit.  See *Brickwood Contractors, Inc. v. DataNet Engineering, Inc.*, 369 F.3d 385 (4th Cir. 2004) (en banc).

The Maryland Litigation began when Dr. Olivarius filed her complaint on March 14, 2005, shortly before the expiration of limitations on causes of action that had actually accrued on or about March 15, 2001.[2]  That was the date on which Dr. Olivarius received certain documents from Dr. Joann Ingwall at Harvard (the "Harvard Ingwall Files") that she believes established the corruption by, *inter alia*, the Freishtat Defendants, of certain arbitration and arbitration-related proceedings between Dr. Olivarius and the Stanley J. Sarnoff Endowment for Cardiovascular Science, Inc. (the "Endowment").  See Declaration of Ann McAllister Olivarius ("Olivarius Decl.") at ¶11.

Because the Freishtat Defendants' Motion reflects considerable confusion with respect to the nature of the complaint that was filed that day, it is important to be clear as to what the Maryland Litigation concerned and did not concern:

- The Maryland Litigation was brought against eight named individuals and the law firm of Freishtat, Burke, Mullen & Dubnow, LLC.  None of these Freishtat Defendants had ever been sued for the acts and omissions that were the subject of the lawsuit.  None were or could have been parties to the arbitration between Dr. Olivarius and the Endowment, as none were parties to the underlying arbitration agreement.

- The Maryland Litigation does not address Dr. Olivarius' wrongful termination by the Endowment.  That was the subject of the arbitration.

---

[2]   It is important to note that the entirety of the Freishtat Defendants' Motion for Sanctions is an attack on this Complaint, and that the filing of the Complaint, on the eve of a potential expiration of a limitations period is the sole substantive act that Dr. Olivarius and Mr. McCarthy performed in the Maryland Litigation.

86194v2

The Maryland Litigation addresses the <u>post-termination</u> conduct of the individual Freishtat Defendants as they sought – by, Plaintiff alleges, inappropriate means – to protect themselves from the consequences of the decisions that led up to Dr. Olivarius's wrongful termination and to the resultant deterioration of the Endowment.

- It was and is Plaintiff's view, as alleged in the Maryland Litigation, that the Freishtat Defendants committed – and continue to commit – actionable torts, from the time of the arbitration to the present, by reason of their willful concealment of key documents and information in the arbitration and subsequent proceedings, and their equally improper efforts to maintain their positions with the Endowment through such conduct.  Those practices, viewed together with the Freishtat Defendants' pattern of misrepresentations to the arbitrator and to subsequent courts, corrupted the integrity of the arbitral and judicial processes in which they surfaced, and damaged and defrauded the courts as well as Dr. Olivarius.

While the Freishtat Defendants obviously do not agree with Plaintiff's characterizations of these facts – and no one would expect them to – they go too far in attacking Dr. Olivarius' right to assert causes of action based upon them in the Maryland Litigation.  For there is no doubt that key documents <u>were</u> withheld for years, and little doubt that many of the Freishtat Defendants' acts and omissions (*e.g.*, fraud on the Endowment's insurers) did occur.

## II.   The Motion For Sanctions.

The Freishtat Defendants' Motion for Sanctions asserts that Plaintiff and her counsel, James D. McCarthy, should be sanctioned pursuant to Fed.R.Civ.P. 11 ("Rule 11"), 28 U.S.C. §

86194v2

1927 ("Section 1927"), and the "inherent powers" of this Court on five grounds: (1) that the Complaint pleads untrue facts; (2) that the Plaintiff's claims are (purportedly on their face) barred by limitations; (3) that Plaintiff's causes of action are "obviously defective;" (4) that the Complaint was filed for an improper or frivolous purpose; and (5) that the Complaint evinces a failure to undertake the reasonable inquiry in the circumstances that parties and their counsel are expected to undertake before filing a complaint.  Freishtat Defendants Motion at 1-2.

While not all these claims are fully elaborated, let alone factually supported, in the moving papers, to the extent possible this Memorandum addresses each alleged ground, and demonstrates why the five defense arguments do not remotely justify the relief sought.

The Freishtat Defendants allege they are entitled to an award of sanctions under Rule 11, under 28 U.S.C. § 1927, and under the inherent powers of this Court.  We address each in turn.

A.      **Rule 11.**

1.      **Substantively.**

Rule 11 specifies that whenever a party-Plaintiff or a lawyer for that party submits a "pleading, written motion, or other paper" to a federal court he or she "is certifying that to the *best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances*" (emphasis added) the pleading in question–

- "is not being presented for any improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation;"

- does not assert "claims . . . and other legal contentions" that are not "warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; and

- "the allegations and other factual contentions" of the complaint "have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."

Fed.R.Civ.P. 11(b)(1)-(3).

A movant intent on establishing a violation of Rule 11 therefore has the burden of showing that the attorneys who signed the Complaint (Mr. McCarthy and his firm) have not met these standards.  A non-movant, to defeat the motion, need not prove that every aspect of the complaint is 100% correct.  He or she will be subject to Rule 11 sanctions only if the complaint is submitted for an improper purpose, or if it asserts wholly insupportable legal or factual contentions and such defects (if any) are not consistent with the pleader's best "knowledge, information and belief, formed after an inquiry reasonable under the circumstances."  In short, being legally or factually incorrect is not sanctionable if a lawyer or party makes such errors after "reasonable" inquiry "under the circumstances" and makes them consistent with his or her post-inquiry "knowledge, information or belief."

In the present circumstances, neither Mr. McCarthy nor Dr. Olivarius filed the Complaint for improper purposes.  Both made an entirely reasonable pre-filing inquiry, and the Complaint was consistent with their post-inquiry knowledge, information and belief.  As their respective declarations make clear, they still do not believe that the Complaint was wrong in any material respect.  Olivarius Decl. at ¶ 18, 34 and 39; Declaration of James McCarthy ("McCarthy Decl.") at ¶ 30.  That the Freishtat Defendants have a different view of the facts does not make the Complaint "wrong".  It makes those facts disputed.[3]

---

[3]  Indeed, to the present day, the Freishtat Defendants have never shown what was "wrong" with the Complaint.  As Dr. Olivarius' dismissal relieved them of the burden of admitting or denying each and every allegation therein, we will likely never know what the Freishtat Defendants would have been able to say in this regard.  However, for present purposes, where they seek to sanction the Plaintiff and her attorney, they have to do much more than denounce the Complaint as wrong or as stating "untrue facts."  As the discussion of these "untrue facts" allegations (below) amply shows, the Freishtat Defendants' factual attacks on the Complaint are few, wrong-headed, and far from adequate.

Of course, even if the Plaintiff were wrong on a point or two (and they and her attorney know of no such errors) that is hardly dispositive on the Rule 11 issues.  Lawsuits with trials and judgments resolve factual issues, not sanctions motions.

86194v2

**2.      Procedurally.**

Rule 11(c)(1)(A) provides the procedure for initiating a party's Rule 11 challenge to a

complaint.  It provides, in relevant part:

> A motion for sanctions under this rule . . . *shall not be filed* with or presented to
> the court *unless*, within 21 days after service of the motion, *the challenged
> [complaint] . . . is not withdrawn* or appropriately corrected.

(Emphasis added).  This "safe harbor" provision of Rule 11 did not arise by accident.  It was

incorporated into the rule as part of the 1993 Amendments. Those amendments were intended,

more than anything else, to reduce the number of questionable Rule 11 motions that the federal

courts had received since the Rule 11 sanctions concept was introduced in 1983.  *See* Preface to

1993 Advisory Committee Note.

Against that background, the same Advisory Committee explained the safe harbor

provisions as follows:

> The motion for sanctions is not, however, to be filed until at least 21 days (or such
> other period as the court may set) after being served. *If, during this period, the
> alleged violation is corrected as by withdrawing (whether formally or informally)
> some allegation or contention, the motion should not be filed with the court.
> These provisions are intended to provide a type of "safe harbor" against motions
> under Rule 11 in that a party will not be subject to sanctions on the basis of
> another party's motion unless, after receiving the motion, it refuses to withdraw
> that position* or to acknowledge candidly that it does not currently have the
> evidence to support a specified allegation. Under the former rule, parties were
> sometimes reluctant to abandon a questionable contention lest that be viewed as
> evidence of a violation of Rule 11; under the revision, the timely withdrawal of a
> contention will protect a party against a motion for sanctions.
>
>          To stress the seriousness of a motion for sanctions and to define precisely
> the conduct claimed to violate the rule, the revision provides that the "safe
> harbor" period begins to run only upon service of the motion. In most cases,
> however, counsel should be expected to give informal notice to the other party,
> whether in person or by a telephone call or letter, of a potential violation before
> proceeding to prepare and serve a Rule 11 motion.

*Id*. (emphasis added).

To the Freishtat Defendants' credit, they paid heed to these requirements and gave the informal notice, by letter, that the Advisory Committee anticipated.  To the Plaintiff's credit, she considered the Freishtat Defendants' positions, as well as many other factors unrelated to the Freishtat Defendants' stated positions, and withdrew the complaint, *with prejudice*. Now, after that Complaint has long been withdrawn, and the case dismissed, the Freishtat Defendants file a Rule 11 motion for sanctions premised on that Complaint. That effort flies in the face of the clearly-stated "safe harbor" provision introduced in the 1993 revisions to Rule 11.[4]  It also flies in the face of well-established Fourth Circuit law holding not only that the Plaintiff must comply with the safe harbor provisions; but that a federal court may not grant a Rule 11 motion that is: (1) not in compliance with the safe harbor provisions; or (2) filed after the conclusion of the case. *See, e.g.*, *Brickwood Contractors, Inc. v. DataNet Engineering*, 369 F.3d 385, 388-390 (4th Cir. 2004) (en banc); *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 152 (4th Cir. 2002).[5]

### 3.      The Freishtat Defendants' Flawed Analysis Of The Applicability Of Rule 11 After Dismissal Of The Complaint.

As noted above, the Freishtat Defendants' motion for sanctions is fatally flawed procedurally, which alone makes its filing improper.  So the Court can appreciate the enormity of

---

[4]      Of course, the withdrawal of Dr. Olivarius' complaint was timely.  As noted in the quoted portion of the 1993 Advisory Committee Notes, the safe harbor provision begins to run "only upon service of the motion".  The first Rule 11 sanctions motion that the Freishtat Defendants ever served was served with Mr. Freishtat's June 29th letter.  *See* Exhibit "19" to the McCarthy Declaration.  As a result, a withdrawal at any time before July 23rd would still be within the safe harbor period and would still immunize Dr. Olivarius, myself and my law firm from the Freishtat Defendants proposed motion for sanctions.

[5]      We note that the similarly-situated Non-Freishtat Defendants in these now closed proceedings have also filed a frivolous motion for sanctions, but they at least recognized that they cannot now claim such sanctions under Rule 11.  *See* Sarnoff Defendants' Mem. at 7, n.5.  The Freishtat Defendants and their counsel were aware of this fact when they filed their motion for sanctions.  Moreover, they had also been advised by Mr. McCarthy's July 20, 2005 letter to Mr. Frederick that the Rule itself, as well as the applicable case law would render any such motion unlawful.  We note that the Freishtat Defendants did not include that letter in their motion for sanctions, though they included the letter to which it responded.  The McCarthy letter is attached as Exhibit "25" to the McCarthy Declaration.  For a review of Mr. McCarthy's and Dr. Olivarius' and Mr. Levy's efforts to foreclose their ill-advised motion for sanctions, see McCarthy Decl. at ¶¶ 48-66.

86194v2

the Freishtat Defendants' error in assuming that Mr. McCarthy, his colleagues, and Dr. Olivarius casually violated their professional obligations under Rule 11, and otherwise, Plaintiff wishes to note the extraordinary effort that counsel and Dr. Olivarius, with the help of many others, including Martin Himeles of Zuckerman, Spaeder, to draft and file a complaint that stated Plaintiff's case as accurately as possible, including an accurate description of the deep injustices Dr. Olivarius suffered in the arbitration procedure and subsequently.

As described in the declarations of Dr. Olivarius and Mr. McCarthy, Dr. Olivarius did not come upon Mr. McCarthy or his firm by accident.  He is a Yale Law graduate, and has had substantial experience with arbitrations, RICO, and commercial and professional liability.  For many years, he has engaged in business litigation from (primarily but not exclusively) the Plaintiff side of the docket, and done so far more often outside of Texas than within Texas.

The potential case with which Dr. Olivarius approached him proposed many possible theories of recovery against numerous possible the Freishtat Defendants, some of whom were in Texas, and all of whom, collectively, were scattered throughout the United States.  Filing a case in the District of Maryland was only one of many possibilities.

Unfortunately, there was also a short fuse deadline for filing a complaint: if Dr. Olivarius was to be absolutely sure that she could preserve her rights against the individuals and entities on the list of potential Freishtat Defendants, the Complaint had to be filed by midnight on March 14, 2005.  While she was able to send Mr. McCarthy some background material before March 9, 2005, and Mr. McCarthy's paralegals were able to do some background factual research before then, he was not available to meet with her until that date.  More importantly, until then he was not able to closely examine the case she was proposing to file, to review the many boxes of documents she ultimately provided, or to question her (and others) closely as to the merits of that

86194v2

proposed case.

From that day forward, however, that is what Mr. McCarthy and a dedicated group of Diamond McCarthy lawyers, paralegals, and secretaries did – read and questioned, read and questioned, stopping only to write and (very occasionally) to sleep, before reading, questioning and writing some more.

Along the way, they investigated the prospect of asserting claims against numerous potential Freishtat Defendants.  Not only did they reject filing suit against numerous potential Freishtat Defendants, they rejected the assertion of numerous types of claims that might have been brought against either those (de-selected) Defendants, or against those Defendants who were ultimately the subject of the Maryland Litigation.  They also rejected numerous venue options before settling on Maryland, but only after determining that Maryland was the most appropriate venue for the case, the claims and those Defendants that would ultimately be involved.

Why did they do all this?  Because they and Dr. Olivarius wanted to insure, as best they could, that they had honored their Rule 11 and other ethical obligations, and did not file anything as to which, in our judgment, they didn't have "enough" knowledge to legally or factually support a lawsuit against the proposed Defendants, or the proposed claims against certain Defendants, or the filing of a lawsuit in a particular venue.

During this period, they read and reread hundreds of documents, summaries of documents, talked and debated with Dr. Olivarius, and also talked with others (including her former lawyers) who knew anything regarding the facts of her case.  Many of those persons who were personally familiar with the facts read drafts of the complaint and offered helpful comments.

86194v2

In short, Ann Olivarius and Mr. McCarthy, and everyone at Mr. McCarthy's firm, did everything possible to craft a legally and factually supportable complaint against those persons who they believe to be responsible for the travesty of justice that had resulted in the earlier proceedings. That Complaint unquestionably resulted from the maximum possible pre-filing inquiry in the circumstances,[6] and it reflected their very best efforts to file a complaint that, to the best of their knowledge, information and belief, satisfied all of Rule 11's requirements.[7]

For her part, Dr. Olivarius was entitled to rely on Mr. McCarthy and his experience and qualifications as well. Although she is a member of the bar, she had never brought a RICO case and has no experience in RICO litigation, nor has she ever practiced criminal law. Once Mr. McCarthy concluded -- based on the voluminous documentary and non-documentary evidence that Dr. Olivarius and others had provided to him, and on the investigation that Mr. McCarthy has described in his own Declaration -- that in his professional judgment she had a bona fide case, Dr. Olivarius was entitled to rely on his judgment, which she did. Olivarius Decl. at ¶ 18.

As a matter of both substance and procedure then, there can be no Rule 11 liability for Dr. Olivarius or Mr. McCarthy.

### B.     Section 1927.

28 U.S.C. § 1927 provides:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally

---

[6]     Of course, the amount of time available to the signer of a pleading is an important factor in determining whether the signer undertook a reasonably inquiry in the circumstances. *See* 1983 Advisory Committee Note to Rule 11.

[7]     While Dr. Olivarius's glittering resume – Undergraduate, Law and Graduate Business degrees from Yale University, Ph.D. from Oxford University, Rhodes Scholar – gave her additional credibility at the outset – Mr. McCarthy was not required to assume that such a person was a liar or evil in the ways in defendants seek to characterize her, and none of those credentials spared her from intensive questioning and incessant requests for corroboration.

the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

To prevail on a section 1927 claim, the Freishtat Defendants must establish that counsel "multiplie[d] the proceedings" in this or some other case; that counsel did so "unreasonably and vexatiously," that is, in bad faith;[8] and that the Freishtat Defendants "reasonably incurred . . . excess costs, expenses and attorneys' fees . . . because of such conduct." This is a standard that the Freishtat Defendants cannot possibly meet.

### 1.    Dr. Olivarius.

The Freishtat Defendants' first burden will be to demonstrate that the statute applies to Dr. Olivarius in the first place. She clearly cannot be assessed with such sanctions in her capacity as a client. *See, e.g., Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 535 (5th Cir. 1996) ("Under § 1927, expenses, costs, and attorneys' fees may only be awarded against attorneys or those admitted to practice before the court."); *United States v. Int'l Brotherhood of Teamsters*, 948 F.2d 1338, 1345 (2d Cir. 1991) ("In contrast with sanctions under Rule 11, awards pursuant to § 1927 may be imposed only against the offending attorney; clients may not be saddled with such awards."). That is true even where the client is a licensed attorney. *See, e.g., Matta v. May*, 118 F.3d 410, 414 (5th Cir. 1997) ("Neither [Plaintiff's] status as a licensed attorney nor his pro se brief filed in the related case make him liable for attorney fees under § 1927."). *See also Balcar v. Bell & Associates, LLC*, 295 F.Supp.2d 635, 639 (N.D.W.Va. 2003), aff'd, 83 Fed. Appx. 519, 2003 WL 22955873 (4th Cir. 2003).

---

[8]    As the Freishtat Defendants correctly note, *see* Freishtat Mem. at 9-10, 15-16, proof that an attorney has acted "unreasonably and vexatiously" requires proof that the attorney acted in "bad faith." However, none of the cases they cite support the proposition that section 1927 liability for an attorney may be premised solely on the attorney's filing of a complaint in the only civil action in which he is involved, and none of those cases (for that reason and many others) have any application to the circumstances of this case.

##        2.       James McCarthy.

That leaves the Freishtat Defendants with the burden of proving that Mr. McCarthy and/or his firm – which has had no involvement in any Olivarius-related proceedings outside the Maryland Litigation, and performed very few acts in this litigation – have somehow unreasonably and vexatiously multiplied the proceedings, and done so in bad faith.  The Freishtat Defendants cannot in good faith claim that they have met that burden.

The problems with the Freishtat Defendants' section 1927 argument begin with their failure to specifically identify the actions by which Mr. McCarthy and/or his firm and he supposedly "multiplied the proceedings" in the Maryland Litigation (or elsewhere). That is particularly true where, as here, the only genuinely material action taken in this case was the filing of the original Complaint that began the lawsuit.  Since the claims stated were the <u>first</u> claims <u>ever</u> asserted against the Freishtat Defendants, it is hard to see how Mr. McCarthy or his firm "multiplied" the proceedings against those Defendants.

The second problem is that the Freishtat Defendants cannot now and never will be able to establish that Mr. McCarthy or any member of his firm acted "unreasonably and vexatiously," or in "bad faith," in filing this Complaint.  That is so because no bad faith ever was involved in bringing this lawsuit. What they did – as the declarations of Dr. Olivarius at ¶¶ 15-18, Mr. McCarthy at ¶¶ 13-23, and Richard Mason[9] at ¶ 21, unequivocally demonstrate – was work virtually around the clock, in a very time-constrained environment, to protect their client's rights to proceed against these and other Defendants.  Dr. Olivarius and Mr. McCarthy never wavered in his efforts to achieve that objective, but he also never wavered in his efforts to determine that anything he filed was done in a manner consistent with the highest obligations of our profession.

---

[9]        Declaration of Richard Mason ("Mason Decl.").

86194v2

The Freishtat Defendants cannot prove bad faith, in short, because there was none, and they are not entitled to ask this Court to assume otherwise.

Lastly, even if the Freishtat Defendants could establish that the "proceedings" in this "case" had been "multiplied", and that Mr. McCarthy or his firm had done so "unreasonably and vexatiously," and with "bad faith," the Freishtat Defendants could not possibly establish that anything he or his firm has done caused the Freishtat Defendants to "reasonably" incur "excess costs, expenses and attorneys' fees" (emphasis added).  It is important to note that section 1927 authorizes only awards for "excess" costs, and not awards for the total cost of litigation.  *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 756 n.3 (1980).  As, in substance, the Freishtat Defendants are claiming the latter,[10] it is their burden to prove that: (1) all of the costs they claim to have incurred were caused by ("because of") Mr. McCarthy or his firm's allegedly unreasonable and vexatious behavior; (2) that the costs were "reasonably incurred"; and (3) that the costs incurred were "excess" costs (over and above what normally would be incurred in defending this litigation).  The Freishtat Defendants cannot establish any of these elements, and certainly cannot establish all of them.

---

[10]    The Freishtat Defendants ask this Court to "impose as a penalty their reasonable attorneys fees pursuant to Rule 11(c)(2) such other sanctions the Court deems necessary and appropriate".  Freishtat Mem. at 17.  It is not entirely clear what this means though the Freishtat Defendants do state that "at a minimum, the Plaintiff should be required to reimburse Freishtat for the legal fees and expenses that were incurred from May 10, 2005, when work on the Motion [to Dismiss and/or for Summary Judgment] commenced to the date the Complaint was finally dismissed, June 7, 2005."  *Id.* at 15.

    Of course, since the Freishtat Defendants had not yet been served, and had not yet even executed the voluntary acceptance of service papers that would give them an additional sixty days to answer or otherwise respond, it is difficult to understand why it was reasonable or necessary to incur those fees at that time, especially when the parties were going to discuss Mr. Frederick's contentions regarding the Complaint in the very near term.  (Of course, those discussions resulted in the offer to dismiss the Complaint as to the Freishtat Defendants on May 16, 2005, as the Freishtat Defendants concede at p. 12 of their Memorandum.)  It is even more puzzling as to why the Motion to Dismiss, etc. (which was not filed until May 26th), was even necessary, given the offer to dismiss with prejudice – made in writing – ten days earlier.  And the most puzzling issue of all is why, even if the Freishtat Defendants were entitled to any relief (they are not), they would be entitled to fees and costs incurred for getting in the way of their own dismissal between May 16th and June 7th.  *See* Section VII of the McCarthy Declaration.

Nothing Mr. McCarthy and his firm ever did caused the Freishtat Defendants to incur any of the costs they now seek to claim, and especially to incur costs for: (1) filing motions to dismiss and/or summary judgment even before being served, in the face of Plaintiff's then-known efforts to dismiss the case, and in the face of counsel for the Freishtat Defendants' own remarkable efforts to block the dismissal that their motion to dismiss ostensibly sought; or (2) for filing wholly discretionary motions for sanctions <u>after</u> the case against the Freishtat Defendants had been dismissed.

As to the first point, this Court needs to understand the extraordinary story of how the Freishtat Defendants and their counsel sought to delay and obstruct their own dismissal.  That story is told, <u>in detail</u>, in Section VII of the McCarthy Declaration at ¶¶ 48-67.  However, in summary, and in sequence, defense counsel Frederick refused to assist Mr. McCarthy in hand-filing or e-filing the Rule 41 dismissal documents that Mr. Frederick actually had in his hand, refused to enter into a stipulation to achieve the same result, called the Clerk's office to (oh-so-helpfully) remind the staff that they should not accept filings from Mr. McCarthy,[11] and then filed a pre-service of process, pre-discovery motion to dismiss/alternative motion for summary judgment that, in its summary judgment aspect, was transparently intended to block Plaintiff's ability to dismiss the case unilaterally under Fed. R. Civ. P. 41(a) (*i.e.*, without offering concessions to the Freishtat Defendants).  As to the motion to dismiss aspect, it was apparently intended to – what? – dismiss a case that was already being dismissed (and that could have been dismissed by Mr. Frederick on any day after May 16, 2005)?

In short, the Freishtat Defendants have only <u>created</u> "excess" costs for the Court and the parties, including themselves.  They certainly cannot expect to be rewarded by being reimbursed

---

[11]    That was so because Mr. McCarthy was not a member of the local bar and had no local counsel at that point (a prerequisite to his attaining *pro hac vice* status).  *See* McCarthy Declaration at ¶¶ 35-40.

86194v2

for their costs in doing so.

   **C.    The Freishtat Defendants' Improper Reliance On The "Inherent Power" Of The Court.**

   There is no doubt that the federal courts have "inherent authority" over the proceedings before them.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 46, 111 S.Ct. 2123 (1991).  As the *Chambers* court noted, however, a court's "inherent powers must be exercised with restraint and discretion."  501 U.S. at 44.  As this Court recognized, that is so, in part, "because they are potent yet shielded from democratic controls."  *Accord Higginbotham v. KCS International, Inc.*, 202 F.R.D. 444, 459 (D. Md. 2001) (Motz, J.) (declining to award sanctions under inherent power).

   In the instant case, the Freishtat Defendants are asking this Court to award attorneys' fees, under its inherent powers, that are not awardable to the Freishtat Defendants under Rule 11, 28 U.S.C. § 1927, or the American Rule.  Such an award would require, at a minimum, an express judicial finding of "bad faith conduct" on Mr. McCarthy or his firm's part, or on Dr. Olivarius' part.  *Chambers*, 501 U.S. at 47 ("the narrow exceptions to the American Rule effectively limit a court's inherent power to impose attorneys' fees as a sanction to cases in which a litigant has engaged in bad-faith conduct or willful disobedience of a court's orders."). For all the reasons noted above, there is no support whatsoever for such a finding.

   The foregoing assumes, however, that the inherent power discussed in *Chambers* could support a pleadings-based sanctions award of attorneys' fees – even for bad faith – against an attorney, his or her law firm, and his or her client when all are the express beneficiaries of Rule 11's "safe harbor."  Plaintiff notes in this respect that *Chambers* is a pre-1993 case, and did not have to deal with the effect of the 1993 revisions to Rule 11 on a court's ability to assess even bad faith sanctions against a beneficiary of Rule 11's safe harbor.  The Freishtat Defendants

-15-

must, therefore, address an issue that *Chambers* did not address, and convince this Court that the sanctions they would attempt to impose – for bad faith that does not exist – should be authorized under the Court's inherent power, and do so in the face of a federal rule barring such sanctions in the pleading context.  *See Chambers*, 501 U.S. at 47 ("it is true that the exercise of the inherent power of the lower federal courts can be limited by statute and rule").

The Freishtat Defendants have no basis for a Rule 11 or section 1927 sanctions motion, because the facts and the law will not support such awards.  In such circumstances, this Court should decline their invitation to leap additional factual and legal barriers to award sanctions under its inherent powers.

**III.     Responses To The Freishtat Defendants' Specific Challenges To The Complaint.**

The many bases for denying the Freishtat Defendants' motion for sanctions are recited above.  In response to specific claims of malfeasance made by the Freishtat Defendants, the Plaintiff responds as follows.

**A.     The Pleading Of Allegedly Untrue Facts.**

Throughout the Freishtat Defendants' motion, and in the accompanying memorandum, they make a number of non-specific and conclusory claims that statements made in the Complaint are not true.  Counsel's source for this judgment is obviously their clients.  There is nothing wrong with that.  Lawyers are allowed, at least presumptively, to believe their clients.

When Plaintiff, however, voices her view of the facts and her judgments as to what the truth is – in her Complaint or elsewhere – the Freishtat Defendants' reaction is not only to contest her version of the facts, but to denounce it as flatly untrue, and worthy of judicial sanctions.  And when Mr. McCarthy believes his client and assists her in the litigation, the Freishtat Defendants claim that his willingness to believe his client (unlike the Freishtat

-16-

Defendants' counsel's willingness to believe the Freishtat Defendants) is not only improper but sanctionable. That is wholly inappropriate. We are not dealing here with sanctionable conduct. We are dealing with fact issues disputed by the parties. In the normal course of events, of course, those fact issues would be resolved in the pre-trial and trial processes of the Maryland Litigation. That would be a long and expensive process. Plaintiff chose to dismiss the case, in part, to avoid incurring those time and money costs. It is therefore mystifying to Plaintiff to see the Freishtat Defendants' attempt to reintroduce all of the fact issues in the case (and to reintroduce the associated expenses) in the guise of a motion for sanctions.

The <u>one</u> concrete example of an untruth that the Freishtat Defendants use when making their "untrue facts" argument highlights this point. That example concerns Mr. Freishtat's alleged efforts to secure a contingency fee agreement relating to the Maryland Orphans Court litigation. Mr. Freishtat says there were no such efforts. Plaintiff says there were. As Mr. Frieshtat was outside counsel in that litigation at the time, and Plaintiff was at all relevant times, the general counsel and Mr. Freishtat's "boss" in litigation matters, and/or the executive officer who would be involved in fee matters, they were <u>both</u> in a position to know the truth regarding the contingent fee issue, even if they now disagree as to what that truth is.

In such circumstances, the actual truth of the matter would have to be resolved by the fact-finder, as would any other fact disputed by the parties. It cannot be resolved simply by one party's (here the Freishtat Defendants) loudly claiming that they are absolutely right as to all facts, and that anyone who disagrees with them is a liar who should be sanctioned. Yet that is precisely what their "untrue facts" argument proposes this Court should do.

That leaves the Court with two alternatives. First, it can admit that a fact dispute exists, but concede that it need not be resolved now that the lawsuit has been dismissed. Second, and

86194v2

alternatively, it can do an extensive mini-trial regarding each fact issue in the context of a motion for sanctions battle – and do so knowing that the ultimate truth of the fact will make no difference to the outcome of the sanctions motion unless the Freishtat Defendants can <u>also</u> prove that Plaintiff made her allegations with a level of bad faith or recklessness that makes her not just wrong but sanctionable.

**B.      The Pleading Of Claims Allegedly Barred By Limitations.**

The Freishtat Defendants also claim that the Complaint is sanctionable because Plaintiff's claims are barred by the relevant statutes of limitations.  That is clearly not true as to her RICO claim,[12] and the Freishtat Defendants do not seriously suggest that is so.  However, the Freishtat Defendants protest that the pendant state law claims are barred by limitations and, therefore, that the mere filing of those claims is sanctionable.

Plaintiff disagrees.  While every one of these claims is subject to a statute of limitations, they are also subject to numerous legal rules and doctrines governing the accrual, tolling, and overall legitimacy of a particular defendant's invocation of a statute of limitations defense.  In the extreme circumstances of this case, in which it is indisputable that numerous and significant documents were knowingly withheld from Dr. Olivarius during her arbitration with the Endowment, and in subsequent proceedings, it hardly seems to be a novel proposition that such deferred accrual or tolling rules would be applicable, or that these particular Defendants, by virtue of their conduct, would be equitably estopped from asserting such defenses in this case. Dr. Olivarius and her counsel certainly expected to prove as much.

---

[12]      In *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143 (1987), the Supreme Court held that a uniform four-year statute of limitations should be applied to all civil RICO actions. It is Plaintiff's contention, well grounded in fact, that such limitations period only began to run when Dr. Joanne Ingwall first gave her access to the Ingwall Documents, beginning on March 15, 2001.  Defendants are free to dispute that position, but its assertion is hardly sanctionable.

Of course, the Plaintiff's reliance on such rules and doctrines cannot be a surprise to the Freishtat defendants. The Plaintiff's express reliance on those doctrines was set forth in Part VI of the Plaintiff's Complaint ("A Note on Limitations"), which stated:

> 443.    The Freishtat Defendants will undoubtedly respond to this Complaint by, inter alia, seeking to claim the protection of the applicable statutes of limitation.  That would be inappropriate for at least three reasons.

> 444.  First, as set forth above, these Defendants have made numerous and material misrepresentations, by and through the Endowment and its lawyers at GCD, that they have honored all arbitral orders and subpoenas and produced all of the documents subject to those discovery requests and arbitral orders. Now that the Harvard/Ingwall documents have actually been disclosed, and the falsity of those representations revealed, the Defendants must be and are equitably estopped from asserting limitations defenses.

> 445.  Second, this Complaint addresses the Defendants' systematic efforts at complying with arbitral and judicial processes from mid-1996 to the present. As to those events that actually took place for the first time, within the last four years (viz, in vacatur proceedings in the Supreme Court that began on April 13, 2001, and in those appellate proceedings in the District of Columbia Court of Appeals which began in the latter part of 2003), there should be little question as to the inapplicability of at least RICO's four year statutes of limitation to the Freishtat Defendants' acts and failures to act within that period.

> 446.  Third, as to those actions and failures to act challenged herein that occurred between June 20, 1996 and March 15, 2001, well-recognized deferred accrual and/or tolling doctrines such as the discovery rule, fraudulent concealment, the continuing tort doctrine, and the doctrine of equitable estoppel operate to preclude any defense assertion of such limitations defenses.

The Freishtat Defendants do not deny, and cannot deny, that these deferred accrual, tolling, and equitable doctrines are part of the law of Maryland. They also do not deny and cannot deny that the application of these limitations-related doctrines is primarily a matter of factual determination that has not yet occurred.   Instead, the Freishtat Defendants simply condemn the filing with serial and, always, conclusory accusations that the Complaint, on its face, is barred by limitations.

Plaintiff and her counsel do not think so.  They believe that the limitations extension

86194v2

doctrines cited to the Freishtat Defendants – from the outset – preclude the Freishtat Defendants' too-easy assertion that the Plaintiff's claims are barred by limitations.  Admittedly, the Freishtat Defendants may prove right in the end, *i.e.*, after the facts have been established.  Or, the Plaintiff may prove that her position is right.  For present purposes, however, what matters is that the Plaintiff's position is not unreasonable or vexatious, not asserted for improper purposes, and not unwarranted by the facts or the law.  Accordingly, the Plaintiff's position on limitation issues is not remotely a proper subject of a motion for sanctions.

      C.      **The Alleged Pleading Of "Obviously Defective" Causes Of Action.**

Apart from the Freishtat Defendants' argument that the Plaintiff's claims are barred by limitations, they also allege that they are "obviously defective."  *See* Freishtat Motion for Sanctions at 1-2.  However, nothing in the Freishtat Defendants' memorandum really explains that very conclusory charge.  The Freishtat Defendants' Motion to Dismiss does attack the Complaint by claiming that certain of the Plaintiff's claims should be dismissed.  However, Plaintiff would have expected to defeat that motion to dismiss had the issues been joined on that ground.  If she lost all or part of the motion to dismiss, she would have expected to replead in a manner sufficient to defeat any charges of the Complaint's legal insufficiency.

To the extent the Freishtat Defendants seem to be making a very oblique collateral estoppel/res judicata argument here, keep in mind what they would have to establish: that a corrupted arbitration proceeding against the Sarnoff Endowment on termination issues somehow binds a later judicial proceeding on post-termination issues against individuals who were not parties to the arbitration.  In this context, their argument becomes: I corrupted the process once, and this Court should assist me in retaining the benefits of that prior corruption.  In any event, the collateral estoppel argument doesn't work.  When the Freishtat Defendants served the

86194v2

Plaintiff and Mr. McCarthy with their proposed motion for sanctions on June 29, 2005, Dr. Olivarius and Mr. McCarthy responded with a detailed analysis of the impropriety of the proposed motion. *See* Exhibit 25 to the McCarthy Declaration (July 20, 2005 letter from McCarthy to Frederick). In response, Mr. Frederick asked Mr. Levy to explain to him why the non-mutual collateral estoppel doctrine (as set forth in two cases he identified) didn't apply. Mr. Levy did so in his July 27, 2005 letter to Mr. Frederick, which is Exhibit 26 to the McCarthy Declaration. A chart showing why that doctrine does not apply to Dr. Olivarius' claims was developed in the course of that process. A copy of the chart is attached hereto as Appendix 1.

For present purposes, however, it does not matter whether Plaintiff would have sustained her Complaint in the face of the Freishtat Defendants' motion to dismiss in whole or in substantial part. Nor would it matter, for sanctions purposes, whether the Freishtat Defendants wholly or partially prevailed on one or more motions to dismiss.[13] The propriety of any claims for sanctions depends on whether the specific procedural and substantive requirements on which the claim is based have been satisfied. For all of the reasons noted above, nothing in the proposed motion for sanctions establishes the proposition that the Plaintiff and her lawyers have engaged in sanctionable conduct.

###     D.     The Allegedly Improper Or Frivolous Purposes for the Filing Of The Complaint.

Plaintiff filed her Complaint to protect her right to proceed against the Freishtat Defendants (and the other individual Freishtat Defendants) for their actions in connection with the arbitration and subsequent proceedings. The assertion of that right (which she had never before exercised) was compelled by a looming statute of limitations deadline – March 15, 2005

---

[13]     Otherwise, every lost motion to dismiss would be followed with an award of sanctions against the losing party.

86194v2

being the four-year anniversary of the turnover of the long-concealed Ingwall documents. She would have preferred to have had the final decision of the D.C. Court of Appeals in hand before her filing, but would have risked losing her claims had she waited any longer.

There is nothing frivolous in such a filing, and certainly nothing improper in it. Moreover, despite the Freishtat Defendants' repetitive and wholly-conclusory claims that the filing was somehow "improper" or "frivolous" in purpose, they never explain their bases for claiming that the filing was or is improper or frivolous in purpose. Instead, they offer only conclusory allegations of impropriety or falsity of purpose, buttressed only by more conclusory allegations that everything about the Complaint is frivolous. No such flawed purpose can be inferred. That is so because there never was such an improper purpose.

## IV.   The Remedies That Defendants Seek.

The Freishtat Defendants' motion for sanctions is in purpose and effect a damages action by which they seek to collect damages from the Plaintiff and Mr. McCarthy. That is so though they clearly recognize that any such liability cannot be premised on a filed Complaint.[14]   The measure of their damages, they say, is their "reasonable attorneys' fees."

Plaintiff does not believe that the Freishtat Defendants can so exploit and subvert Rule 11, 28 U.S.C. § 1927 and the inherent power of the courts that they can be used as a post-dismissal substitute for a prohibited damages action. Even if that were the case, however, it seems impossible to believe that the Freishtat Defendants would be awarded the attorneys' fees they incurred when they largely incurred them in: (1) avoiding and attempting to sabotage their own dismissal; and (2) filing a motion for sanctions that is barred by Rule 11 itself.

---

[14]    In his June 29, 2005 letter to Mr. McCarthy and Mr. Levy (Exhibit "19" to the McCarthy Declaration), Mr. Frederick, on behalf of the Defendants noted that "it is clear that statements made by a client in a lawsuit are absolutely privileged."

**V.      Conclusion.**

For all of the foregoing reasons, the Freishtat Defendants' Motion for Sanctions should be denied in all respects.  That motion for sanctions is frivolous, and is offered in bad faith and for an improper purpose (to "inflict pain," to use Mr. Frederick's term).  Accordingly, it is offered in violation of Local Rule 105.8(a) of the United States District Court for the District of Maryland, and should itself be the subject of sanctions.

Respectfully submitted,

_____/s/_____
Andrew D. Levy (Fed. Bar No. 00861)
BROWN, GOLDSTEIN & LEVY, LLP
120 East Baltimore Street, Suite 1700
Baltimore, Maryland 21202
(410) 962-1030

_____/s/_____
James D. McCarthy
DIAMOND McCARTHY TAYLOR FINLEY
BRYANT & LEE, LLP
1201 Elm Street, 34th floor
Dallas, Texas 75270
(214) 389-5300

Attorneys for Dr. Ann McAllister Olivarius

Dated: September 1, 2005

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** this 1st day of September, 2005, that a copy of the foregoing was filed electronically and served on all counsel participating in the Court's ECF system.

_____/s/_____
Andrew D. Levy

-23-

86194v2

# APPENDIX I: COLLATERAL ESTOPPEL CRITERIA[*] – AND THEIR APPLICABILITY TO THE OLIVARIUS COMPLAINT

| The Four Criteria | Relevant Facts in Arbitration Proceedings | Relevant Facts in RICO Case | Comments |
|---|---|---|---|
| 1.  Was the issue decided in the arbitration identical to the one presented in the RICO action? | The arbitration with the Endowment concerned her wrongful termination. | The RICO action against the individual Defendants (and not the Endowment) was concerned with those individual Defendants post-termination behavior. That issue could not have been brought in the arbitration or decided by the arbitrator (as the Defendants were not parties to the arbitration agreement and the arbitrator would not have been empowered to decide the controversy). | No.  The Defendants fail to satisfy the first criterion. |
| 2.  Was there a final judgment on the merits in the arbitration? | No final judgment at the time the RICO action was filed. | Case voluntarily dismissed. | No, not at the time of filing. |
| 3.  Was the party against whom the plea is asserted (Dr. Olivarius) a party or in privity with a party to the arbitration? | Dr. Olivarius was a party. | Dr. Olivarius was a party. | Yes.  They do satisfy the third criterion. |
| 4.  Was the party against whom the plea is asserted (Dr. Olivarius) given fair opportunity (in the arbitration) to be heard on the issue sought to be barred in the RICO action? | 1.  The arbitration did not and could not concern the individual Defendants' misconduct in the arbitration and thereafter.  That issue could not have been brought in arbitration or decided by the arbitrator (as the Defendants were not parties to the arbitration agreement and the arbitrator could not have been empowered to decide the controversy).  Accordingly, Dr. Olivarius could not and was not heard on the issue.<br><br>2.  Dr. Olivarius was unaware of the RICO action issues at the time of the arbitration.<br><br>3.  Because she was unaware of the issues and because of the misconduct of the individual defendants in the arbitration, she was not given a fair opportunity in the arbitration to be heard on the RICO action issues. | 1.  The RICO action presents different issues, some of which did not even exist at the time of the arbitration.<br><br>2.  Chronologically, the issues raised in the RICO action could not have been raised during the arbitration because Dr. Olivarius did not have the Ingwall papers until long after the fact-finding in the arbitration had been concluded.  Thus, at the time of the arbitration, she did not even know of the issue.<br><br>3.  It is precisely because of the Defendants' misconduct in the arbitration and subsequent proceedings that Dr. Olivarius was not given a fair opportunity to be heard on those issues that were presented in the prior arbitration. | No.  The Defendants fail to satisfy the fourth criterion. |

[*]  Res judicata does not apply because the second (RICO action) proceeding: (1) did not present claims identical to those asserted in the first (arbitration) proceeding; and (2) did not involve the same parties.  For those reasons, among others, the Freishtat Defendants' argument should be reduced to a collateral estoppel argument only.  (In their correspondence, the Freishtat Defendants seem to realize that.  That is why they are now making their argument in terms of "non-mutual collateral estoppel".)

The collateral estoppel criteria referenced above are those identified in the *Colandrea v. Wilde Lake Community Ass'n, Inc.*, 361 Md. 371, 390-392, 761 A.2d 899, 908-910 (2000) and *Washington Suburban Sanitary Comm'n v. TKU Assoc., 281 Md 1,* 18-19, 376 A.2d 505, 514 (1977), cases supplied by the Freishtat Defendants' attorney, Mr. Frederick.

It is also important to note that the collateral estoppel analysis described here will have to be applied to each and every single factual issue that the Freshtat Defendants' claim should be barred – a task of tremendous magnitude in a case with such factual and procedural complicity.